## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ESTATE OF YONA BETZALEL BRIEF,**
By David Chaim Brief, as
Representative,

**DAVID CHAIM BRIEF,**

**HAZEL SUSAN KASSEL BRIEF,**

**MICHA NAFTALIE BRIEF,**

**LIBI BRIEF ALUSH,**

**YASMINA TAMAR BRIEF,**

**AVIEL SIMCHA BRIEF,**

**NAVA SHIREL BRIEF,**

**ADI ALEXANDER,**

**YAEL ALEXANDER,**

**MIKA ALEXANDER,**

**R.A.,**
By Adi Alexander, as Next Friend,

**ESTATE OF DANIEL BEN SENIOR,**
By Shay Ben Senior, as Representative,

**ESTATE OF PERRY BEN SENIOR,**
By Shay Ben Senior, as Representative,

**ESTATE OF JACOB BEN SENIOR,**
By Shay Ben Senior, as Representative,

**SHAY BEN SENIOR,**

**AVIRAM ABRAHAM BEJERANO,**

**NOAH SAMUEL BRADSHAW,**

Civil Action No.: 1:25-3264

**FLOR NOFAR BRADSHAW,**

**NOFYA LEVI,**

**RON SIMCHI,**

**TZIONA MALKA SIMCHI,**

**M.S.,**
By Ron Simchi, as Next Friend,

**JONATHAN DEKEL-CHEN,**

**BEN ODLES GEWIRTZMAN,**

**EDEN ODLES GEWIRTZMAN,**

**SHERRI GEWIRTZMAN,**

**OFER ODLES,**

**ESTATE OF ADRIENNE ANNE NETA,**
By Nahar Neta, as Representative,

**NAHAR NETA,**

**DROR NETA,**

**AYANA NETA,**

**CARMEL NETA,**

**CHEN ZEIGEN,**

**ESTATE OF ETAI COHEN,**
By Yaniv Yacov Cohen, as
Representative,

**ORTAL PNINA COHEN,**

**N.C.,**
By Yaniv Yacov Cohen, as Next Friend,

**OFEK HANA COHEN,**

**JULIANA SHARONI,**

**E.S.,**
By Juliana Sharoni, as Next Friend,

**LUCIANA GANACH,**

**ANITA SCHWADRON TREGER,**

**RAY COOPER,**

**ORA COOPER,**

**ZIONAH ALEXANDRA WINITZKY,**

**CARMI RUTH SPIWACK HOLTZER,**

**DAVID GARY HOLTZER,**

**NOAM GALIT EDRI,**

**ILAN YOSEF HOLTZER,**

**YONATAN MORDECHAI HOLTZER,**

**LOTAN RAANAN HOLTZER,**

**Y.H.,**
By Ilan Yosef Holtzer, as Next Friend,

**L.H.,**
By Ilan Yosef Holtzer, as Next Friend,

**M.H.,**
By Ilan Yosef Holtzer, as Next Friend,

**TIRTZA ELMALIACH WAISBERG,**

**LEV WAISBERG,**

**L.W.,**

By Tirtza Elmaliach Waisberg, as Next
Friend,

**N.W.,**
By Tirtza Elmaliach Waisberg, as Next
Friend,

**NAOMI FAYE SANDERS,**

**DAVID JACOB SANDERS,**

**HILA SANDERS,**

**RACHEL ESTHER SANDERS,**

**YAIR BELLER,**

**ARNONA SHAPIRO-BELLER,**

**NOAM MENACHEM BELLER,**

**ISAAC BELLER,**

**YEHUDA SHMUEL BELLER,**

**HADASSA DEVORAH MALKA
BELLER COHEN,**

**ASHIRA BELLER,**

**LIOR YOVEL BAR-OR,**

**MARC LEON BRAWER,**

**ZOHAR TZLIL BAR-OR,**

**HILA MALKA BAR-OR,**

**MATAN ELIYAHU BOLTAX,**

**JONATHAN MARSHALL BOLTAX,**

**ARLYN BARRIE BOLTAX,**

**ELIORA YERUSHALAIM
BOLTAX,**

**AMICHAI YISRAEL BOLTAX,**

**N.E.B.,**
By Jonathan Marshall Boltax, as Next
Friend,

**NAOR TZION TZEDEK BOLTAX.,**

**DAVID TUVIAL BROMBERG,**

**ISAAC SAMUEL BROMBERG,**

**RACHEL BROMBERG,**

**ELISHEVA RENA BROMBERG,**

**YEHUDA ARYEH BROMBERG,**

**RIVKA CHAYA STRAUSS,**

**YEHUDA PESACH STRAUSS,**

**L.S.S.,**
By Yehuda Pesach Strauss, as Next
Friend,

**L.Y.S.,**
By Yehuda Pesach Strauss, as Next
Friend

**STEPHANIE CHERYL STRAUSS,**

**SHLOMO AKIVA STRAUSS,**

**EZRA MORDECHAI STRAUSS,**

**MEIRA BATYA LERNER,**

**GAL BUKSPAN,**

**DAVID ENGLANOFF,**

**SAMUEL ENGLANOFF,**

**MORDECHAI NISSIM ENGLANOFF,**

**DEBORAH ITZHAK,**

**SHLOMO ENGLANOFF,**

**SHEEREL GABAY,**

**GIL GABAY,**

**LIRON MAZEH GABAY,**

**OREL GABAY,**

**LIOR GELBAUM,**

**DANIELLE GELBAUM,**

**GILAD KARPLUS,**

**HADAR KLEIN,**

**SHAY KLEIN,**

**YONAT KLEIN,**

**NITAI KLEIN,**

**ELI KLEIN,**

**ORI LEVY,**

**NADIR LEVY,**

**CARMEL MEDALIA,**

**AVISHAG SHILAT OVED,**

**AVIVAH MIRIAM OVED,**

**A.O.,**
By Ronen Oved, as Next Friend,

**Av.O.,**
By Ronen Oved, as Next Friend,

**AVIV OZ,**

**NAVA OZ,**

**HADAR OZ,**

**GAL PORAT,**

**MAYA SHAHAM,**

**STACY MARLA SHAHAM,**

**AVIV SHAHAM,**

**OREN SHAHAM,**

**OFIR TAL,**

**SHELLEY SHARON WEISBERGER,**

**KEITH STEWART WEISBERGER,**

**ITAMAR YEHUDA SHAPIRA,**

**AMY LAUREN SHAPIRA,**

**YIFTACH SHAPIRA,**

**N.S.,**
By Amy Lauren Shapira, as Next Friend,

**SHARON SHOSHANA FIORENTINO,**

**ORA SHTRULL,**

**IZAK SHTRULL,**

**OFIR SHTRULL,**

**NATALIE SHTRULL,**

**ELEANOR SHTRULL,**

**LEE DEKALO,**

**TOMER YEHUDA MAOZ,**

**CARMI LISA TINT,**

**AMI ESTELLE TINT,**

**ARIN LEE TINT,**

**NOA MICHELLE TINT,**

**GUY ALON PAUL,**

**LAWRENCE ELLIOT PAUL,**

          **Plaintiffs,**

    **v.**

**ISLAMIC REPUBLIC OF IRAN,**
Ministry of Foreign Affairs
Khomeini Avenue
Tehran, IRAN

**ISLAMIC REVOLUTIONARY
GUARD CORPS,**
Ministry of Foreign Affairs
Khomeini Avenue
Tehran, IRAN

**HARAKAT AL-MUQAWAMA AL-
ISLAMIYA (a/k/a HAMAS),**
c/o Waqfiya Al-Ri'aya Al-Usra Al-
Filistinya Wa Al-Lubnanya
P.O. Box: 1267925
Beirut, LEBANON

**PALESTINIAN ISLAMIC JIHAD,**
c/o Al Ihsan Charitable Society
Al-Iman – Fathi Al-Ahmad Building
Jenin, Palestinian Authority

**THE POPULAR FRONT FOR THE
LIBERATION OF PALESTINE,**
c/o Health Work Committees,

Al-Fardan Martyrs Street
P.O. Box 3966
Ramallah – Al Bireh
Palestinian Territories

**THE DEMOCRATIC FRONT FOR THE LIBERATION OF PALESTINE,**
Gaza Strip, Palestinian Territories

**THE AL-AQSA MARTYRS BRIGADE,**
Gaza Strip, Palestinian Territories

**THE POPULAR RESISTANCE COMMITTEES,**
Gaza Strip, Palestinian Territories

**THE PALESTINIAN MUJAHIDEEN MOVEMENT,**
Gaza Strip, Palestinian Territories

**HEZBOLLAH,**
(a/k/a Hizbullah, Hezballah, Hizballah)
c/o The Martyrs Foundation (Al Shahid)
1st Floor - Saadeh & Sawaya Bldg -
Main Road – Kafaat, Hadath
LEBANON

**SYRIAN ARAB REPUBLIC,**
Ministry of Foreign Affairs
Damascus, SYRIA

**DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,**
Ministry of Foreign Affairs
Jungson-Dong Central District
Pyongyang, NORTH KOREA

**Defendants.**

# **COMPLAINT**

1.      At daybreak on Saturday, October 7, 2023, thousands of terrorists—led by Hamas but including members of at least seven different militant terrorist groups—swarmed into Israeli communities near the Israel-Gaza border and brutally massacred and terrorized innocent men, women, and children in their wake (the "October 7 Attack" or the "Attack"). The October 7 Attack was the deadliest attack on Jewish people since the Holocaust, though the terrorists' rampage killed, injured, and terrorized Jews and non-Jews alike. Victims of the onslaught included Israelis (both Jews and Arabs), dual nationals (including many American citizens), foreign workers, people simply visiting their families for the Jewish holidays of *Sukkot* and *Simchat Torah*, and the mostly young people attending a music festival celebrating peace and love. It was a terrorist attack of pure and indiscriminate brutality.

2.      First, the terrorists launched thousands of rockets, missiles, and armed drones into Israel. Some of these specifically targeted Israeli guard posts and surveillance, communication, and other security and defensive systems to pave the way for an all-out attack. Next, droves of armed terrorists breached the security fence separating Gaza from Israel in dozens of locations, allowing for attackers to infiltrate on motorcycles and in trucks. Some terrorists also paraglided into Israel, while others stormed Israeli beaches on motorboats. The terrorists then went on a barbaric rampage, murdering and injuring innocent victims—men, women, the elderly, teenagers, toddlers, and babies—on the streets and in their cars, homes, and wherever else they could be found.

3.      The unfathomable atrocities the terrorists committed as part of their massacre included rape, mutilation, decapitation, torture, and burning human beings alive, including full families huddled together in their final, terrifying moments. The terrorists ripped hostages from their homes, places of work, and wherever else they could be found, including hiding in places

such as "safe rooms" or bomb shelters, murdering some and holding others as leverage, bargaining chips, and human shields.  The terrorists continue to this day to hold 48 hostages from the October 7 Attack—innocent people who were stolen from their families and their lives.  It is unknown how many are dead or alive, or what brutal torture the terrorists have wreaked upon them.

4.      In a horrifying scene of vicious dichotomy, the murderous terrorists stormed through the Nova Music Festival—an open-air festival celebrating music, love, and unity— hunting down and indiscriminately murdering over 350 innocent celebrants, many as they desperately tried to flee to safety, and injuring and terrorizing thousands, mostly young people. The festival was advertised as "one of the biggest, most influential, and revered festivals in the world," taking place "for the very first time in Israel."  It was designed to bring together a "massive community, which has been built over 23 years, inspiring people globally across continents," and promoting "a set of fundamental and important human values," including "free love and spirit, environmental preservation, [and] appreciation of rare natural values."  Those who miraculously survived the onslaught bear the permanent scars of the horrors they experienced, and the friends and family they lost.

5.      The terrorists were not an independent band of marauders.  They were organized death squads deployed by their terrorist organizations, and supported, funded, and supplied by terrorist-sponsoring countries and terrorist groups, who have consistently supported and sponsored terrorist attacks on Americans and their allies, including in Israel, and continue to do so today.

6.      Plaintiffs in this case are individuals, and the estates of individuals, who were killed, taken hostage, and/or physical and/or emotionally injured in the October 7 Attack, and immediate family members of those victims.

7.      Plaintiffs, by and through undersigned counsel, bring this action against Defendants Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, the Democratic Front for the Liberation of Palestine, the al-Aqsa Martyrs Brigade, the Popular Resistance Committees, and the Palestinian Mujahideen Movement (collectively the "Gaza Terrorist Group Defendants," and with Hezbollah, the "Terrorist Group Defendants"); Hezbollah; and the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea (collectively the "FSIA Defendants"), seeking money damages for their personal injury and/or wrongful death claims arising out of the October 7 Attack—a coordination of extrajudicial killings, hostage takings, and related horrors planned and perpetrated by Defendants, and for which Defendants provided material support and resources.  In support of their claims, Plaintiffs allege the following:

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this case against the FSIA Defendants under 28 U.S.C. 1330(a).  The FSIA Defendants are subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., and in particular 28 U.S.C. § 1605A (the "Terrorism Exception"), and related statutes.

9.      This Court has jurisdiction over the subject matter of this case against the Terrorist Group Defendants under 28 U.S.C. § 1331 because this case arises under the laws of the United States.  The Terrorist Group Defendants are subject to suit in the courts of the United States under the Anti-Terrorism Act, 18 U.S.C. § 2333.

10.    Venue is proper in this District under 28 U.S.C. § 1391(f)(4) and 28 U.S.C. § 1391(b)(3).

## THE PARTIES

### PLAINTIFFS

11.    Plaintiffs are U.S. citizens who were injured and/or killed as a result of the October 7 Attack, and/or the immediate family members of those injured and/or killed.

**A.    Brief Family**

12.    Yona Betzalel Brief, now deceased, was a victim of the October 7 Attack.  Yona Betzalel Brief was injured and, after an extended period of extreme suffering, succumbed to his injuries, as a result of the Attack.  At the time of the acts alleged herein, Yona Betzalel Brief was a U.S. Citizen.  Yona Betzalel Brief was killed by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, 28 U.S.C. 1350 note, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Yona Betzalel Brief's estate is governed by the laws of Israel.  The Estate of Yona Betzalel Brief is represented by David Chaim Brief for purposes of this lawsuit.  David Chaim Brief, on behalf of the Estate of Yona Betzalel Brief, brings claims for wrongful death, personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

13.    David Chaim Brief is the father of Yona Betzalel Brief, who was killed as a result of the October 7 Attack.  David Chaim Brief is a U.S. citizen.  David Chaim Brief brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

14.    Hazel Susan Kassel Brief is the mother of Yona Betzalel Brief, who was killed as a result of the October 7 Attack.  Hazel Susan Kassel Brief is a U.S. citizen.  Hazel Susan Kassel

Brief brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

15.     Micha Naftalie Brief is the brother of Yona Betzalel Brief, who was killed as a result of the October 7 Attack. Micha Naftalie Brief is a U.S. citizen. Micha Naftalie Brief brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

16.     Libi Brief Alush is the sister of Yona Betzalel Brief, who was killed as a result of the October 7 Attack. Libi Brief Alush is a U.S. citizen. Libi Brief Alush brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

17.     Yasmina Tamar Brief is the sister of Yona Betzalel Brief, who was killed as a result of the October 7 Attack. Yasmina Tamar Brief is a U.S. citizen. Yasmina Tamar Brief brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

18.     Aviel Simcha Brief is the brother of Yona Betzalel Brief, who was killed as a result of the October 7 Attack. Aviel Simcha Brief is a U.S. citizen. Aviel Simcha Brief brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

19.     Nava Shirel Brief is the sister of Yona Betzalel Brief, who was killed as a result of the October 7 Attack. Nava Shirel Brief is a U.S. citizen. Nava Shirel Brief brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**B.    Alexander Family**

20.    Edan Alexander was a victim of the October 7 Attack.  Edan was injured and taken hostage during the Attack.  Edan Alexander was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

21.    Adi Alexander is the father of Edan Alexander, who was injured and taken hostage as a result of the October 7 Attack.  Adi Alexander is a U.S. citizen.  Adi Alexander brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

22.    Yael Alexander is the mother of Edan Alexander, who was injured and taken hostage as a result of the October 7 Attack.  Yael Alexander is a U.S. citizen.  Yael Alexander brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

23.    Mika Alexander is the sister of Edan Alexander, who was injured and taken hostage as a result of the October 7 Attack.  Mika Alexander is a U.S. citizen.  Mika Alexander brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

24.    R.A. is the brother of Edan Alexander, who was injured and taken hostage as a result of the October 7 Attack.  R.A. is a U.S. citizen.  R.A., a minor child, is represented by Adi Alexander as Next Friend for the purposes of this lawsuit.  Adi Alexander, on behalf of R.A., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

C.    **Ben Senior Family**

25.    Daniel Ben Senior, now deceased, was murdered in the October 7 Attack, after suffering severe physical and emotional injury as a result of the Attack.  At the time of the acts alleged herein, Daniel Ben Senior was a U.S. Citizen.  Daniel Ben Senior was killed by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, 28 U.S.C. 1350 note, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Daniel Ben Senior's estate is governed by the laws of Israel.  The Estate of Daniel Ben Senior is represented by Shay Ben Senior for purposes of this lawsuit.  Shay Ben Senior, on behalf of the Estate of Daniel Ben Senior, brings claims for wrongful death, personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

26.    Perry Ben Senior, now deceased, was the mother of Daniel Ben Senior, a U.S. Citizen, who was killed as a result of the October 7 Attack.  Perry Ben Senior was a U.S. citizen. Perry Ben Senior's estate is governed by the laws of Israel.  The Estate of Perry Ben Senior is represented by Shay Ben Senior for purposes of this lawsuit.  Shay Ben Senior, on behalf of the Estate of Perry Ben Senior, brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

27.    Jacob Ben Senior, now deceased, was the father of Daniel Ben Senior, who was killed as a result of the October 7 Attack.  Jacob Ben Senior was a U.S. citizen.  Jacob Ben Senior's estate is governed by the laws of Israel.  The Estate of Jacob Ben Senior is represented by Shay Ben Senior for purposes of this lawsuit.  Shay Ben Senior, on behalf of the Estate of Jacob Ben Senior, brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

28.     Shay Ben Senior is the brother of Daniel Ben Senior, who was killed as a result of the October 7 Attack.  Shay Ben Senior is a U.S. citizen.  Shay Ben Senior brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

29.     Aviram Abraham Bejerano is the brother of Daniel Ben Senior, who was killed as a result of the October 7 Attack.  Aviram Abraham Bejerano is a U.S. citizen.  Aviram Abraham Bejerano brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**D.     Bradshaw (Noah) Family**

30.     Noah Samuel Bradshaw was a victim of the October 7 Attack.  At the time of the acts alleged herein, Noah Samuel Bradshaw was a U.S. citizen.  Noah Samuel Bradshaw was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Noah Samuel Bradshaw brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

31.     Flor Nofar Bradshaw is the wife of Noah Samuel Bradshaw, who was injured as a result of the October 7 Attack.  Flor Nofar Bradshaw is an Israeli citizen.  Flor Nofar Bradshaw brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**E.     Bradshaw (Flor) Family**

32.     Flor Nofar Bradshaw was a victim of the October 7 Attack. Flor Nofar Bradshaw was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28

U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

33.     Noah Samuel Bradshaw is the husband of Flor Nofar Bradshaw, who was injured as a result of the October 7 Attack.  Noah Samuel Bradshaw is a U.S. citizen.  Noah Samuel Bradshaw brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**F.     Levi Family**

34.     Roi Levi was a victim of the October 7 Attack.  Roi Levi was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

35.     Nofya Levi is the wife of Roi Levi, who was injured as a result of the October 7 Attack.  Nofya Levi is a U.S. citizen.  Nofya Levi brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**G.     Simchi (Ron) Family**

36.     Ron Simchi was a victim of the October 7 Attack.  At the time of the acts alleged herein, Ron Simchi was a U.S. citizen.  Ron Simchi was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Ron Simchi brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

37.    Tziona Malka Simchi is the wife of Ron Simchi, who was injured as a result of the October 7 Attack.  Tziona Malka Simchi is a U.S. citizen.  Tziona Malka Simchi brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

38.    M.S. is the daughter of Ron Simchi, who was injured as a result of the October 7 Attack.  M.S. is a U.S. citizen.  M.S., a minor child, is represented by Ron Simchi as Next Friend for purposes of this lawsuit.  Ron Simchi, on behalf of M.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**H.    Simchi (Tziona) Family**

39.    Tziona Malka Simchi was a victim of the October 7 Attack.  At the time of the acts alleged herein, Tziona Malka Simchi was a U.S. citizen.  Tziona Malka Simchi was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Tziona brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

40.    Ron Simchi is the husband of Tziona Malka Simchi, who was injured as a result of the October 7 Attack.  Ron Simchi is a U.S. citizen.  Ron Simchi brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

41.    M.S. is the daughter of Tziona Malka Simchi, who was injured as a result of the October 7 Attack.  M.S. is a U.S. citizen.  M.S., a minor child, is represented by Ron Simchi as

Next Friend for purposes of this lawsuit.  Ron Simchi, on behalf of M.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## I.     Simchi (M.S.) Family

42.     M.S. was a victim of the October 7 Attack.  At the time of the acts alleged herein, M.S. was a U.S. citizen.  M.S. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  M.S., a minor child, is represented by Ron Simchi as Next Friend for purposes of this lawsuit.  Ron Simchi, on behalf of M.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

43.     Ron Simchi is the father of M.S., who was injured as a result of the October 7 Attack.  Ron Simchi is a U.S. citizen.  Ron Simchi brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

44.     Tziona Simchi is the mother of M.S., who was injured as a result of the October 7 Attack.  Tziona Simchi is a U.S. citizen.  Tziona Simchi brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## J.     Dekel-Chen (Sagui) Family

45.     Sagui Dekel-Chen was a victim of the October 7 Attack.  Sagui was injured and taken hostage during the Attack.  Sagui Dekel-Chen was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and

1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

46.     Jonathan Dekel-Chen is the father of Sagui Dekel-Chen, who was injured and taken hostage during the October 7 Attack. Jonathan Dekel-Chen is a U.S. citizen.  Jonathan Dekel-Chen brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**K.     Dekel-Chen (Ophir) Family**

47.     Ophir Dekel-Chen was a victim of the October 7 Attack. Ophir Dekel-Chen was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

48.     Jonathan Dekel-Chen is the father of Ophir Dekel-Chen, who was injured during the October 7 Attack. Jonathan Dekel-Chen is a U.S. citizen.  Jonathan Dekel-Chen brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**L.     Odles Gewirtzman Family**

49.     Ben Odles Gewirtzman was a victim of the October 7 Attack.  At the time of the acts alleged herein, Ben Odles Gewirtzman was a U.S. citizen.  Ben Odles Gewirtzman was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Ben Odles Gewirtzman brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

50.    Eden Odles Gewirtzman is the sister of Ben Odles Gewirtzman, who was injured during the October 7 Attack. Eden Odles Gewirtzman is a U.S. citizen.  Eden Odles Gewirtzman brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

51.    Sherri Gewirtzman is the mother of Ben Odles Gewirtzman, who was injured during the October 7 Attack. Sherri Gewirtzman is a U.S. citizen.  Sherri Gewirtzman brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

52.    Ofer Odles is the father of Ben Odles Gewirtzman, who was injured during the October 7 Attack. Ofer Odles is an Israeli citizen.  Ofer Odles brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**M.    Neta Family**

53.    Adrienne Anne Neta (a.k.a.  Adrienne Anne Lampard), now deceased, was murdered in the October 7 Attack, after suffering severe physical and emotional injury as a result of the Attack.  At the time of the acts alleged herein, Adrienne Anne Neta was a U.S. citizen. Adrienne Anne Neta was killed by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Adrienne Anne Neta's estate is governed by the laws of Israel.  The Estate of Adrienne Anne Neta is represented by Nahar Neta for purposes of this lawsuit.  Nahar Neta, on behalf of the Estate of Adrienne Anne Neta, brings claims for wrongful death, personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

54.     Nahar Neta is the son of Adrienne Anne Neta, who was killed as a result of the October 7 Attack.  Nahar Neta is a U.S. citizen.  Nahar Neta brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

55.     Dror Neta is the daughter of Adrienne Anne Neta, who was killed as a result of the October 7 Attack.  Dror Neta is a U.S. citizen.  Dror Neta brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

56.     Ayana Neta is the daughter of Adrienne Anne Neta, who was killed as a result of the October 7 Attack.  Ayana Neta is a U.S. citizen.  Ayana Neta brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

57.     Carmel Neta is the son of Adrienne Anne Neta, who was killed as a result of the October 7 Attack.  Carmel Neta is a U.S. citizen.  Carmel Neta brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**N.     Silver/Zeigen Family**

58.     Vivian Silver was murdered in the October 7 Attack, after suffering severe physical and emotional injury as a result of the Attack. Vivian Silver was killed by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the Trafficking Victims Protection Act ("TVPA"), and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

59.      Chen Zeigen is the son of Vivian Silver, who was killed as a result of the October 7 Attack.  Chen Zeigen is a U.S. citizen.  Chen Zeigen brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**O.      Cohen Family**

60.      Etai Cohen, now deceased, was murdered in the October 7 Attack, after suffering severe physical and emotional injury as a result of the Attack.  At the time of the acts alleged herein, Etai Cohen was a U.S. citizen.  Etai Cohen was killed by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Etai Cohen's estate is governed by the laws of Israel. The Estate of Etai Cohen is represented by Yaniv Yacov Cohen for purposes of this lawsuit. Yaniv Yacov Cohen, on behalf of the Estate of Etai Cohen, brings claims for wrongful death, personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

61.      Ortal Pnina Cohen (a.k.a. Ortal Pnina Katz) is the mother of Etai Cohen, who was killed as a result of the October 7 Attack.  Ortal Pnina Cohen is a U.S. citizen.   Ortal Pnina Cohen brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

62.      N.C. is the brother of Etai Cohen, who was killed as a result of the October 7 Attack.  N.C. is a U.S. citizen.  N.C., a minor child, is represented by Yaniv Yacov Cohen as Next Friend for purposes of this lawsuit. Yaniv Yacov Cohen, on behalf of N.C., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

63.    Ofek Hana Cohen is the sister of Etai Cohen, who was killed as a result of the October 7 Attack.  Ofek Hana Cohen is a U.S. citizen.  Ofek Hana Cohen brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**P.    Sharoni/Herszkowicz (Juliana) Family**

64.    Juliana Sharoni (a.k.a. Juliana Hershkoviz Johnson) was a victim of the October 7 Attack.  At the time of the acts alleged herein, Juliana Sharoni was a U.S. citizen.  Juliana Sharoni was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Juliana Sharoni brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

65.    E.S. is the daughter of Juliana Sharoni, who was injured as a result of the October 7 Attack.  E.S. is a U.S. citizen.  E.S., a minor child, is represented by Juliana Sharoni as Next Friend for purposes of this lawsuit.  Juliana Sharoni, on behalf of E.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

66.    Luciana Ganach is the sister of Juliana Sharoni, who was injured as a result of the October 7 Attack.  Luciana Ganach is a U.S. citizen.  Luciana Ganach brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**Q.    Sharoni/Herszkowicz (E.S.) Family**

67.    E.S. was a victim of the October 7 Attack.  At the time of the acts alleged herein, E.S. was a U.S. citizen.  E.S. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  E.S., a minor child, is represented by Juliana Sharoni as Next Friend for purposes of this lawsuit.  Juliana Sharoni, on behalf of E.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

68.    Juliana Sharoni is the mother of E.S., who was injured as a result of the October 7 Attack.  Juliana Sharoni is a U.S. citizen.  Juliana Sharoni brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**R.    Sharoni/Herszkowicz (Sueli) Family**

69.    Sueli Herszkowicz was a victim of the October 7 Attack. Sueli Herszkowicz was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

70.    Juliana Sharoni is the daughter of Sueli Herszkowicz, who was injured as a result of the October 7 Attack. Juliana Sharoni is a U.S. citizen. Juliana Sharoni brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

71. Luciana Ganach is the daughter of Sueli Herszkowicz, who was injured as a result of the October 7 Attack. Luciana Ganach is a U.S. citizen. Luciana Ganach brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**S.    Treger Family**

72. Maya Treger Rosenfeld was a victim of the October 7 Attack. Maya Treger Rosenfeld was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

73. Anita Schwadron Treger is the mother of Maya Treger Rosenfeld, who was injured as a result of the October 7 Attack. Anita Schwadron Treger is a U.S. citizen. Anita Schwadron Treger brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**T.    Cooper (Amiram) Family**

74. Amiram Cooper, now deceased, was a victim of the October 7 Attack. Amiram Cooper was injured and taken hostage in the Attack, and was later killed in Hamas captivity as a result of the Attack. Amiram Cooper was injured and killed by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

75. Ray Cooper (a.k.a. Rotem Cooper) is the son of Amiram Cooper, who was injured, taken hostage, and then killed, as a result of the October 7 Attack. Ray Cooper is a U.S.

citizen.  Ray Cooper brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

76.    Ora Cooper is the sister of Amiram Cooper, who was injured, taken hostage, and then killed, as a result of the October 7 Attack.  Ora Cooper is a U.S. citizen.  Ora Cooper brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**U.    Cooper (Nurit) Family**

77.    Nurit Cooper was a victim of the October 7 Attack.  Nurit Cooper was injured and taken hostage in the Attack. Nurit Cooper was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

78.    Ray Cooper (a.k.a. Rotem Cooper) is the son of Nurit Cooper, who was injured and taken hostage as a result of the October 7 Attack.  Ray Cooper is a U.S. citizen.  Ray Cooper brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**V.    Holtzer/Winitzky (Zionah) Family**

79.    Zionah Alexandra Winitzky (a.k.a. Zionah Alexandra Holtzer) was a victim of the October 7 Attack.  At the time of the acts alleged herein, Zionah Alexandra Winitzky was a U.S. citizen.  Zionah Alexandra Winitzky was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Zionah Alexandra Winitzky brings claims for personal injury, pain

and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

80. Carmi Ruth Spiwack Holtzer is the mother of Zionah Alexandra Winitzky, who was injured as a result of the October 7 Attack. Carmi Ruth Spiwack Holtzer is a U.S. citizen. Carmi Ruth Spiwack Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

81. David Gary Holtzer is the father of Zionah Alexandra Winitzky, who was injured as a result of the October 7 Attack. David Gary Holtzer is a U.S. citizen. David Gary Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

82. Noam Galit Edri (a.k.a. Noam Galit Holtzer) is the sister of Zionah Alexandra Winitzky, who was injured as a result of the October 7 Attack. Noam Galit Edri is a U.S. citizen. Noam Galit Edri brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

83. Ilan Yosef Holtzer is the brother of Zionah Alexandra Winitzky, who was injured as a result of the October 7 Attack. Ilan Yosef Holtzer is a U.S. citizen. Ilan Yosef Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

84. Yonatan Mordechai Holtzer is the brother of Zionah Alexandra Winitzky, who was injured as a result of the October 7 Attack. Yonatan Mordechai Holtzer is a U.S. citizen. Yonatan Mordechai Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

85. Lotan Raanan Holtzer is the brother of Zionah Alexandra Winitzky, who was injured as a result of the October 7 Attack. Lotan Raanan Holtzer is a U.S. citizen. Lotan Raanan Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**W.    Winitzky (Michael) Family**

86. Michael Winitzky was a victim of the October 7 Attack. Michael Winitzky was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

87. Zionah Alexandra Winitzky is the wife of Michael Winitzky, who was injured as a result of the October 7 Attack. Zionah Alexandra Winitzky is a U.S. citizen. Zionah Alexandra Winitzky brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**X.    Winitzky (S.W.) Family**

88. S.W. was a victim of the October 7 Attack. S.W. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

89. Zionah Alexandra Winitzky is the mother of S.W., who was injured as a result of the October 7 Attack. Zionah Alexandra Winitzky is a U.S. citizen. Zionah Alexandra Winitzky brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**Y.** **Holtzer/Winitzky (David) Family**

90.    David Gary Holtzer was a victim of the October 7 Attack.  At the time of the acts alleged herein, David Gary Holtzer was a U.S. citizen.  David Gary Holtzer was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  David Gary Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

91.    Carmi Ruth Spiwack Holtzer is the wife of David Gary Holtzer, who was injured as a result of the October 7 Attack.  Carmi Ruth Spiwack Holtzer is a U.S. citizen.  Carmi Ruth Spiwack Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

92.    Zionah Alexandra Winitzky (a.k.a. Zionah Alexandra Holtzer) is the daughter of David Gary Holtzer, who was injured as a result of the October 7 Attack.  Zionah Alexandra Winitzky is a U.S. citizen.  Zionah Alexandra Winitzky brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

93.    Noam Galit Edri is the daughter of David Gary Holtzer, who was injured as a result of the October 7 Attack.  Noam Galit Edri is a U.S. citizen.  Noam Galit Edri brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

94.    Ilan Yosef Holtzer is the son of David Gary Holtzer, who was injured as a result of the October 7 Attack.  Ilan Yosef Holtzer is a U.S. citizen.  Ilan Yosef Holtzer brings claims

for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

95.     Yonatan Mordechai Holtzer is the son of David Gary Holtzer, who was injured as a result of the October 7 Attack.  Yonatan Mordechai Holtzer is a U.S. citizen.  Yonatan Mordechai Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

96.     Lotan Raanan Holtzer is the son of David Gary Holtzer, who was injured as a result of the October 7 Attack.  Lotan Raanan Holtzer is a U.S. citizen.  Lotan Raanan Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**Z.     Edri/Holtzer (Noam) Family**

97.     Noam Galit Edri was a victim of the October 7 Attack.  At the time of the acts alleged herein, Noam Galit Edri was a U.S. citizen.  Noam Galit Edri was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Noam Galit Edri brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

98.     David Gary Holtzer is the father of Noam Galit Edri, who was injured as a result of the October 7 Attack.  David Gary Holtzer is a U.S. citizen.  David Gary Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

99.    Carmi Ruth Spiwack Holtzer is the mother of Noam Galit Edri, who was injured as a result of the October 7 Attack. Carmi Ruth Spiwack Holtzer is a U.S. citizen. Carmi Ruth Spiwack Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

100.    Zionah Alexandra Winitzky is the sister of Noam Galit Edri, who was injured as a result of the October 7 Attack. Zionah Alexandra Winitzky is a U.S. citizen. Zionah Alexandra Winitzky brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

101.    Ilan Yosef Holtzer is the brother of Noam Galit Edri, who was injured as a result of the October 7 Attack. Ilan Yosef Holtzer is a U.S. citizen. Ilan Yosef Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

102.    Yonatan Mordechai Holtzer is the brother of Noam Galit Edri, who was injured as a result of the October 7 Attack. Yonatan Mordechai Holtzer is a U.S. citizen. Yonatan Mordechai Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

103.    Lotan Raanan Holtzer is the brother of Noam Galit Edri, who was injured as a result of the October 7 Attack. Lotan Raanan Holtzer is a U.S. citizen. Lotan Raanan Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## AA.    Edri (R.E.) Family

104.    R.E. was a victim of the October 7 Attack. R.E. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and

1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

105.    Noam Galit Edri is the mother of R.E., who was injured as a result of the October 7 Attack.  Noam Galit Edri is a U.S. citizen.  Noam Galit Edri brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**BB.    Holtzer (Ilan) Family**

106.    Ilan Yosef Holtzer was a victim of the October 7 Attack.  At the time of the acts alleged herein, Ilan Yosef Holtzer was a U.S. citizen.  Ilan Yosef Holtzer was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Ilan Yosef Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

107.    Y.H. is the son of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  Y.H. is a U.S. citizen.  Y.H., a minor child, is represented by Ilan Yosef Holtzer as Next Friend for purposes of this lawsuit.  Ilan Yosef Holtzer, on behalf of Y.H., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

108.    L.H. is the daughter of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  L.H. is a U.S. citizen.  L.H., a minor child, is represented by Ilan Yosef Holtzer as Next Friend for purposes of this lawsuit.  Ilan Yosef Holtzer, on behalf of L.H., brings

claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

109.    M.H. is the daughter of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  M.H. is a U.S. citizen.  M.H., a minor child, is represented by Ilan Yosef Holtzer as Next Friend for purposes of this lawsuit.  Ilan Yosef Holtzer, on behalf of M.H., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

110.    Carmi Ruth Spiwack Holtzer is the mother of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  Carmi Ruth Spiwack Holtzer is a U.S. citizen.  Carmi Ruth Spiwack Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

111.    David Gary Holtzer is the father of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  David Gary Holtzer is a U.S. citizen.  David Gary Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

112.    Zionah Alexandra Winitzky is the sister of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  Zionah Alexandra Winitzky is a U.S. citizen.  Zionah Alexandra Winitzky brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

113.    Noam Galit Edri is the sister of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  Noam Galit Edri is a U.S. citizen.  Noam Galit Edri brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

114.    Yonatan Mordechai Holtzer is the brother of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  Yonatan Mordechai Holtzer is a U.S. citizen.  Yonatan Mordechai Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

115.    Lotan Raanan Holtzer is the brother of Ilan Yosef Holtzer, who was injured as a result of the October 7 Attack.  Lotan Raanan Holtzer is a U.S. citizen.  Lotan Raanan Holtzer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**CC.    Elmaliach/Waisberg (Tirtza) Family**

116.    Tirtza Elmaliach Waisberg was a victim of the October 7 Attack.  At the time of the acts alleged herein, Tirtza Elmaliach Waisberg was a U.S. citizen.  Tirtza Elmaliach Waisberg was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Tirtza Elmaliach Waisberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

117.    Lev Waisberg is the husband of Tirtza Elmaliach Waisberg, who was injured as a result of the October 7 Attack.  Lev Waisberg is a U.S. citizen.  Lev Waisberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

118.    L.W. is the son of Tirtza Elmaliach Waisberg, who was injured as a result of the October 7 Attack.  L.W. is a U.S. citizen.  L.W., a minor child, is represented by Tirtza Elmaliach Waisberg as Next Friend for purposes of this lawsuit. Tirtza Elmaliach Waisberg, on

behalf of L.W., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

119.    N.W. is the daughter of Tirtza Elmaliach Waisberg, who was injured as a result of the October 7 Attack.  N.W. is a U.S. citizen.  N.W., a minor child, is represented by Tirtza Elmaliach Waisberg as Next Friend for purposes of this lawsuit.  Tirtza Elmaliach Waisberg, on behalf of N.W., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**DD.    Elmaleah (Daniel) Family**

120.    Daniel Elmaleah was a victim of the October 7 Attack.  Daniel Elmaleah was injured by an act of "torture, extrajudicial killing…[or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7) and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

121.    Tirtza Elmaliach Waisberg is the sister of Daniel Elmaleah, who was injured as a result of the October 7 Attack.  Tirtza Elmaliach Waisberg is a U.S. citizen.  Tirtza Elmaliach Waisberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**EE.    Elmaliah (Moriel) Family**

122.    Moriel Shimon Elmaliah was a victim of the October 7 Attack.  Moriel Shimon Elmaliah was injured by an act of "torture, extrajudicial killing…[or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7) and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

123.    Tirtza Elmaliach Waisberg is the sister of Moriel Shimon Elmaliah, who was injured as a result of the October 7 Attack.  Tirtza Elmaliach Waisberg is a U.S. citizen.  Tirtza

Elmaliach Waisberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**FF.    Sanders/Gelfand (Naomi) Family**

124.    Naomi Faye Sanders was a victim of the October 7 Attack.  At the time of the acts alleged herein, Naomi Faye Sanders was a U.S. citizen.  Naomi Faye Sanders was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Naomi Faye Sanders brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

125.    David Jacob Sanders is the father of Naomi Faye Sanders, who was injured as a result of the October 7 Attack.  David Jacob Sanders is a U.S. citizen.  David Jacob Sanders brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

126.    Hila Sanders (a.k.a. Hila Segev) is the mother of Naomi Faye Sanders, who was injured as a result of the October 7 Attack.  Hila Sanders is a U.S. citizen.  Hila Sanders brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

127.    Rachel Esther Sanders is the sister of Naomi Faye Sanders, who was injured as a result of the October 7 Attack.  Rachel Esther Sanders is a U.S. citizen.  Rachel Esther Sanders brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**GG.    Sanders/Gelfand (Ofer) Family**

128.    Ofer Gelfand was a victim of the October 7 Attack.  Ofer Gelfand was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

129.    Naomi Faye Sanders is the wife of Ofer Gelfand, who was injured as a result of the October 7 Attack.  Naomi Faye Sanders is a U.S. citizen.  Naomi Faye Sanders brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**HH.    Beller Family**

130.    Yair Beller was a victim of the October 7 Attack.  At the time of the acts alleged herein, Yair Beller was a U.S. citizen.  Yair Beller was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Yair Beller brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

131.    Arnona Shapiro-Beller is the mother of Yair Beller, who was injured as a result of the October 7 Attack.  Arnona Shapiro-Beller is a U.S. citizen.  Arnona Shapiro-Beller brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

132.    Noam Menachem Beller is the brother of Yair Beller, who was injured as a result of the October 7 Attack. Noam Menachem Beller is a U.S. citizen. Noam Menachem Beller

brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

133.    Isaac Beller (a.k.a. Yitzchak Beller) is the brother of Yair Beller, who was injured as a result of the October 7 Attack.  Isaac Beller is a U.S. citizen.  Isaac Beller brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

134.    Yehuda Shmuel Beller is the brother of Yair Beller, who was injured as a result of the October 7 Attack.  Yehuda Shmuel Beller is a U.S. citizen.  Yehuda Shmuel Beller brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

135.    Hadassa Devorah Malka Beller Cohen is the sister of Yair Beller, who was injured as a result of the October 7 Attack. Hadassa Devorah Malka Beller Cohen is a U.S. citizen. Hadassa Devorah Malka Beller Cohen brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

136.    Ashira Beller is the sister of Yair Beller, who was injured as a result of the October 7 Attack.  Ashira Beller is a U.S. citizen.  Ashira Beller brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## II.    Bar-Or Family

137.    Lior Yovel Bar-Or was a victim of the October 7 Attack.  At the time of the acts alleged herein, Lior Yovel Bar-Or was a U.S. citizen.  Lior Yovel Bar-Or was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as

defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Lior Yovel Bar-Or brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

138.    Marc Leon Brawer (a.k.a. Marc Leon Bar-Or) is the father of Lior Yovel Bar-Or, who was injured as a result of the October 7 Attack.  Marc Leon Brawer is a U.S. citizen.  Marc Leon Brawer brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

139.    Zohar Tzlil Bar-Or is the sister of Lior Yovel Bar-Or, who was injured as a result of the October 7 Attack.  Zohar Tzlil Bar-Or is a U.S. citizen.  Zohar Tzlil Bar-Or brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

140.    Hila Malka Bar-Or (a.k.a. Hila Malka Bar-Or Lohr) is the sister of Lior Yovel Bar-Or, who was injured as a result of the October 7 Attack.  Hila Malka Bar-Or is a U.S. citizen.  Hila Malka Bar-Or brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**JJ.    Boltax Family**

141.    Matan Eliyahu Boltax was a victim of the October 7 Attack.  At the time of the acts alleged herein, Matan Eliyahu Boltax was a U.S. citizen.  Matan Eliyahu Boltax was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Matan Eliyahu Boltax brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

142.    Jonathan Marshall Boltax is the father of Matan Eliyahu Boltax, who was injured as a result of the October 7 Attack.  Jonathan Marshall Boltax is a U.S. citizen.  Jonathan Marshall Boltax brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

143.    Arlyn Barrie Boltax (a.k.a.  Arlyn Fertel) is the mother of Matan Eliyahu Boltax, who was injured as a result of the October 7 Attack.  Arlyn Barrie Boltax is a U.S. citizen.  Arlyn Barrie Boltax brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

144.    Eliora Yerushalaim Boltax is the sister of Matan Eliyahu Boltax, who was injured as a result of the October 7 Attack.  Eliora Yerushalaim Boltax is a U.S. citizen.  Eliora Yerushalaim Boltax brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

145.    Amichai Yisrael Boltax is the brother of Matan Eliyahu Boltax, who was injured as a result of the October 7 Attack.  Amichai Yisrael Boltax is a U.S. citizen.  Amichai Yisrael Boltax brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

146.    N.E.B. is the sister of Matan Eliyahu Boltax, who was injured as a result of the October 7 Attack.  N.E.B. is a U.S. citizen.  N.E.B., a minor child, is represented by Jonathan Marshall Boltax as Next Friend for purposes of this lawsuit. Jonathan Marshall Boltax, on behalf of N.E.B., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

147.    Naor Tzion Tzedek Boltax is the brother of Matan Eliyahu Boltax, who was injured as a result of the October 7 Attack.  Naor Tzion Tzedek Boltax is a U.S. citizen.  Naor

Tzion Tzedek Boltax brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## KK.    Bromberg Family

148.    David Tuvial Bromberg (a.k.a. David Tovial Bromberg) was a victim of the October 7 Attack.  At the time of the acts alleged herein, David Tuvial Bromberg was a U.S. citizen.  David Tuvial Bromberg was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  David Tuvial Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

149.    Isaac Samuel Bromberg is the father of David Tuvial Bromberg, who was injured as a result of the October 7 Attack.  Isaac Samuel Bromberg is a U.S. citizen.  Isaac Samuel Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

150.    Rachel Bromberg is the mother of David Tuvial Bromberg, who was injured as a result of the October 7 Attack.  Rachel Bromberg is a U.S. citizen.  Rachel Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

151.    Elisheva Rena Bromberg (a.k.a. Elisheva Rena Lavi) is the sister of David Tuvial Bromberg, who was injured as a result of the October 7 Attack.  Elisheva Rena Bromberg is a U.S. citizen.  Elisheva Rena Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

152. Yehuda Aryeh Bromberg is the brother of David Tuvial Bromberg, who was injured as a result of the October 7 Attack. Yehuda Aryeh Bromberg is a U.S. citizen. Yehuda Aryeh Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

153. Rivka Chaya Strauss (a.k.a. Rivka Chaya Bromberg) is the sister of David Tuvial Bromberg, who was injured as a result of the October 7 Attack. Rivka Chaya Strauss is a U.S. citizen. Rivka Chaya Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**LL.    Strauss (Rivka) Family**

154. Rivka Chaya Strauss (a.k.a. Rivka Chaya Bromberg) was a victim of the October 7 Attack. At the time of the acts alleged herein, Rivka Chaya Strauss was a U.S. citizen. Rivka Chaya Strauss was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack. Rivka Chaya Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

155. Yehuda Pesach Strauss is the husband of Rivka Chaya Strauss, who was injured as a result of the October 7 Attack. Yehuda Pesach Strauss is a U.S. citizen. Yehuda Pesach Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

156. L.S.S. is the son of Rivka Chaya Strauss, who was injured as a result of the October 7 Attack. L.S.S. is a U.S. citizen. L.S.S., a minor child, is represented by Yehuda Pesach Strauss as Next Friend for purposes of this lawsuit. Yehuda Pesach Strauss, on behalf of

L.S.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

157.    L.Y.S. is the daughter of Rivka Chaya Strauss, who was injured as a result of the October 7 Attack.  L.Y.S. is a U.S. citizen.  L.Y.S., a minor child, is represented by Yehuda Pesach Strauss as Next Friend for purposes of this lawsuit.  Yehuda Pesach Strauss, on behalf of L.Y.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

158.    Isaac Samuel Bromberg is the father of Rivka Chaya Strauss, who was injured as a result of the October 7 Attack.  Isaac Samuel Bromberg is a U.S. citizen.  Isaac Samuel Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

159.    Rachel Bromberg is the mother of Rivka Chaya Strauss, who was injured as a result of the October 7 Attack.  Rachel Bromberg is a U.S. citizen.  Rachel Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

160.    David Tuvial Bromberg (a.k.a. David Tovial Bromberg) is the brother of Rivka Chaya Strauss, who was injured as a result of the October 7 Attack.  David Tuvial Bromberg is a U.S. citizen.  David Tuvial Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

161.    Elisheva Rena Bromberg (a.k.a. Elisheva Rena Lavi) is the sister of Rivka Chaya Strauss, who was injured as a result of the October 7 Attack.  Elisheva Rena Bromberg is a U.S. citizen.  Elisheva Rena Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

162.    Yehuda Aryeh Bromberg is the brother of Rivka Chaya Strauss, who was injured as a result of the October 7 Attack.  Yehuda Aryeh Bromberg is a U.S. citizen.  Yehuda Aryeh Bromberg brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## MM.  Strauss (Yehuda) Family

163.    Yehuda Pesach Strauss was a victim of the October 7 Attack.  At the time of the acts alleged herein, Yehuda Pesach Strauss was a U.S. citizen.  Yehuda Pesach Strauss was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Yehuda Pesach Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

164.    Rivka Chaya Strauss is the wife of Yehuda Pesach Strauss, who was injured as a result of the October 7 Attack.  Rivka Chaya Strauss is a U.S. citizen.  Rivka Chaya Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

165.    L.S.S. is the son of Yehuda Pesach Strauss, who was injured as a result of the October 7 Attack.  L.S.S. is a U.S. citizen.  L.S.S., a minor child, is represented by Yehuda Pesach Strauss as Next Friend for purposes of this lawsuit.  Yehuda Pesach Strauss, on behalf of L.S.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

166.    L.Y.S. is the daughter of Yehuda Pesach Strauss, who was injured as a result of the October 7 Attack.  L.Y.S. is a U.S. citizen.  L.Y.S., a minor child, is represented by Yehuda

Pesach Strauss as Next Friend for purposes of this lawsuit. Yehuda Pesach Strauss, on behalf of L.Y.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

167. Stephanie Cheryl Strauss (a.k.a. Stephanie Cheryl Schechter) is the mother of Yehuda Pesach Strauss, who was injured as a result of the October 7 Attack. Stephanie Cheryl Strauss is a U.S. citizen. Stephanie Cheryl Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

168. Shlomo Akiva Strauss is the brother of Yehuda Pesach Strauss, who was injured as a result of the October 7 Attack. Shlomo Akiva Strauss is a U.S. citizen. Shlomo Akiva Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

169. Ezra Mordechai Strauss is the brother of Yehuda Pesach Strauss, who was injured as a result of the October 7 Attack. Ezra Mordechai Strauss is a U.S. citizen. Ezra Mordechai Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

170. Meira Batya Lerner (a.k.a. Meira Batya Strauss) is the sister of Yehuda Pesach Strauss, who was injured as a result of the October 7 Attack. Meira Batya Lerner is a U.S. citizen. Meira Batya Lerner brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**NN.    Strauss (L.S.S.) Family**

171. L.S.S. was a victim of the October 7 Attack. At the time of the acts alleged herein, L.S.S. was a U.S. citizen. L.S.S. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of

the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection

with the October 7 Attack.  L.S.S., a minor child, is represented by Yehuda Pesach Strauss as

Next Friend for purposes of this lawsuit.  Yehuda Pesach Strauss, on behalf of L.S.S., brings

claims for personal injury, pain and suffering, economic damages, and/or punitive damages

resulting from the acts alleged herein.

172.    Rivka Chaya Strauss is the mother of L.S.S., who was injured as a result of the

October 7 Attack.  Rivka Chaya Strauss is a U.S. citizen.  Rivka Chaya Strauss brings claims for

personal injury, pain and suffering, economic damages, and/or punitive damages resulting from

the acts alleged herein.

173.    Yehuda Pesach Strauss is the father of L.S.S., who was injured as a result of the

October 7 Attack.  Yehuda Pesach Strauss is a U.S. citizen.  Yehuda Pesach Strauss brings

claims for personal injury, pain and suffering, economic damages, and/or punitive damages

resulting from the acts alleged herein.

174.    L.Y.S. is the sister of L.S.S., who was injured as a result of the October 7 Attack.

L.Y.S. is a U.S. citizen.  L.Y.S., a minor child, is represented by Yehuda Pesach Strauss as Next

Friend for purposes of this lawsuit.  Yehuda Pesach Strauss, on behalf of L.Y.S., brings claims

for personal injury, pain and suffering, economic damages, and/or punitive damages resulting

from the acts alleged herein.

## OO.    Strauss (L.Y.S.) Family

175.    L.Y.S. was a victim of the October 7 Attack.  At the time of the acts alleged

herein, L.Y.S. was a U.S. citizen. L.Y.S. was injured by an act of "torture, extrajudicial killing, .

. [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of

the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection

with the October 7 Attack.  L.Y.S., a minor child, is represented by Yehuda Pesach Strauss as Next Friend for purposes of this lawsuit.  Yehuda Pesach Strauss, on behalf of L.Y.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

176.    Rivka Chaya Strauss is the mother of L.Y.S., who was injured as a result of the October 7 Attack.  Rivka Chaya Strauss is a U.S. citizen.  Rivka Chaya Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

177.    Yehuda Pesach Strauss is the father of L.Y.S., who was injured as a result of the October 7 Attack.  Yehuda Pesach Strauss is a U.S. citizen.  Yehuda Pesach Strauss brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

178.    L.S.S. is the brother of L.Y.S., who was injured as a result of the October 7 Attack.  L.S.S. is a U.S. citizen.  L.S.S., a minor child, is represented by Yehuda Pesach Strauss as Next Friend for purposes of this lawsuit.  Yehuda Pesach Strauss, on behalf of L.S.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**PP.    Bukspan Family**

179.    Gal Bukspan was a victim of the October 7 Attack.  At the time of the acts alleged herein, Gal Bukspan was a U.S. citizen.  Gal Bukspan was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Gal Bukspan brings claims for

personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## QQ.    Englanoff Family

180.    David Englanoff was a victim of the October 7 Attack.  At the time of the acts alleged herein, David Englanoff was a U.S. citizen.  David Englanoff was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  David Englanoff brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

181.    Samuel Englanoff is the brother of David Englanoff, who was injured as a result of the October 7 Attack.  Samuel Englanoff is a U.S. citizen.  Samuel Englanoff brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

182.    Mordechai Nissim Englanoff is the brother of David Englanoff, who was injured as a result of the October 7 Attack.  Mordechai Nissim Englanoff is a U.S. citizen.  Mordechai Nissim Englanoff brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

183.    Deborah Itzhak (a.k.a. Deborah Englanoff) is the sister of David Englanoff, who was injured as a result of the October 7 Attack.  Deborah Itzhak is a U.S. citizen.  Deborah Itzhak brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

184.    Shlomo Englanoff (a.k.a. Shlomo Lilvia) is the brother of David Englanoff, who was injured as a result of the October 7 Attack.  Shlomo Englanoff is a U.S. citizen.  Shlomo Englanoff brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**RR.    Gabay Family**

185.    Sheerel Gabay was a victim of the October 7 Attack.  At the time of the acts alleged herein, Sheerel Gabay was a U.S. citizen.  Sheerel Gabay was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Sheerel Gabay brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

186.    Liron Mazeh Gabay is the mother of Sheerel Gabay, who was injured as a result of the October 7 Attack.  Liron Mazeh Gabay is a U.S. citizen.  Liron Mazeh Gabay brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

187.    Gil Gabay is the father of Sheerel Gabay, who was injured as a result of the October 7 Attack. Gil Gabay is a U.S. citizen. Gil Gabay brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

188.    Orel Gabay is the sister of Sheerel Gabay, who was injured as a result of the October 7 Attack. Orel Gabay is a U.S. citizen. Orel Gabay brings claims for personal injury,

pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**SS.    Gelbaum (Lior) Family**

189.    Lior Gelbaum was a victim of the October 7 Attack.  At the time of the acts alleged herein, Lior Gelbaum was a U.S. citizen.  Lior Gelbaum was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Lior Gelbaum brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

190.    Danielle Gelbaum is the sister of Lior Gelbaum, who was injured as a result of the October 7 Attack.  Danielle Gelbaum is a U.S. citizen.  Danielle Gelbaum brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**TT.    Gelbaum (Danielle) Family**

191.    Danielle Gelbaum was a victim of the October 7 Attack.  At the time of the acts alleged herein, Danielle Gelbaum was a U.S. citizen.  Danielle Gelbaum was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Danielle Gelbaum brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

192.    Lior Gelbaum is the sister of Danielle Gelbaum, who was injured as a result of the October 7 Attack.  Lior Gelbaum is a U.S. citizen.  Lior Gelbaum brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**UU.    Karplus Family**

193.    Gilad Karplus was a victim of the October 7 Attack.  At the time of the acts alleged herein, Gilad Karplus was a U.S. citizen.  Gilad Karplus was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Gilad Karplus brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**VV.    Klein Family**

194.    Hadar Klein was a victim of the October 7 Attack.  At the time of the acts alleged herein, Hadar Klein was a U.S. citizen.  Hadar Klein was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Hadar Klein brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

195.    Shay Klein is the father of Hadar Klein, who was injured as a result of the October 7 Attack.  Shay Klein is a U.S. citizen.  Shay Klein brings claims for personal injury,

pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

196.    Yonat Klein is the mother of Hadar Klein, who was injured as a result of the October 7 Attack.  Yonat Klein is a U.S. citizen.  Yonat Klein brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

197.    Nitai Klein is the brother of Hadar Klein, who was injured as a result of the October 7 Attack.  Nitai Klein is a U.S. citizen.  Nitai Klein brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

198.    Eli Klein is the brother of Hadar Klein, who was injured as a result of the October 7 Attack.  Eli Klein is a U.S. citizen.  Eli Klein brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**WW.   Levy Family**

199.    Ori Levy was a victim of the October 7 Attack.  At the time of the acts alleged herein, Ori Levy was a U.S. citizen.  Ori Levy was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Ori Levy brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

200.    Nadir Levy is the brother of Ori Levy, who was injured as a result of the October 7 Attack.  Nadir Levy is a U.S. citizen.  Nadir Levy brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## XX.    Medalia Family

201.    Carmel Medalia was a victim of the October 7 Attack.  At the time of the acts alleged herein, Carmel Medalia was a U.S. citizen.  Carmel Medalia was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Carmel Medalia brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## YY.    Oved Family

202.    Avishag Shilat Oved was a victim of the October 7 Attack.  At the time of the acts alleged herein, Avishag Shilat Oved was a U.S. citizen.  Avishag Shilat Oved was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Avishag Shilat Oved brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

203.    Avivah Miriam Oved (a/k/a Avivah Miriam Nathan) is the mother of Avishag Shilat Oved, who was injured as a result of the October 7 Attack.  Avivah Miriam Oved is a U.S. citizen.  Avivah Miriam Oved brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

204.    A.O. is the sister of Avishag Shilat Oved, who was injured as a result of the October 7 Attack.  A.O. is a U.S. citizen.  A.O., a minor child, is represented by Ronen Oved as Next Friend for purposes of this lawsuit.  Ronen Oved, on behalf of A.O., brings claims for

personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

205.    Av.O. is the sister of Avishag Shilat Oved, who was injured as a result of the October 7 Attack.  Av.O. is a U.S. citizen.  Av.O., a minor child, is represented by Ronen Oved as Next Friend for purposes of this lawsuit.  Ronen Oved, on behalf of Av.O., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**ZZ.    Oz Family**

206.    Aviv Oz was a victim of the October 7 Attack.  At the time of the acts alleged herein, Aviv Oz was a U.S. citizen.  Aviv Oz was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Aviv Oz brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

207.    Nava Oz (a.k.a. Nava Goren) is the mother of Aviv Oz, who was injured as a result of the October 7 Attack.  Nava Oz is a U.S. citizen.  Nava Oz brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

208.    Hadar Oz is the brother of Aviv Oz, who was injured as a result of the October 7 Attack.  Hadar Oz is a U.S. citizen.  Hadar Oz brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**AAA.  Porat Family**

209.    Gal Porat was a victim of the October 7 Attack.  At the time of the acts alleged herein, Gal Porat was a U.S. citizen.  Gal Porat was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Gal Porat brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**BBB.  Shaham Family**

210.    Maya Shaham was a victim of the October 7 Attack.  At the time of the acts alleged herein, Maya Shaham was a U.S. citizen.  Maya Shaham was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Maya Shaham brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

211.    Stacy Marla Shaham (a.k.a. Stacy Marla Fromm) is the mother of Maya Shaham, who was injured as a result of the October 7 Attack.  Stacy Marla Shaham is a U.S. citizen.  Stacy Marla Shaham brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

212.    Aviv Shaham is the brother of Maya Shaham, who was injured as a result of the October 7 Attack.  Aviv Shaham is a U.S. citizen.  Aviv Shaham brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

213.    Oren Shaham is the brother of Maya Shaham, who was injured as a result of the October 7 Attack.  Oren Shaham is a U.S. citizen.  Oren Shaham brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## CCC.  Tal Family

214.    Hila Tal was a victim of the October 7 Attack.  Hila Tal was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

215.    Ofir Tal is the father of Hila Tal, who was injured as a result of the October 7 Attack.  Ofir Tal is a U.S. citizen.  Ofir Tal brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## DDD.  Weisberger Family

216.    Shelley Sharon Weisberger was a victim of the October 7 Attack.  At the time of the acts alleged herein, Shelley Sharon Weisberger was a U.S. citizen.  Shelley Sharon Weisberger was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Shelley Sharon Weisberger brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

217.    Keith Stewart Weisberger is the father of Shelley Sharon Weisberger, who was injured as a result of the October 7 Attack.  Keith Stewart Weisberger is a U.S. citizen.  Keith

Stewart Weisberger brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**EEE.  Shapira Family**

218.    Itamar Yehuda Shapira was a victim of the October 7 Attack.  At the time of the acts alleged herein, Itamar Yehuda Shapira was a U.S. citizen.  Itamar Yehuda Shapira was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Itamar Yehuda Shapira brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

219.    Amy Lauren Shapira (a.k.a.  Amy Lauren Arnoni) is the mother of Itamar Yehuda Shapira, who was injured as a result of the October 7 Attack.  Amy Lauren Shapira is a U.S. citizen.  Amy Lauren Shapira brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

220.    Yiftach Shapira is the brother of Itamar Yehuda Shapira, who was injured as a result of the October 7 Attack.  Yiftach Shapira is a U.S. citizen.  Yiftach Shapira brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

221.    N.S. is the sister of Itamar Yehuda Shapira, who was injured as a result of the October 7 Attack.  N.S. is a U.S. citizen.  N.S., a minor child, is represented by Amy Lauren Shapira as Next Friend for purposes of this lawsuit.  Amy Lauren Shapira, on behalf of N.S., brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**FFF.  Fiorentino (Ilan) Family**

222.    Ilan Fiorentino, now deceased, was murdered in the October 7 Attack, after suffering severe physical and emotional injury as a result of the attack.  Ilan was injured and killed by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

223.    Sharon Shoshana Fiorentino (a.k.a. Sharon Shoshana Shtrull) is the wife of Ilan Fiorentino, who was killed as a result of the October 7 Attack.  Sharon Shoshana Fiorentino is a U.S. citizen.  Sharon Shoshana Fiorentino brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**GGG.  Fiorentino (Sharon) Family**

224.    Sharon Shoshana Fiorentino (a.k.a. Sharon Shoshana Shtrull) was a victim of the October 7 Attack.  At the time of the acts alleged herein, Sharon Shoshana Fiorentino was a U.S. citizen.  Sharon Shoshana Fiorentino was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Sharon Shoshana Fiorentino brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

225.    Ora Shtrull is the mother of Sharon Shoshana Fiorentino, who was injured as a result of the October 7 Attack.  Ora Shtrull is a U.S. citizen.  Ora Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

226.    Izak Shtrull is the father of Sharon Shoshana Fiorentino, who was injured as a result of the October 7 Attack.  Izak Shtrull is a U.S. citizen.  Izak Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

227.    Ofir Shtrull is the brother of Sharon Shoshana Fiorentino, who was injured as a result of the October 7 Attack.  Ofir Shtrull is a U.S. citizen.  Ofir Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

228.    Natalie Shtrull is the sister of Sharon Shoshana Fiorentino, who was injured as a result of the October 7 Attack.  Natalie Shtrull is a U.S. citizen.  Natalie Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

229.    Eleanor Shtrull is the sister of Sharon Shoshana Fiorentino, who was injured as a result of the October 7 Attack.  Eleanor Shtrull is a U.S. citizen.  Eleanor Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

### HHH.  Fiorentino (N.F.) Family

230.    N.F. was a victim of the October 7 Attack.  N.F. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

231.    Sharon Shoshana Fiorentino is the mother of N.F., who was injured as a result of the October 7 Attack.  Sharon Shoshana Fiorentino is a U.S. citizen.  Sharon Shoshana

Fiorentino brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

### III.    Fiorentino (L.F.) Family

232.    L.F. was a victim of the October 7 Attack.  L.F. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

233.    Sharon Shoshana Fiorentino is the mother of L.F., who was injured as a result of the October 7 Attack.  Sharon Shoshana Fiorentino is a U.S. citizen.  Sharon Shoshana Fiorentino brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

### JJJ.    Fiorentino (D.F.) Family

234.    D.F. was a victim of the October 7 Attack.  D.F. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

235.    Sharon Shoshana Fiorentino is the mother of D.F., who was injured as a result of the October 7 Attack.  Sharon Shoshana Fiorentino is a U.S. citizen.  Sharon Shoshana Fiorentino brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

### KKK.  Shtrull Family

236.    Eleanor Shtrull was a victim of the October 7 Attack.  At the time of the acts alleged herein, Eleanor Shtrull was a U.S. citizen.  Eleanor Shtrull was injured by an act of

"torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Eleanor Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

237.    Ora Shtrull is the mother of Eleanor Shtrull, who was injured as a result of the October 7 Attack.  Ora Shtrull is a U.S. citizen.  Ora Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

238.    Izak Shtrull is the father of Eleanor Shtrull, who was injured as a result of the October 7 Attack.  Izak Shtrull is a U.S. citizen.  Izak Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

239.    Ofir Shtrull is the brother of Eleanor Shtrull, who was injured as a result of the October 7 Attack.  Ofir Shtrull is a U.S. citizen.  Ofir Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

240.    Natalie Shtrull is the sister of Eleanor Shtrull, who was injured as a result of the October 7 Attack.  Natalie Shtrull is a U.S. citizen.  Natalie Shtrull brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

241.    Sharon Shoshana Fiorentino is the sister of Eleanor Shtrull, who was injured as a result of the October 7 Attack.  Sharon Shoshana Fiorentino is a U.S. citizen.  Sharon Shoshana

Fiorentino brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

### LLL.   Dekalo (Nissan) Family

242.    Nissan Dekalo was a victim of the October 7 Attack.  Nissan Dekalo was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

243.    Lee Dekalo is the wife of Nissan Dekalo, who was injured as a result of the October 7 Attack.  Lee Dekalo is a U.S. citizen.  Lee Dekalo brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

### MMM.    Dekalo (Yeari) Family

244.    Yeari Dekalo was a victim of the October 7 Attack.  Yeari Dekalo was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

245.    Lee Dekalo is the mother of Yeari Dekalo, who was injured as a result of the October 7 Attack.  Lee Dekalo is a U.S. citizen.  Lee Dekalo brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

### NNN.  Dekalo (Yeela) Family

246.    Yeela Dekalo was a victim of the October 7 Attack.  Yeela Dekalo was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§

1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

247.    Lee Dekalo is the mother of Yeela Dekalo, who was injured as a result of the October 7 Attack.  Lee Dekalo is a U.S. citizen.  Lee Dekalo brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**OOO.  Maoz (Tomer) Family**

248.    Tomer Yehuda Maoz was a victim of the October 7 Attack.  At the time of the acts alleged herein, Tomer Yehuda Maoz was a U.S. citizen.  Tomer Yehuda Maoz was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Tomer Yehuda Maoz brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**PPP.  Maoz (Eitan) Family**

249.    Eitan Maoz was a victim of the October 7 Attack.  Eitan Maoz was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

250.    Tomer Yehuda Maoz is the son of Eitan Maoz, who was injured as a result of the October 7 Attack.  Tomer Yehuda Maoz is a U.S. citizen.  Tomer Yehuda Maoz brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## QQQ.  Maoz (Zmira) Family

251.    Zmira Maoz was a victim of the October 7 Attack.  Zmira Maoz was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

252.    Tomer Yehuda Maoz is the son of Zmira Maoz, who was injured as a result of the October 7 Attack.  Tomer Yehuda Maoz is a U.S. citizen.  Tomer Yehuda Maoz brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## RRR.  Maoz (Guy) Family

253.    Guy Maoz was a victim of the October 7 Attack.   Guy Maoz was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

254.    Tomer Yehuda Maoz is the brother of Guy Maoz, who was injured as a result of the October 7 Attack.  Tomer Yehuda Maoz is a U.S. citizen.  Tomer Yehuda Maoz brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## SSS.  Maoz (I.M.) Family

255.    I.M. was a victim of the October 7 Attack.  I.M. was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.

256.    Tomer Yehuda Maoz is the brother of I.M., who was injured as a result of the October 7 Attack.  Tomer Yehuda Maoz is a U.S. citizen.  Tomer Yehuda Maoz brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**TTT.    Tint Family**

257.    Carmi Lisa Tint was a victim of the October 7 Attack.  At the time of the acts alleged herein, Carmi Lisa Tint was a U.S. citizen.  Carmi Lisa Tint was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Carmi Lisa Tint brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

258.    Ami Estelle Tint is the sister of Carmi Lisa Tint, who was injured as a result of the October 7 Attack.  Ami Estelle Tint is a U.S. citizen.  Ami Estelle Tint brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

259.    Arin Lee Tint is the sister of Carmi Lisa Tint, who was injured as a result of the October 7 Attack.  Arin Lee Tint is a U.S. citizen.  Arin Lee Tint brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

260.    Noa Michelle Tint is the sister of Carmi Lisa Tint, who was injured as a result of the October 7 Attack.  Noa Michelle Tint is a U.S. citizen.  Noa Michelle Tint brings claims for

personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

**UUU.  Paul Family**

261.    Guy Alon Paul was a victim of the October 7 Attack.  At the time of the acts alleged herein, Guy Alon Paul was a U.S. citizen.  Guy Alon Paul was injured by an act of "torture, extrajudicial killing, . . . [or] hostage taking" as defined in 28 U.S.C. §§ 1605A(a) and 1605A(h)(7), and in section 3 of the TVPA, and an "act of international terrorism" as defined in 18 U.S.C. § 2331, in connection with the October 7 Attack.  Guy Alon Paul brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

262.    Lawrence Elliot Paul is the father of Guy Alon Paul, who was injured as a result of the October 7 Attack.  Lawrence Elliot Paul is a U.S. citizen.  Lawrence Elliot Paul brings claims for personal injury, pain and suffering, economic damages, and/or punitive damages resulting from the acts alleged herein.

## DEFENDANTS

263.    Each of the Defendants is a terrorist organization or sovereign state or political subdivision of a foreign state that participated in the planning and/or execution of the October 7 Attack, by direct participation in the Attack, aiding and abetting the Attack, and/or providing material support for the Attack.

264.    Each of the Terrorist Group Defendants is (a) a terrorist group designated as such under U.S. law,[1] and/or (b) a terrorist group that has committed "act[s] of international terrorism" within the definition of the Anti-Terrorism Act, 18 U.S.C. § 2331(1).

---

[1] Under section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 8 U.S.C. § 1189, the Secretary of State may

265.    The FSIA Defendants – Iran, the IRGC, Syria, and North Korea – are all foreign

states, but do not have sovereign immunity because, *inter alia*, each was designated a State

Sponsor of Terrorism and participated in, funded, and/or otherwise provided material support

and resources for the October 7 Attack.

**A. Islamic Republic of Iran and the Islamic Revolutionary Guard Corps**

266.    Defendant the Islamic Republic of Iran ("Iran") is a foreign sovereign state.

267.    For decades, Iran has engaged in and materially supported anti-Israel and anti-

American terror attacks, including through the Islamic Revolutionary Guard Corps and its

nonstate partners and armed proxies, including Hamas, Palestinian Islamic Jihad ("PIJ"),

Hezbollah, and the Houthis.

268.    Defendant the Islamic Revolutionary Guard Corps ("IRGC") is a political

subdivision of Iran. Accordingly, for all relevant purposes, the IRGC is considered  the foreign

sovereign state of Iran. *See* 28 U.S.C. § 1603(a).

269.    The IRGC, primary through the Islamic Revolutionary Guard Corps–Quds Force

("IRGC-QF"), installs and operates terrorist cells across the Middle East, including terrorist cells

in Syria, Lebanon, the West Bank, and Gaza.  The IRGC also provides material support to

terrorist groups such as Hezbollah, Hamas, and PIJ.

---

designate a foreign group as a terrorist organization ("FTO") if the organization "engages in
terrorist activity" that "threatens the security of United States nationals or the national security of
the United States."  The Secretary of State can also, in consultation with the Attorney General
and the Secretary of the Treasury, designate foreign groups and individuals as "Specially
Designated Global Terrorists" ("SDGT").  Exec. Order. 13224, "Blocking Property and
Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support
Terrorism," 3 CFR 786 (2002).  In 2019, Executive Order 13224, which allows for the SDGT
designation, was amended by Executive Order 13886, which also revoked Executive Order
12947 as amended by Executive Order 13099.  Under the older Executive Orders (E.O. 12947 as
amended by E.O. 13099,) the Secretary of State could designate foreign groups and individuals
as "Specially Designated Terrorists" ("SDT").

270.    As set forth herein, Iran and the IRGC provided material support and resources for the October 7 Attack.

271.    Iran and the IRGC are not immune from the jurisdiction of this Court because Plaintiffs are seeking money damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, . . . hostage taking, or the provision of material support or resources for such an act," as provided for in the FSIA's Terrorism Exception.  28 U.S.C. § 1605A(a).

272.    Iran is now and has been designated a State Sponsor of Terrorism since January 19, 1984, pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. Appx. § 2405(j), and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371.

273.    The United States designated the IRGC a Specially Designated Global Terrorist ("SDGT") on October 13, 2017, and a Foreign Terrorist Organization ("FTO") on April 15, 2019, and the IRGC has been continuously designated as an FTO and SDGT through the filing of this Complaint.

274.    The United States designated the IRGC-QF an SDGT on October 25, 2007, and the IRGC-QF has been continuously designated as an SDGT through the filing of this Complaint.

275.    28 U.S.C. § 1605A(a)(2)(A)(i)(I) allows a court to hear claims against a foreign state related to an act of state-sponsored terrorism if the claimants or the victims meet certain requirements in other provisions of 28 U.S.C. § 1605A(a)(2) and "the foreign state was designated a state sponsor of terrorism . . . as a result of such act . . . and remains so designated." Because Iran was "designated as a state sponsor of terrorism at the time" of the October 7, 2023 act of torture, extrajudicial killing, and hostage taking on which Plaintiffs' claims are based, and

"remains so designated" at the time of the filing of those claims, the requirements of 28 U.S.C. § 1605A(a)(2)(A)(i)(I) are met with respect to Iran and IRGC.

**B. Hamas**

276.    Defendant Harakat al-Muqawama al-Islamiya ("Hamas") is an extremist fundamentalist Islamic Palestinian terrorist group founded in 1987.

277.    In 2007, Hamas violently seized control of the Gaza Strip from fellow Palestinians and has acted as the governing entity there since.  Hamas's stated primary goal is to eradicate the State of Israel and establish a Palestinian Islamic regime in its place.

278.    As set forth more fully herein, Hamas has committed numerous terrorist attacks, and Hamas planned, led, actively participated in, materially supported, and aided and abetted the October 7 Attack, and was joined and materially supported by many other terrorist organizations, including the other Terrorist Group Defendants.

279.    The United States designated Hamas an SDT on January 25, 1995.  The United States designated Hamas an FTO on October 8, 1997, and an SDGT on October 31, 2001. Hamas was designated an SDT until EO 13886 eliminated that designation, and has been continuously designated as an FTO and an SDGT through the filing of this Complaint.

**C. Palestine Islamic Jihad**

280.    Defendant Palestinian Islamic Jihad ("PIJ") is a terrorist group founded in 1981.

281.    As set forth more fully herein, PIJ has committed numerous terrorist attacks, including through its militant wing, the al-Quds Brigades, and actively participated in, materially supported, and aided and abetted, the October 7 Attack.

282.    The United States designated PIJ an SDT on January 25, 1995.  The United States designated PIJ an FTO on October 8, 1997, and an SDGT on October 31, 2001. PIJ was

designated an SDT until EO 13886 eliminated that designation, and has been continuously designated as an FTO and SDGT through the filing of this Complaint.

### D.  Popular Front for the Liberation of Palestine

283.    The Popular Front for the Liberation of Palestine ("PFLP") is a terrorist group founded in 1967.

284.    As set forth more fully herein, PFLP has committed numerous terror attacks, including through its militant wing, the Abu Ali Mustafa Brigades, and actively participated in, materially supported, and aided and abetted, the October 7 Attack.

285.    The United States designated PFLP an SDT on January 25, 1995.  The United States designated PFLP an FTO on October 8, 1997, and an SDGT on October 31, 2001.  PFLP was designated an SDT until EO 13886 eliminated that designation, and has been continuously designated as an FTO and SDGT through the filing of this Complaint.

### E.  Democratic Front for the Liberation of Palestine

286.    The Democratic Front for the Liberation of Palestine ("DFLP") is a terrorist group founded in 1969.

287.    As set forth more fully herein, DFLP has committed numerous terrorist attacks, including through its militant wing, the National Resistance Brigades (a.k.a. Omar Al-Qasim Forces), and actively participated in, materially supported, and aided and abetted, the October 7 Attack.

### F.  Al-Aqsa Martyrs Brigade

288.    The al-Aqsa Martyrs Brigade ("AAMB") is a terrorist group created in 2000, when it was formed as an armed wing of Yasser Arafat's Fatah faction.

289.    As set forth more fully herein, AAMB has committed numerous terrorist attacks, and actively participated in, materially supported, and aided and abetted, the October 7 Attack.

290.    The United States designated AAMB an SDT, FTO, and SDGT on March 27, 2002. AAMB was designated an SDT until EO 13886 eliminated that designation, and has been continuously so-designated as an FTO and SDGT through the filing of this Complaint.

### G. Palestinian Mujahideen Movement

291.    The Palestinian Mujahideen Movement ("PMM") is a terrorist group founded in 2001.

292.    As set forth more fully herein, PMM has committed numerous terrorist attacks, including through its military wing, The Mujahideen Brigades (a/k/a al-Mujahidin Brigades), and PMM actively participated in, materially supported, and aided and abetted, the October 7 Attack.

293.    The Mujahideen Brigades were designated an SDGT on November 13, 2018 and have been continuously so-designated through the filing of this Complaint.

### H. Popular Resistance Committees

294.    The Popular Resistance Committees ("PRC") is a coalition of militant terrorist groups formed in 2000, and is considered the third-largest terror group in Gaza, after Hamas and PIJ.

295.    As set forth more fully herein, PRC has committed numerous terrorist attacks and actively participated in, materially supported, and aided and abetted, the October 7 Attack.

296.    In March 2025, bipartisan and bicameral legislation was introduced in the U.S. Congress to sanction and designate PRC as a terrorist organization.

### I. Hezbollah

297.    Hezbollah (a/k/a Hizbullah, Hezballah, or Hizballah) is a terrorist organization founded in 1982 during the Lebanese Civil War.

298.    As set forth more fully herein, Hezbollah has committed numerous terrorist attacks, including some of the deadliest and most infamous attacks against Americans. Hezbollah participated actively in the planning of the October 7 Attack, and aided and abetted and materially supported the Attack, and immediately following the Attack, began a campaign of terrorist rocket attacks on Israel.

299.    The United States designated Hezbollah an SDT on January 23, 1995.  The United States designated Hezbollah an FTO on October 8, 1997, and an SDGT on October 31, 2001.  Hezbollah was designated an SDT until EO 13886 eliminated that designation, and it has been continuously designated an FTO and SDGT through the filing of this Complaint.

## J.  Syrian Arab Republic

300.    Defendant the Syrian Arab Republic ("Syria") is a foreign sovereign state.

301.    For decades, Syria has engaged in and materially supported anti-Israel and anti-American terror attacks, including specifically attacks by Hamas and Hezbollah in Israel.  As set forth herein, Syria provided material support and resources for the October 7 Attack.

302.    Syria is not immune from the jurisdiction of this Court because Plaintiffs are seeking money damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, . . . hostage taking, or the provision of material support or resources for such an act," as provided by 28 U.S.C. § 1605A(a).

303.    Syria is now and has been designated a State Sponsor of Terrorism since December 29, 1979, pursuant to Section 6(j) of the Export Administration Act of 1979, 50

U.S.C. App. § 2405(j), and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371.

304.    28 U.S.C. § 1605A(a)(2)(A)(i)(I) allows a court to hear claims against a foreign state related to an act of state-sponsored terrorism if the claimants or the victims meet certain requirements in other provisions of 28 U.S.C. § 1605A(a)(2) and "the foreign state was designated a state sponsor of terrorism . . . as a result of such act . . . and remains so designated." Because Syria was "designated as a state sponsor of terrorism at the time" of the October 7, 2023 act of torture, extrajudicial killing, and hostage taking on which Plaintiffs' claims are based, and "remains so designated" at the time of the filing of those claims, the requirements of 28 U.S.C. § 1605A(a)(2)(A)(i)(I) are met with respect to Syria.

## K. Democratic People's Republic of Korea

305.    Defendant the Democratic People's Republic of North Korea ("North Korea") is a foreign sovereign state.

306.    For decades, North Korea has supported Palestinian militant groups, including in connection with terrorist attacks in Israel. North Korea has specifically supported Iranian proxies such as Hamas and Hezbollah in connection with attacks in Israel. As set forth herein, North Korea provided material support and resources for the October 7 Attack.

307.    North Korea is not immune from the jurisdiction of this Court because Plaintiffs are seeking money damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, . . . hostage taking, or the provision of material support or resources for such an act," as provided by 28 U.S.C. § 1605A(a).

308.    North Korea is now and has been designated as a State Sponsor of Terrorism since November 20, 2017, pursuant to Section 6(j) of the Export Administration Act of 1979, 50

U.S.C. App. § 2405(j), and section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371.

309.    28 U.S.C. § 1605A(a)(2)(A)(i)(I) allows a court to hear claims against a foreign state related to an act of state-sponsored terrorism if the claimants or the victims meet certain requirements in other provisions of 28 U.S.C. § 1605A(a)(2) and "the foreign state was designated a state sponsor of terrorism . . . as a result of such act . . . and remains so designated." Because North Korea was "designated as a state sponsor of terrorism at the time" of the October 7, 2023 act of torture, extrajudicial killing, and hostage taking on which Plaintiffs' claims are based, and "remains so designated" at the time of the filing of those claims, the requirements of 28 U.S.C. § 1605A(a)(2)(A)(i)(I) are met with respect to North Korea.

## FACTUAL ALLEGATIONS

310.    The October 7 Attack was led by Hamas. But Hamas did not act alone. At least six other groups, including the Gaza Terrorist Group Defendants, joined the terrorist attack on Israel. And Hezbollah, alongside Iran, the IRGC, Syria, and North Korea, aided and abetted, and provided critical material support for, the Attack. As set forth more fully below, each of the Defendants participated in or materially supported the October 7 Attack, and in doing so killed, injured, and took hostage victims who are United States citizens, and injured the immediate family members of those victims, or otherwise caused the same.

311.    The Gaza Terrorist Group Defendants all participated in the October 7 Attack through:

> a.   "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;" and that

b.   "appear to be intended— (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping;" and these acts

c.   "occur[ed] primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." *See* 18 U.S.C. 2331(1).

312.    Although Hamas was the leader in the October 7 Attack, each of the Gaza Terrorist Group Defendants supplied terrorists, materials, and weapons and fully participated in the October 7 Attack.

313.    The United Nations Human Rights Counsel's Independent International Commission of Inquiry ("HRC Commission") found in its June 10, 2024 Detailed Findings on Attacks Carried Out On and After 7 October 2023 in Israel that each of the Gaza Terrorist Group Defendants participated in the October 7 Attack.

314.    The HRC Commission also found that "prior to the attack, all of the Gaza Terrorist Group Defendants were taking part in joint military maneuvers aimed at 'simulating expected enemy threats and increasing the efficiency and ability of resistance forces to fight in various circumstances…'."

315.    Whether Hezbollah participated directly in the October 7 Attack, it aided and abetted, and provided material support and assistance to, the Gaza Terrorist Group Defendants in planning and carrying out the October 7 Attack, and on October 8, 2023, began a large-scale assault on Northern Israel using rockets, missiles, and drones.

316.    The FSIA Defendants each provided material support, training, material, and funds used to carry out the attacks.

A.    **Background to the October 7 Attack**

1.    **The Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, and the Iranian Axis of Resistance**

317.    Since the 1979 Iranian Revolution, the Islamic Republic of Iran has dedicated itself to the destruction of both Israel and America.  Iranian leaders, including both of Iran's Supreme Leaders since the revolution – Ayatollah Ruhollah Khomeini and Ayatollah Ali Khameini – consistently have referred to the United States as the "Great Satan," and to Israel as the "Little Satan."  "Death to America" and "Death to Israel" have been, and remain, common and constant refrains of Iran.  Iran has acted on its mission of terrorist destruction against Israel and America for decades, such that the U.S. State Department has called Iran "the leading state sponsor of terrorism, facilitating a wide range of terrorist and other illicit activities around the world."

318.    Iran, including through its IRGC, is dedicated to projecting Iranian influence through its use and support of a complex network of state and nonstate partners and armed proxies outside the territory of Iran—including in Lebanon, the Palestinian territories, Iraq, Yemen, and Syria.  In the case of the Palestinian territories, and in Gaza in particular, Iran projects its power through its proxies, including Hamas and PIJ, among other terrorist organizations.

319.    As part of its regional and global strategy, particularly directed at attacking Israel and weakening U.S. influence in the Middle East, Iran has built what has been called the "Axis of Resistance."

320.    The Axis of Resistance includes various armed terror groups, including Hamas, Hezbollah, PIJ, the PFLP, and the Yemeni Houthis, often joined by other terrorist groups.  Iran's primary reason for assembling and supporting these groups is to encircle Israel with what Iran

calls a "Ring of Fire." For decades, Iran has armed and trained its Palestinian proxies in this Ring of Fire, and has both materially supported and directed the Terrorist Group Defendants, including specifically through the IRGC, to attack, weaken, and ultimately destroy Israel.

321.    Iran is very clear that it views its proxies – including specifically the Terrorist Group Defendants – as an extension of Iran itself, fulfilling Iran's mission. As Khamenei proclaimed in the period leading up to the October 7 Attack: "We regard Palestine as an organ of our body, and the support of the Palestinian nation is pride for the Iranian people . . . The Palestinian people must continue the blessed Jihad and standing against the enemies of Islam . . . the Hamas, Islamic Jihad and Fatah forces must continue the struggle in a united way. Indeed, the only solution is the elimination of the root of the crisis, which is the Zionist regime imposed on the region." And Iran not only has encouraged these violent terror attacks by Palestinians against Israel, but has routinely pledged and confirmed Iran's material support.

322.    Iran's terrorist proxies in the Axis of Resistance are diverse in terms of ethnic, religious, and political backgrounds. Despite those differences, all these groups are virulently antisemitic enemies of Israel and the United States, and work in tandem with each other, and with other terrorist groups (including other Gaza Terrorist Group Defendants), to achieve their mutual goals of death and destruction.

323.    Through its Axis of Resistance, Iran has caused, facilitated, and materially supported a wide range of terrorist activities against Americans and Israelis, including the October 7 Attack, by funding, training, and providing weapons and other resources to, its proxies, including Hamas, PIJ, Hezbollah, and others, enabling the terrorists to plan and execute terror attacks in Israel, like the October 7 Attack. Indeed, Iran's hundreds of millions of dollars in funding to Hamas over the years have paid for intelligence operations, weapons and training,

as well as organizational costs, all of which materially supported and provided resources for those attacks, including the October 7 Attack. Over the years, Iran also has publicly announced its financial support and compensation to families of Palestinian terrorists who commit attacks in Israel.

324.    Courts in this District repeatedly have held Iran liable to American victims of state-sponsored terrorism for terrorist attacks carried out by Hamas in Israel, due to Iran's long and documented history of providing material support to Hamas, including by supplying weapons, training, and arranging funding. *See, e.g.*, *Fuld v. Islamic Republic of Iran*, No. 20-CV-2444-RCL, 2024 WL 1328790 (D.D.C. Mar. 28, 2024); *Estate of Henkin v. Islamic Republic of Iran*, No. 18-cv-1273-RCL, 2023 WL 3319425 (D.D.C. May 9, 2023); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020); *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910 (RCL), 2019 WL 6117722 (D.D.C. Nov. 18, 2019); *Baxter v. Islamic Republic of Iran*, No. 11-cv-02133, 2019 U.S. Dist. LEXIS 243209 (D.D.C. Sept. 27, 2019); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017); *Fraenkel Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232 (D.D.C. 2012); *Bennett v. Islamic Republic of Iran,* 507 F. Supp. 2d 117 (D.D.C. 2007); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp.2d 286 (D.D.C. 2003); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002).

325.    As one court in this District has found, "there is near-universal agreement that Iran has provided 'critical' material support—in the form of cash, weapons, and training—for Hamas's terrorist activities since at least the mid-1990s." *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 338 (D.D.C. 2020) (internal cite omitted). The court further found that Iran's

relationship with Hamas grew even closer after 2006, when Hamas won its plurality of seats in the Palestinian parliament after Israel's withdrawal from Gaza, "prompting 'Iranian support, finances and arms [to] r[i]se exponentially.'" *Id.* at 339.

326.    Indeed, as that court also found, both Iran and Hamas "have repeatedly acknowledged the support that Iran provides," including specifically to the "Axis of Resistance," whose goal it is to expand Iranian influence and destroy Israel.  Just a few examples during the period leading up to the October 7 Attack of Iran's support not only to Hamas but to the gamut of Palestinian terrorist groups, including Gaza Terrorism Group Defendants, include:

    a.    A 2014 statement by Supreme Leader of Iran Ayatollah Ali Khamenei stating that "[w]e helped Hizbullah of Lebanon . . . in the same way that we helped . . . Hamas and Islamic Jihad . . . and we will continue to do that . . . we managed to strengthen the fists of our Palestinian brothers in Gaza and by Allah's favor we will continue to do that"; he further stated "Our people love fighting against the Zionists and the Islamic Republic has proved this as well.";

    b.    A 2017 letter from General Qassem Soleimani – then commander of the IRGC-Quds Force – to Hamas leader Ismail Haniyeh to congratulate him on being elected to be the head of Hamas's political bureau, stating:

> We look forward to strengthening cooperation with you, the allies of the Axis of Resistance. Together, we will restore light on the Palestinian issue. I sincerely hope that your jihad continues until the liberation of the Al-Aqsa Mosque and all Palestinian land, and until Jerusalem becomes a meeting place for all Muslims.;

c. A 2020 statement by Khamenei reiterating Iran's deep commitment to supporting Hamas: "Iran will spare no effort to support the Palestinian people to restore their right and hold off the evil schemes of the Zionist entity.";

d. A letter from General Soleimani sent prior to his death in 2020, calling for the annihilation of Israel and pledging that "Islamic Iran will never leave Palestine.";

e. A January 2021 statement by IRGC Aerospace Force commander Amir Ali Hajizadeh, who boasted: "All the missiles you might see in Gaza and Lebanon were created with Iran's support."; and

f. On October 3, 2023, just before the Gaza Terrorist Group Defendants launched the October 7 Attack, Khamenei posted on X: [T]he usurper regime is coming to an end . . . Imam Khomeini once described the usurper Zionist regime as a cancer. This cancer will definitely be eradicated at the hands of the Palestinian people."

327. Courts have also held Iran liable for providing material support to other Gaza Terrorist Group Defendants. *See, e.g.*, *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 340-41 (D.D.C. 2020) (describing Iran's material support of PIJ); *Przewozman v. Islamic Republic of Iran*, 754 F. Supp. 3d 1, 15-16 (D.D.C. 2024) (same); *Heching v. Syrian Arab Republic*, No. 17-CV-1192 (TSC), 2023 WL 2384393, at *2 (D.D.C. Mar. 5, 2023) ("Syria and Iran provided material support to PFLP in the years prior to 2014…").

328. Official U.S. Government reports also have long acknowledged Iran's material support for Palestinian terrorist groups, including Gaza Terrorist Group Defendants. In

designating the IRGC-QF as an SDGT in 2007, the State Department observed specifically that the IRGC-QF provided support to Terrorist Group Defendants.  And in April 2019, when designating the IRGC in its entirety as an FTO, the State Department reiterated its conclusion that the IRGC "continues to provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Izballah in Iraq, al-Ashtar Brigades in Bahrain, and other terrorist groups in Syria and around the Gulf."  The State Department concluded that "the [FTO] designation highlights that Iran is an outlaw regime that uses terrorism as a key tool of statecraft and that the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago."

329.     As recorded in video and press accounts, Iran's proxies, including Gaza Terrorist Group Defendants, are likewise open about Iran's material support and provision of resources to Palestinian terror group activities, especially in Israel.  In 2017, for example, Hamas leader Yahya Sinwar stated that "the Islamic Republic of Iran is playing a central role in providing Hamas with financial and military assistance and the training of Hamas' militant wing Al-Qassam Brigades." Sinwar also stated that "Iran has never failed to provide the movement with all forms of support since the Israeli aggression on Gaza in 2014," and that "[r]elations with Iran are excellent and Iran is the largest supporter of the [al-Qassam Brigades] with money and arms."  Also in 2017, Saleh al-Arouri, a founding commander of the al-Qassam Brigades and prominent Hamas leader, likewise stated that Iran was the "main and primary benefactor" of the al-Qassam Brigades, "whether through knowledge or assistance."  In 2020, al-Arouri further stated that "Iran has given Hamas and the resistance movements all the support and weapons

they need."  Also in 2020, a senior Hamas leader in Gaza confirmed Iran's ongoing support, stating that Iran's support for the "Palestinian resistance" would be "greater than ever, with no restrictions and in any way the Palestinian resistance wishes."

330.    As detailed below, other Gaza Terrorist Group Defendants are similarly open about Iran's support.  As far back as 1993, one of PIJ's founders, Fathi al-Shiqaqi, told a Western newspaper that "Iran gives us money and supports us, then we supply the money and arms to the occupied territories and support the families of our people."

331.    Senior Hamas and other "Axis of Resistance" officials continued to make such public pronouncements in the period leading up to the October 7 Attack.  In 2021, senior PIJ official Ramez Al-Halabi said that rockets used to target Israel "bear the signature of Iran and Soleimani," that the IRGC trained PIJ members, and that Iranian money was used to buy weapons in Gaza.  According to Al-Halabi, every home in Gaza has Soleimani's portrait, and "it is they [Iran] who support us with weapons, money, and food."  Meanwhile Yahya Sinwar announced Hamas's "complete gratitude . . . to the Islamic Republic of Iran, which has spared us and the other Palestinian resistance factions nothing in recent years.  They have provided us with money, weapons, and expertise."  In 2023, senior Hamas official Khalil Al-Haya asserted that Iran "supports Hamas and the resistance forces and helps us with money and weapons."  And PIJ leader Ziyad al-Nakhalah said on television that "the weapons that the Palestinians use for fighting come from Iran," either directly or by paying for them, and that Iran has provided "billions of dollars" to support the Palestinian efforts, including $150,000,000 annually to Hamas.

332.    Other reports suggest even higher levels of support.  In 2019, when the U.S. sanctioned Iran for its role in financing, training, and arming Hamas, the U.S. Financial Crimes

Enforcement Network ("FinCEN") determined that Iran's support to Hamas alone during periods of substantial collaboration could be as high as $300 million per year, and FinCEN subsequently estimated that Iran has provided as much as $100 million per year to Hamas since 2018. These figures are consistent with a report that Iran's Supreme Leader had expressed Iran's willingness to raise its monthly support to the terror group to $30 million per month. And in Congressional hearings immediately following the October 7 Attack, the Congressional Research Service cited a source finding that Iran had increased funding for Hamas's militant wing in the preceding year from $100 million to $350 million, an increase likely spurred by the planning for the October 7 Attack.

333.    Analysts estimate that Iran spends hundreds of millions of dollars a year supporting terrorist groups in addition to Hamas. For example, up to 80% of Hezbollah's funding is believed to come from business and charitable fronts personally controlled by Iran's supreme leader, Ayatollah Ali Khamenei. Iran also reportedly sends at least $30 million a year to PIJ.

334.    Iran uses a variety of methods – both simple and advanced – to deliver financial support to Palestinian terrorist groups in Gaza, including Gaza Terrorist Group Defendants, ranging from suitcases of cash to cryptocurrency to bank transfers through foreign branches of Iranian-owned banks, practices the U.S. Treasury Department and the European Commission have been tracking for years. Indeed, it is because of this financial support that the U.S. government has in recent years designated multiple Iranian banks, including the Central Bank of Iran, for their support of terrorism and proliferation activities.

335.    In addition to money, Iran has provided these groups with weapons, ammunition and supplies, materials, and technological training, including for purposes of manufacturing

weapons in Gaza, all of which materially supported the October 7 Attack.  This, too, is no secret.

In 2021, the U.S. State Department observed that "Iran has maintained a near-global

procurement network, obtaining cutting-edge technology from companies and locales around the

world to bolster its terrorist and military capabilities."

336.    Nor do Iran's proxies and beneficiaries conceal this support.  In 2020, the Hamas

Commander from the Military Production Unit of the al-Qassam Brigades said on camera that,

"the weapons came to us, by land and sea, from hundreds and thousands of kilometers away.

Various types of weapons have arrived in Gaza from Iran.  Other countries, like Syria, have also

played a role in arming the resistance."  With Iran's assistance, Hamas and other Gaza Terrorist

Group Defendants have significantly upgraded their weapons arsenal with enhanced accuracy,

longer ranges, heavier warheads, and improved launchers.

337.    Iran also has provided training and logistical support that has enabled Hamas and

other Gaza Terrorist Group Defendants to coordinate and execute attacks in Israel, including the

October 7 Attack.  Specifically, Iran has facilitated training of terrorist operatives in IRGC and

other military bases in Iran, Syria, and Lebanon.  In 2019, the Hamas official newspaper "Al-

Risala" published an article outlining Iran's military support, including training of Hamas

members in military specializations.  And in November 2023, after the October 7 Attack, retired

IRGC General Ezzatollah Zarghami reported in an interview how Iran supplied Hamas with

Iranian Fajr-3 rockets (North Korean-supplied rocket systems) used in the October 7 Attack and

used Hamas's tunnels for travel and training with respect to the usage of these rockets.

338.    As a direct and proximate result of the material support and resources Iran

provided to Hamas, PIJ, and other Terrorist Group Defendants, thousands of innocent people

were murdered, injured, and/or taken hostage in connection with the October 7 Attack, including Plaintiffs herein.

339.    Iran's material support for Defendants was a more than substantial cause of the October 7 Attack and Iran is therefore liable for that attack.  Indeed, Hamas, PIJ, and the other Gaza Terrorist Group Defendants never could have conducted the Attack without material support from Iran, both historically and in the period leading up to the Attack.

340.    Only days after the October 7 Attack, the BBC reported that a spokesman for Hamas, Ghazi Hamad, admitted that Hamas had received support from Iran for the October 7 Attack.  And, following the death of Iranian President Ebrahim Raisi in May 2024, Hamas leader Ismail Haniyeh told an Iranian official on camera that President Raisi's death was "a great loss for Palestine because the role of the President and Foreign Minister were great in the 'Battle of Aqsa Flood'"—the name Hamas has given to the October 7 Attack.

341.    According to current and former U.S. officials, decades of Iranian arms, funding, and military training made the October 7 Attack possible.  Not only did Hamas and other Gaza Terrorist Group Defendants use the funds and weapons (rockets, missiles, drones, assault weapons, ammunition, etc.) supplied by Iran, but also received material training and support, without which the terrorists could not have carried out such a complicated and calculated attack.

342.    It has been estimated that hundreds of militants, including Hamas and PIJ militants, received specialized combat training in Iran leading up to the October 7 Attack.

343.    Numerous meetings also were reportedly conducted between Hamas, PIJ, and Iranian leaders and military officials during the period leading up to the Attack, including:

a.   From April to June 2023, Iranian leaders, including Iran's Supreme leader Ayatollah Khamenei and Iranian President Ebrahim Raisi, publicly hosted Hamas and PIJ leaders in Iran and Syria.

b.   In June 2023, Quds Force commander Esmail Qaani met in Tehran with Hamas leader Ismail Haniyeh and PIJ leader Ziyad Al-Nakhala; according to the Congressional Research Service, Haniyeh himself reportedly visited Tehran at least three times between 2019 and the October 7 Attack.

c.   On June 19, 2023, Haniyeh met with a delegation of Iranian security and military officials.

d.   On June 21, 2023, Haniyeh met with Ayatollah Ali Khamenei, as well as a delegation of high-level Iranian security and military officials.

e.   In August 2023, Hamas deputy leader Salah Al-Arouri publicly acknowledged: "We are preparing for an all-out war, and we are discussing the prospects of this war with all relevant parties," which, one report concluded, "surely included the IRGC and Hizbollah, with whom Hamas leaders met regularly in a 'joint war room' in Beirut."

f.   On October 2, 2023, leaders of Hamas, PIJ, and Hezbollah met with Iranian officials in Beirut to plan the October 7 Attack.

344.   Since October 7, statements made by Iranian officials have further confirmed Iran's material support for the Attack.  Not only have Iran's leaders consistently praised the Attack, supporting and encouraging the terrorist perpetrators, Iran's IRGC has since boasted of its connections to the Attack, calling it one of its own operations.  On October 28, 2023, IRGC

commander General Hossein Salami publicly stated: "All it takes to break Israel is one of *our* operations."

345.    Iran provided material support and resources to Hamas and the other Gaza Terrorist Group Defendants– both in the decades leading up to the October 7 Attack, and in the period leading up to the Attack – that enabled them to carry out the October 7 Attack.  The Gaza Terrorist Group Defendants could not have carried out the Attack without Iran's support and sponsorship, and Iran knew that they would use its support and resources to carry out attacks such as the October 7 Attack.

346.    As a direct and proximate result of the material support and resources Iran provided to the Terrorist Group Defendants, thousands of innocent people were murdered, injured, and/or taken hostage by the Gaza Terrorist Group Defendants in connection with the October 7 Attack, including Plaintiffs herein.

### 2.    Hamas

347.    As a leader among Iran's "Axis" of terrorist proxies in Gaza, it is important to understand Hamas's origins and how it came to assume a primary role in Iran's mission to annihilate Israel, especially in the lead-up to the October 7 Attack.

348.    The Islamic Resistance Movement (Harakat-Al-Muqawama Al-Islamia), known by its Arabic acronym "Hamas," is an extremist fundamentalist Islamic Palestinian terrorist organization.

349.    Hamas operates in primarily Gaza, the West Bank, Lebanon, and Syria, and has leadership based in several countries around the region.  It was formed in Gaza in 1987 by a group led by Sheikh Ahmed Yassin as an outgrowth of the Muslim Brotherhood.  Hamas's stated primary goal is to eradicate the State of Israel and establish a Palestinian Islamic regime in its place.  Since its inception, Hamas has used extreme violence and terrorism to promote this goal.

350.    Hamas does not conceal its genocidal intent with respect to Jews, Israel and Israelis, including the Israeli-Americans who live in Israel.  The Preamble of the Hamas charter, issued on August 18, 1988, states: "Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it."  The charter further states that "[t]here is no solution to the Palestinian problem except by Jihad," and it calls upon the Arab and Islamic world to join the "struggle against the Jews . . . until the enemies are defeated and Allah's victory prevails."

351.    Since 1993, Hamas, through its militant wing, the "al-Qassam Brigades," has been the primary terrorist group responsible for violent attacks in and against Israel, causing the deaths of dozens of Americans and hundreds of Israeli citizens, figures which increased dramatically on October 7, 2023.

352.    In 2005, Israel unilaterally disengaged from the Gaza Strip, removing Israeli Defense Forces ("IDF") installations and forces, and removing over 9,000 Israeli citizens across 25 settlements.  After Israel's withdrawal from Gaza, elections were held in 2006 for the Palestinian Legislative Council, with Hamas winning the majority of seats.  After Hamas's election, a power struggle ensued with Fatah, the party of Yasser Arafat, which had dominated Palestinian politics for almost a half-century.  After a bloody and brutal civil war, Hamas ultimately took control of the Gaza Strip, and expelled Fatah from Gaza in June 2007.

353.    Since 2007, Hamas has been the *de facto* governing body in Gaza, but no other country recognizes Hamas as a sovereign entity.

354.    Since seizing power over Gaza in 2007, Hamas has dedicated the majority of its activity to building a military industrial complex and carrying out murderous attacks in Israel, from kidnappings and killings to suicide bombings and rocket attacks.

355.    Hamas has assumed a lead role in the terrorist infrastructure in Gaza, but has worked with other terrorist groups in the region, including other Gaza Terrorist Group Defendants, in furtherance of its genocidal mission against Israel, especially during the period leading up to the October 7 Attack.

356.    Thus, in July 2018, Hamas first established and led a Joint Room for Palestinian Resistance Factions (a.k.a. The Palestinian Joint Operations Room) ("Joint Operations Room") in Gaza, as an alliance of Palestinian armed groups, in concert with other groups in Gaza, including Gaza Terrorist Group Defendants, to coordinate attacks against Israel using pooled resources. The Joint Operations Room oversaw joint military maneuvers in preparation for the October 7 Attack throughout the period leading up to the October 7 Attack, with the last drill held just three weeks before the October 7 Attack.  Photos and videos from the Joint Operations Room of tactics used in the drills – including simulated infiltrations, raids, and hostage-taking in the groups' "Strong Pillar" exercises – closely resemble the tactics used by the Gaza Terrorist Group Defendants in the October 7 Attack itself.

357.    Since 2020, the Gaza Terrorist Group Defendants, have, through the Joint Operations Room and under the direction of Hamas, trained in military exercises for the kind of attack they perpetrated on October 7, 2023.

358.    The first of the Joint Operations Room's military exercises was timed to be close enough to the first anniversary of the death of IRGC commander Qassem Soleimani that terrorist groups, particularly Hamas and PIJ, could use the exercises as an excuse to thank Iran for its support.

359.    U.S. courts, including courts in this District, have repeatedly found Hamas responsible for terrorist attacks that caused the deaths of American and Israeli citizens in Israel.

*See, e.g.*, *Fuld v. Islamic Republic of Iran*, No. 20-CV-2444-RCL, 2024 WL 1328790 (D.D.C. Mar. 28, 2024); *Estate of Henkin v. Islamic Republic of Iran*, No. 18-cv-1273-RCL, 2023 WL 3319425 (D.D.C. May 9, 2023); *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910 (RCL), 2019 WL 6117722 (D.D.C. Nov. 18, 2019); *Baxter v. Islamic Republic of Iran*, No. 11-cv-02133, 2019 U.S. Dist. LEXIS 243209 (D.D.C. Sept. 27, 2019); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017); *Fraenkel  Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232 (D.D.C. 2012).

360.    Hamas has received substantial and material support for its terrorist activities in Israel, including the October 7 Attack, from Iran, Syria, North Korea, and Hezbollah, that has enabled it to plan for and execute these attacks.

361.    Given Hamas's lead role, the evidence of Iran's material support for Hamas's terrorist activities, including the October 7 Attack, is unsurprisingly overwhelming, as already described above. Indeed, Iran's support of Hamas dates back to the early 1990s when Hamas grew to prominence in Gaza, and this relationship continues strong today.  Since that time, Hamas leaders and officials have regularly visited Iran to meet with senior Iranian leaders and officials at the highest levels.  Hamas routinely has acknowledged Iran's support – both financial and military – and the U.S. Government has likewise reported consistently on Iran's substantial support of Hamas, including weapons, funding, and training, including in connection with the October 7 Attack.

### 3.    Palestinian Islamic Jihad

362.    PIJ is an extremist Islamist terror group, founded in 1981 by Fathi Shiqaqi and Abd al-Aziz Awda (a.k.a. Sheikh Obdeh), both originally members of the Muslim Brotherhood who felt that organization was too moderate and wished to create a radical militant alternative. Shiqaqi was heavily influenced by the ideology of Iran Supreme Leader Ayatollah Ruhollah

Khomeini.  As described by Shiqaqi's successor Ramadan Shallah in 2002, "[PIJ] is another fruit of the Ayatollah Khomeini's fructous tree."  PIJ's mission is to establish a sovereign Islamic state through the military destruction and replacement of the Jewish state.  PIJ rejects a two-state solution.

363.    PIJ founded its militant wing, the al-Quds Brigade, in 1992, and has routinely executed and escalated attacks in Israel—including suicide bombings and mass killings on both military and civilian targets—to derail any peace process.

364.    PIJ is part of the Joint Operations Room and participated in trainings that simulated attacks on Israel highly similar to the October 7 Attack.

365.    As with Hamas, Iran has provided PIJ with significant monetary support as well as weapons.  According to the United States Department of State, Iran has trained PIJ terrorists "while also funding groups that provide financial support to Palestinian Islamic Jihad-affiliated fighters."  As one court in this District found: Iran provided "PIJ with significant support in the forms of arms and financial assistance, as well as training and technical expertise."  *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 337 (D.D.C. 2020).

366.    PIJ has been attacking Israel and Israeli targets since the 1980s.  During the early years of the group's existence, its leaders traveled to Tehran to meet with Khomeini, who promised the group aid and arms.  IRGC trained PIJ members at Hezbollah camps in Lebanon, and PIJ and Hezbollah collaborated on joint attacks against Israel.

367.    Since that time, PIJ operatives have continued to receive Iranian military and terror training both in Lebanon and in Iran.  Iran also has supplied PIJ with weapons and funding.  A 2023 U.S. Treasury report notes that Iranian support has enabled both Hamas and

PIJ's terrorist activities, including through hundreds of millions of dollars in financial assistance and the furnishing of weapons and operational training.

368.    PIJ has routinely acknowledged Iran's material support.  In the 1990s, Shiqaqi stated in an interview that "Iran gives us money and supports us," and "then we supply the money and arms to the occupied territories and support the families of our people."  In the early 2000s, Iran paid PIJ millions of dollars for each attack against Israel during the Second Intifada, and Iran Supreme Leader Ayatollah Ali Khameini promised to increase Iran's support of the organization by 70 percent.  In 2012, PIJ spokesman Daoud Shihab stated that military assistance to PIJ, "[f]rom A to Z, from bullet to rocket – is assistance from the Islamic republic, Iranian assistance."  That same year, PIJ's deputy secretary general, Ziad al-Nakhalah, referenced Fajr-5 long range missiles the terrorist group used in attacks against Israel as "from our brothers in Iran."  Nakhalah stated that "these weapons are excellent Iranian weapons," and thanked Iran for "the great sacrifices that they made in order that these weapons would get to the Gaza strip."  In 2013, Shihab stated that "all of the weapons in Gaza are provided by Iran, be they weapons intended for the Hamas movement or for the PIJ.  Perhaps Hamas even has more Iranian weapons than us; and everyone knows that Iran is financing us . . . the largest share of this financial and military support is coming from Iran."

369.    In recent years, and leading up to the October 7 Attack, PIJ terror attacks against Israel have included the firing of thousands of rockets from Gaza.  In 2021, by which time Iranian aid had increased to tens of millions of dollars, senior PIJ official Ramez Al-Halabi stated: "I am proud to say that the rockets that are used to pound Tel Aviv have an Iranian signature on them."  He added that PIJ members were trained by the IRGC and that Iranian money was used to buy weapons for the armed factions in Gaza and Lebanon.

370.    U.S. Government reports reflect that Iran's support to PIJ continued through the October 7 Attack, including weapons, financing, and training.

371.    Since 2018, PIJ has coordinated with Hamas and the other Gaza Terrorist Group Defendants at the Joint Operations Room in Gaza regarding attacks on Israel, including the October 7 Attack.  Though PIJ also acted independently, when Hamas launched the October 7 Attack, PIJ quickly followed to join the attack, participating actively in the massacre.

372.    PIJ has publicly claimed credit for the rocket and mortar attacks during the October 7 Attack.  A PIJ spokesperson, Abu Hamza, even stressed the fact that the rocket and mortar attacks by PIJ targeted Israeli civilians, rather than military targets.

373.    That same spokesperson also confirmed that "[PIJ] is part of this battle, and [its] men are fighting shoulder to shoulder alongside with their brothers in the al-Qassam Brigades…"

374.    PIJ itself, through its militant wing, the al-Quds Brigades, published videos of its participation in the October 7 Attack, including videos of its attacks on Nahal Oz, an Israeli military installation.

375.    PIJ terrorists also have been identified among the terrorists who attacked Kibbutz Nir Oz, discussed *infra*.

376.    PIJ fighters are often identified by black and gold headbands, allowing observers and investigators to confirm their involvement in the October 7 Attack.

377.    The Attorney General of the United States has confirmed PIJ's involvement in the October 7 Attack.

378.    PIJ's actions during the October 7 Attack were particularly brutal.  Two masked terrorists wearing PIJ insignia were seen holding a man's severed head in a post on social media.

379.    On October 8, 2023, PIJ's leader, Ziad al-Nakhala, publicly announced that PIJ was holding over 30 hostages kidnapped during the October 7 Attack.

380.    As detailed herein, PIJ has received substantial and material support for its terrorist activities in Israel, including the October 7 Attack, from Iran, Syria, and North Korea, that has enabled it to plan for and execute these attacks.

381.    U.S. courts, including courts in this District, have repeatedly found PIJ responsible for terrorist attacks that caused the deaths of American and Israeli citizens in Israel. *See, e.g., Przewozman v. Islamic Republic of Iran*, 754 F. Supp. 3d 1, 16-17 (D.D.C. 2024); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 16 (D.D.C. 2009); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 30-31 (D.D.C. 2012).

### 4.    Popular Front for the Liberation of Palestine

382.    PFLP is a Marxist-Leninist terror group, which believes that eliminating Israel is precursor to the establishment of a Palestinian communist state.  It does not recognize Israel, and opposes any negotiations, instead calling for the "liberation" of all of what it calls "historical Palestine," regularly by means of terror.

383.    PFLP has regularly used terrorism to achieve its means since the 1970s, and deployed suicide bombers against Israel during the Second Intifada.

384.    Since 2018, PFLP and its militant wing, the Abu Ali Mustafa Brigades, have coordinated with Hamas and the other Gaza Terrorist Group Defendants regarding attacks on Israel at the Joint Operations Room in Gaza.

385.    Iran has supported PFLP since at least 2013, and likely longer.  A 2013 report noted that Iran had resumed military and financial support to PFLP after leaders from both sides had several meetings in Tehran, Beirut, and Damascus under the auspices of Hezbollah.  In 2021, PFLP, along with several other of the Gaza Terrorist Group Defendants, further boasted about

their relationship with Iran, including military support they have received. A PFLP delegation also met with Iran President Ibrahim Raisi after his swearing-in in 2021, at which meeting Raisi affirmed Iran's continued support for the "Palestinian Resistance" and the "liberation of Palestine."

386.     U.S. Government reports from 2016 to 2023 consistently reflect Iran's support to PFLP, including in the form of weapons and financing.

387.     In June 2023, PFLP representatives also met with the Iranian ambassador to Syria to discuss cooperation on "the Palestinian nation's resistance in the West Bank" and "strengthening the axis of resistance."

388.     PFLP has been confirmed as a participant in the October 7 Attack.

389.     On October 7, 2023, PFLP posted photos on official channels showing its militants attacking Israeli civilians. It also posted statements to its website confirming its involvement.

390.     The PFLP said specifically that:

> Cells of the martyr Abu Ali Mustafa Brigades stormed several [military] points in the Gaza envelope and have inflicted verified losses in the Zionist ranks. The cells have returned safely to their bases, and other cells are operating in the field now to inflict more losses in the ranks of the occupation army troops and the herds of their settlers.

391.     Through its militant wing, the Abu Ali Mustafa Brigades, PFLP issued another statement on October 7, 2023:

> "The Al-Aqsa flood" campaign is a campaign of the Palestinian people in all its resistance forces. In light of the heroic sights made possible by the heroes of the resistance inside the occupied lands…we in the Abu Ali Mustafa Brigades emphasize the following: We announce a state of maximum mobilization within the ranks of our fighters, and we work on the field on the ground [sic] in several axes side by side the comrades of blood and arms.

We stand with our brothers in the [Izz ad-Din] Al-Qassam Brigades and with all the resistance forces, and fight alongside them [in] this campaign which will be noted in history. We call upon all resistance forces inside and outside of Palestine to take their positions in the trenches of confrontation which stretch now throughout all the area. Glory to the martyrs and victory to the resistance…

392.    The official PFLP website also added a statement on October 7, 2023:

On this day, the nature of the conflict and the dignity of the Arab nation are regained…. [the] PFLP calls the sons of our heroic people across Palestine to actively participate in the 'Al-Aqsa flood' campaign, each from his location and with whatever means he possesses, in order to bring an onslaught on the enemy's army and its settlers…and to hail attacks on them in every inch of the land of Palestine. The Front emphasized its call to all who carries arms, and especially the sons of the [Palestinian Authority] security forces to join in the campaign of the Palestinian people against its enemy and to position themselves in the natural place of every free Palestinian that fights to end the occupation….

393.    U.S. courts, including courts in this district, have found PFLP responsible for terrorist attacks that caused the deaths of American and Israeli citizens in Israel.  *See, e.g.*, *Shatsky v. Syrian Arab Republic*, No. CV 08-496 (RJL), 2024 WL 1091803, at *2 (D.D.C. Mar. 13, 2024); *Heching v. Syrian Arab Republic*, No. 17-CV-1192 (TSC), 2023 WL 2384393, at *2 (D.D.C. Mar. 5, 2023); *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 453 (D.P.R. 2010).

**5.    Democratic Front for the Liberation of Palestine**

394.    DFLP is another Marxist-Leninist terror group, founded in 1969.  Its militant wing is called the National Resistance Brigades or the Martyr Omar Al-Qassem Forces.

395.    DFLP infamously committed the Ma'alot Massacre in 1974, in which 25 schoolchildren were murdered.

396.    During the Second Intifada, DFLP was involved in numerous acts of terrorism against Israel.

397.    DFLP participates in the Palestinian Joint Operations Room and was part of the Joint Operations Room's preparations for the October 7 Attack.

398.    By 2011, DFLP had begun a close relationship with Iran and its proxies. In 2011, a Hezbollah parliamentarian gave a speech at DFLP's congress in which he "stressed the need for the Palestinian factions to overcome their political differences, so that they could be [better] able to confront the Israel aggression," and DFLP maintained close relationships with Hezbollah leading up to the October 7 Attack.

399.    DFLP participated in the October 7 Attack and bragged about its participation on its social media channels.  On its official Telegram channel, DFLP posted images of DFLP fighters, identified by red headbands, engaged violently in the October 7 Attack.

400.    DFLP claimed, in particular, that its terrorists participated in the attacks on Kibbutz Be'eri, Kerem Shalom, Kibbutz Kfar Aza, and Kissufim, as part of the October 7 Attack.

401.    DFLP has received substantial and material support for its terrorist activities in Israel, including the October 7 Attack, from Iran, Syria, and North Korea, that has enabled it to plan for and execute these attacks.

402.    Iran specifically has supported DFLP in Gaza by providing weaponry and other material support. DFLP terrorists are known to use Iranian-made weapons.  DFLP's militant wing, the National Resistance Brigades, started as a group of terrorist cells in Gaza and the West Bank.  But with the assistance of Iran, it has turned into a "cohesive armed structure" that enabled it to carry out the October 7 Attack.

**6.    Al-Aqsa Martyrs Brigade**

403.    Al-Aqsa Martyrs Brigade is a terrorist organization that began during the Second Intifada.

404.    AAMB participates in the Joint Operations Room and was part of the Joint Operations Room's preparations for the October 7 Attack.  AAMB has been confirmed as a participant in the October 7 Attack.  Its terrorists can sometimes be identified by distinctive yellow headbands.

405.    Only two hours after the October 7 Attack began, at around 8:30 am, AAMB announced that it would join the assault on Israel.

406.    AAMB later released videos of its participation in the October 7 Attack.

407.    AAMB terrorists have been identified among the terrorists who attacked Kibbutz Nir Oz, discussed *infra.*

### 7.    Palestinian Mujahideen Movement

408.    PMM is a terrorist group established in 2001.

409.    PMM is an Islamist group that has frequently praised Iran and its proxies.

410.    PMM is active in both the West Bank and Gaza and regularly fires rockets into Israel.

411.    PMM participates in the Joint Operations Room and was part of the Joint Operations Room's preparations for the October 7 Attack.

412.    Like the AAMB, PMM announced its own participation in the October 7 Attack.

413.    PMM is known to have participated in the attack on Kibbutz Nir Oz, discussed *infra*.

414.    Following the October 7 Attack, PMM claimed to be holding hostages captured during the Attack.

### 8.    Popular Resistance Committees

415.    The Popular Resistance Committees is a coalition of armed groups that opposes all attempts at peace with Israel.

416.    The PRC was formed in 2000 out of groups with a long history of terror attacks on Israel.  These separate armed groups operate through the al-Nasser Salah al-Din Brigades.

417.    The PRC has admitted and touted its participation in the October 7 Attack.

418.    The PRC participates in the Joint Operations Room and was part of the Joint Operations Room's preparations for the October 7 Attack.

419.    The PRC is known to have participated in the attack on Kibbutz Nir Oz, discussed *infra*.

420.    Following the October 7 Attack, the PRC claimed to be holding hostages captured during the Attack.

421.    The PRC is known to receive "extensive" support from Iran, and has touted its receipt of support from both Iran and Hezbollah.  After Operation Protective Edge, an IDF operation in Gaza in 2014, the PRC told western media outlets that support from Hezbollah and Iran had continued.

422.    In 2016, a PRC spokesperson thanked Iran because the IRGC had provided "every missile, shell, or any tool of the Resistance."

423.     In 2021, while marking the death of IRCG commander Qassem Soleimani, the PRC acknowledged Soleimani's support for the group.

424.    A bi-partisan group of United States Senators have introduced a bill to designate the PRC an FTO, in part because it operates as a "puppet of Iran."  The sponsors of the proposed bill stated that PRC has been the third-largest terror group in the Gaza strip, after Hamas and PIJ, since as early as 2011.

**9.    Hezbollah**

425.    Hezbollah is a terrorist organization based in Lebanon, founded in 1982.

426.    Hezbollah and its militant wing, the Jihad Council, was, as of October 7, 2023, likely the most well-armed and largest non-state militarized group in the world, with an estimated strength of at least 50,000 fighters.

427.    Hezbollah's stated goals include destroying Israel and removing "Western," particularly U.S., influence from Lebanon, as well as promoting Shia Islam at the behest of Iran.

428.    Hezbollah and Hamas have long been close allies, acting cooperatively.  In this capacity, and bolstered by its partnership with Iran as another Iranian proxy, Hezbollah plays a vital role in Hamas's links with Iran.

429.    Historically, Hezbollah has offered military training to Hamas combatants, made political recommendations to the organization, and encouraged Hezbollah-affiliated media platforms to support Hamas and the Palestinian cause.  Hezbollah also facilitated transfers of funds from Iran to Hamas.

430.    Hezbollah has provided Palestinian terrorist groups, including Hamas, with training and intelligence.

431.    Hezbollah's relationship with Hamas dates back to at least 1992, when Israel deported over 400 Hamas members to Lebanon in response to Hamas' participation in the First Intifada.  Hezbollah and the IRGC trained the Hamas members in insurgency tactics, including building and deploying suicide bombs.  Going forward, Hezbollah smuggled weapons and bombmakers into Gaza to support Palestinian attacks against Israel.

432.    Before the Arab uprisings in 2011, Hamas and Hezbollah cooperated politically and militarily and were closely aligned with Iran and Syria.  The two groups were so close that Hezbollah invited and allowed Hamas to maintain offices and residences for several high-ranking officials in Hezbollah strongholds in Beirut's southern suburbs.

433.    Following the Arab uprisings, the relationship between Hamas and Hezbollah changed for a time when Hamas took a different approach with the Assad regime from Hezbollah and Iran, but the partnership never disappeared as Hamas maintained, and over time re-strengthened, its relationship with both Hezbollah and Iran.  In June 2021, following an uptick in clashes between Hamas and Israel's armed forces, Hezbollah leader Hassan Nasrallah and Hamas political bureau chief Ismail Haniyeh met in Beirut to further strengthen their alliance. Hamas leaders confirmed that they fully coordinated with Hezbollah and the IRGC during this period of escalating conflict and were committed to working together in the future.  Hezbollah continued to work closely with Hamas up to and through the October 7 Attack, providing material support that was instrumental to the Attack.

434.    Hezbollah also has provided substantial and material support to other Gaza Terrorist Group Defendants that enabled them to prepare for and participate in the October 7 Attack.

435.    PIJ members historically trained at Hezbollah camps and collaborated with Hezbollah on joint attacks against Israel.  Syria hosted meetings between Iranian and PFLP leaders under the auspices of Hezbollah which led to Iran's resumption of military and financial support to PFLP during the years leading up to the October 7 Attack.  In 2011, a Hezbollah parliamentarian gave a speech at DFLP's congress in which he "stressed the need for the Palestinian factions to overcome their political differences, so that they could be [better] able to confront the Israel aggression," and DFLP maintained close relationships with Hezbollah leading up to the October 7 Attack.  And the PRC has also publicly touted its support from Hezbollah.

436.    Hezbollah has a long history of attacks on U.S. citizens. It has attacked American targets around the world, including embassies and military buildings in Lebanon, Kuwait and

Saudi Arabia.  Some of the most well-known attacks include the bombings of the U.S. Embassy,

Embassy Annex, and Marine Barracks in Beirut in 1983 and 1984, killing hundreds of

Americans and injuring hundreds more, for which courts in this district have found Hezbollah

responsible.  *See Wagner v. Islamic Republic of Iran*, 172 F. Supp. 128 (D.D.C. 2001);

*Dammerell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105 (D.D.C. 2003); *Doe v. Islamic

Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011); *Fain v. Islamic Republic of Iran*, 856 F.

Supp. 2d 109, 117 (D.D.C. 2012).  Courts have continued to find Hezbollah responsible for

attacks against Americans in the Middle East in the ensuing years.  *See, e.g., Estate of Heiser v.

Islamic Republic of Iran*, 466 F. Supp. 2d 229, 248 (D.D.C. 2006) (finding that Hezbollah

orchestrated and carried out June 25, 1996 bombing at Khobar Towers residence in Saudi Arabia

which killed 19 U.S. servicemen); *Kaplan et al v. Hezbollah et al*, No. 1:09-cv-00646-RCL

(D.D.C. 2016) (holding Hezbollah liable for rocket attacks on northern Israel between July 12

and August 14, 2006 which injured thirty U.S. citizens); *Fritz v. Islamic Republic of Iran*, 320 F.

Supp. 3d 48, 63 (D.D.C. 2018) (finding Hezbollah trained Iraqi militia groups to carry out

January 20, 2007 attack on Karbala Provincial Joint Coordination Center in which three U.S.

servicemen were abducted, tortured, and executed).  Hezbollah helped plan the October 7 Attack

and contributed material support to the terrorists who attacked Israel.  Indeed, Hezbollah's then-

Secretary General, Hassan Nasrallah, had ongoing and continuous contact with Hamas

leadership while the October 7 Attack was being planned.

437.    Israeli intelligence operatives have found documents showing that Hamas also

tried to use Hezbollah infrastructure to attack Israel from Lebanon on October 7.

438.    Documents show that during the period leading up to the October 7 Attack,

Hamas leaders held meetings with Hezbollah leaders to discuss "the big project" and schemed

together to deceive Israel into believing that Gaza was focused on "life and economic growth" rather than attacking Israel. According to these documents, Hezbollah sanctioned and supported the October 7 Attack but was not prepared to participate more directly at that time, needing more time "to prepare the environment."

439.    Still, Hezbollah was primed to join the attack on Israel, and did join immediately following the October 7 Attack on October 8, 2023, firing rockets, missiles, and drones into Israel.

440.    Without Hezbollah's material support, Hamas and the other Gaza Terrorist Group Defendants would not have been equipped or prepared to carry out the October 7 Attack.

441.    As discussed herein, Hezbollah has received substantial and material support for its terrorist activities in and against Israel, including the October 7 Attack, from Iran, Syria, and North Korea, that has enabled it to plan for, execute, and support such attacks.

**10.    Syria**

442.    Syria's Ba'athist government, which seized power in a coup in 1963, engaged in state-sponsored terrorism for decades, including specifically in Israel, as part of its terrorist campaign against Israel and against western and American interests.

443.    The U.S. designated Syria a state sponsor of terrorism in 1979, and Syria has remained on the list of state sponsors of terrorism "because of its continued support of terrorism and terrorist groups."

444.    Syria's long-standing and extensive support for Palestinian terrorism has been repeatedly recognized by courts in this District, which have held Syria liable for such attacks in Israel. *See, e.g.*, *Shatsky v. Syrian Arab Republic*, No. CV 08-496 (RJL), 2024 WL 1091803, at *2 (D.D.C. Mar. 13, 2024); *Heching v. Syrian Arab Republic*, No. 17-CV-1192 (TSC), 2023 WL 2384393, at *2 (D.D.C. Mar. 5, 2023); *Fuld*, 2024 WL 1328790, at *4-6; *Jakubowicz v. Islamic*

*Republic of Iran*, No. 18-1450 (RDM), 2022 WL 3354719, at *7 (D.D.C. Aug. 9, 2022); *Henkin*,

2021 WL 2914036, at *2; *Force*, 464 F. Supp. 3d at 341; *Estate of Steinberg*, 2019 WL 6117722,

at * 8; *Roth v. Syrian Arab Republic*, No. 1-14-cv-01946-RCL, 2018 WL 4680270, at *8 (D.D.C.

Sept. 28, 2018); *Fraenkel,* 248 F. Supp. 3d at 31; *Braun*, 228 F. Supp. 3d at 71-72.

445.    As one court in this District just recently held, Hamas and its leaders have also

received substantial material support and resources from Syria, including among other things:

operational and logistical support for its militants in the West Bank and Gaza, safe haven for its

leadership in Damascus, the training of its militants, safe passage and transit across Syrian

territory, and the provision of financial assistance as a matter of state policy. *Fuld*, 2024 WL

1328790, at *6.

446.    As another court in this District recently held, Syria, like Iran, has been

supporting proxy forces in attacks in Israel for many decades.  As that court found, Syria has

supported Hamas dating back to when Hamas announced its existence in the late 1980s, and

Syria's relationship with and direct support of Hamas spans decades.  Syria also has "formed a

particularly close relationship with the PIJ"—Hamas's partner in the "Axis of Resistance"—

"based on their 'total agreement to forcefully fight against and obstruct the peace process'

between Israel and Palestine."  *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110, 121

(D.D.C. 2022).

447.    Hamas opened an office in Damascus in the early 1990s, and in the aftermath of

failed peace negotiations between Syria and Israel in the early 1990s and the signing of the Oslo

I Accord in 1993, Syria steadily increased its backing for Hamas.

448.    At the same time, Hamas's presence in Syria increased throughout the 1990s, as

the Kingdom of Jordan increased restrictions on Hamas during the leadup to and after its 1994

peace treaty with Israel, which culminated in Hamas moving its Political Bureau to Damascus in 2000.

449.    Hamas's Damascus office, established by a senior commander of Hamas's al-Qassam Brigades, served, according to one report, as an "operational headquarters of the Hamas militant wing and a nexus for the transfer of external funds to Hamas operatives in" the West Bank and Gaza.

450.    As far back as the early 2000s, the U.S. Government acknowledged Syria's political and material support for Hamas, which continued leading up to and through the October 7 Attack.

451.    In 2000, the State Department recognized that the Syrian Government had allowed Hamas to open a main office in Damascus, and in 2003, Congress passed legislation seeking to punish Syria for its support of terrorism, including by calling for Syria to "close all terrorist offices and facilities in Syria, including Hamas [. . .]." At the time, Congress found that Hamas and other Palestinian groups "maintain[ed] offices, training camps, and other facilities on Syrian territory, and operate[d] in areas of Lebanon occupied by the Syrian armed forces and receive[d] supplies from Iran through Syria." Around that same time, Israel's Ministry of Foreign Affairs called Hamas a "central sub-contractor at the service of Iran and Syria." Through the decade, the U.S. Government continued to recognize Syria's support for Hamas, finding that the group was able to conduct "diplomatic, fundraising, and arms smuggling activities" in Syria, among other countries. State Department reports also detailed high-level meetings among and between Hamas leaders, representatives of other terror groups, and the Syrian Government, including with Syrian President Bashar al-Assad himself. Syria's long-standing material support was instrumental in Hamas building its infrastructure over a matter of

years to render it capable of committing murderous terrorist attacks against Israel, such as it committed on October 7, 2023.

452.    Although Syria's relationship with Hamas changed temporarily during the Syrian civil war, the relationship was reinvigorated after Hezbollah restored its own ties with Syria in 2017.  With Qassem Soleimani's and Hezbollah's assistance, Hamas and Syria formally resumed ties in 2022.

453.    In holding Syria responsible for other Hamas attacks in Israel, courts in this District have found that Hamas has routed weapons shipments originating from Iran through Syria and from there to Gaza.  In addition to refuge, weapons, and training, Syria has also historically provided Hamas with financial support.  As one court in this District found in connection with other attacks in Israel, Syria has provided Hamas with "financial support, arms, "training for the planning and execution of terrorist attacks," and "safe haven and refuge."  *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71 (D.D.C. 2017).

454.    Syria also has hosted Iranian training of terrorist operatives in military bases in Syria.

455.    Syria's support for Hamas terrorism persisted, leading up to the October 7 Attack. In 2018, the U.S. Treasury Department uncovered an "oil-for-terror" scheme in which oil was shipped from Iran to the Assad regime in Syria, which would then sell the oil and give hundreds of millions of dollars to the IRGC from the proceeds.  From there, the Treasury Department found that the IRGC would distribute the funds to Hamas and Hezbollah.

456.    In December 2020, Hezbollah Secretary General Hassan Nasrallah announced that Russian Kornet anti-tank guided missiles had been provided to Hamas and PIJ from Syria. As Nasrallah stated: "We took those missiles from the brothers in Syria.  President Bashar al-

Assad agreed that those missiles, which Syria purchased from Russia, are in South Lebanon, but I don't know whether he will agree to them being in Gaza." With Soleimani's approval, Nasrallah spoke with al-Assad, who responded that there was "no problem" with transferring the missiles to Gaza.

457. Days later, PIJ Secretary-General Ziad Al-Nakhalah confirmed: "We have had the Kornet [missile] in our possession since 2012, as have our brothers in Hamas. In all the campaigns [against Israel] . . . the resistance has used them . . . All the conventional weapons reached [Gaza] via Al-Hajj Qassem Soleimani, Hezbollah and Syria, and the entire [resistance] axis played a part in transporting them . . . There are training camps in Syria where our brothers in Hamas received special training to produce the rockets."

458. In October 2022, Syria hosted two senior Hamas officials in Syria and publicly reaffirmed its support for Hamas. The state news agency SANA reported that Syrian President Bashar al-Assad told the Hamas delegation that "despite the war that Syria is being subjected to, it did not change its stance on backing resistance by all forms." That same month, Hamas chief of Arab relations, Khalil al-Hayya, discussed with reporters in Damascus Hamas's renewed relations with Syria: "This is a glorious and important day, in which we come back to our dear Syria to resume joint work." Al-Hiya further described how al-Assad was "keen on Syria's support to the Palestinian resistance," and asserted that "Syria has provided for the Palestinians what no other country has provided." Al-Assad sounded a similar note, telling a delegation of Palestinian terrorist leaders that "despite the war that Syria is being subject to, it did not change its stance of backing resistance in all forms."

459. In April 2023, in a speech marking International Quds Day, Hamas leader Yahya Sinwar acknowledged Syria's critical role in building and supporting the Palestinian resistance

movement, including Hamas: "The credit for building the resistance goes to the resistance itself, to the support of the Islamic Republic of Iran, the support of Syria (President Bashar) Al-Assad, and developing our relationship with Hezbollah."  Sinwar further described Syria as "one of the squares of the main pillars and armies in Shaam (Levant)."  Osama Hamdan, Hamas's representative in Lebanon and prominent member of its political bureau, echoed Sinwar's statements, calling Syria's support "unequivocal."

460.    From April to June 2023, Syria hosted meetings between Iranian, Hamas, and PIJ leaders.

461.    As courts in this District have found, the safe haven in Damascus "provided by Syria allowed Hamas to solidify its organizational structure," transformed Hamas "into a leading terrorist organization with the sophistication needed to carry out terror attacks," and allowed it "to increase [its] military capabilities and solidify itself as a major player in the Palestinian arena."  *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 342 (D.D.C. 2020); *Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 31 (D.D.C. 2017).   As one court observed in 2017, "[w]ithout Syria's support from the early 1990s to 2012, Hamas would not be as strong or organized as it is today."  *Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d at 31.  And another court in 2024 observed that, as a result of Syria's support, "Hamas continues to use the tactical know-how which Hamas gained while under Syrian protection."  *Fuld v. Islamic Republic of Iran*, 2024 WL 1328790, at *6 (D.D.C. Mar. 28, 2024).  As one court put it succinctly: "the effects of Syria's support will continue to be relevant for years to come."  *Force v. Islamic Republic of Iran*, 464 F.Supp.3d at 342-43.

462.    Syria's material support allowed Hamas to carry out the October 7 Attack.  Indeed, Syria publicly affirmed its support for the October 7 Attack as it was occurring.  The day

of the Attack, the Assad regime issued a statement praising it, using the name given to the terrorist operation by Hamas, "Operation Al-Aqsa Flood": "Syria raises its head high in honor of the martyrs of the Palestinian revolution and the heroes who planned and achieved the Al-Aqsa Flood operation, and affirms its standing by the Palestinian people and their fighting forces against terrorism and the Zionist methodology."

463.    In the period leading up to the October 7 Attack, Hamas leader Ismail Haniyeh stated publicly that Hamas's long-range rocket arsenal "came from abroad, from Iran, Syria, and others . . .."  There are also reports that Syria's trafficking of billions of dollars' worth of the amphetamine-like drug, Captagon, "has helped to spread violence across the region," noting that "Hamas terrorists' reported use of the drug only adds to the carnage."  In November 2023, U.S. Congressman Jared Moskowitz (D-Florida) co-sponsored bipartisan legislation that called on the U.S. Government to dismantle the illicit production and trafficking of Captagon, noting that Captagon, which the Assad regime in Syria "creates and distributes across the region," aided Hamas in the October 7th attack; "[C]aptagon pills were found on the bodies of dead Hamas terrorists, allowing them to remain alert and restless as they slaughtered innocent men, women, and babies."

464.    Decades of Syria's financial, logistical, and military support and provision of resources, including specifically during the period leading up to the October 7 Attack, materially facilitated the terrorists' preparation for and execution of the October 7 Attack, and the terrorizing, murder, and injuring of thousands of innocent people, including Plaintiffs in this case.

465.    Syria has also provided material support to the other Gaza Terrorist Group Defendants that enabled them to also carry out the October 7 Attack.

466.    PIJ's leadership was based in Syria from as early as the late 1980s, and courts in this District recently have found that Syria has continued to provide PIJ with resources and support, including hosting, equipping, funding, and training. *See, e.g., Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 337 (D.D.C. 2020); *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110, 122 (D.D.C. 2022).

467.    One of those courts found specifically that Syria "provided support to PIJ in the form of a safe operational base from which it has been able to freely fundraise, train operatives, and direct attacks until at least 2018…" *Id.* at 343.

468.    Thus, for more than three decades, Syria has provided consistent and substantial support to PIJ, including safe harbor, financial, and military support.  Syria has allowed PIJ to maintain headquarters and a substantial presence in Damascus, and to operate from within Syria's borders.  Syria also has hosted military and terrorist training camps for PIJ recruits, including at Syrian army bases and facilities.  Syria has also provided a safe haven for senior PIJ leaders and has facilitated the transfer of weapons through Syria to PIJ for its use in terrorist activities.

469.    The U.S. Government has recognized Syria's material support for PIJ.  The U.S. State Department consistently has recognized that Syria "provided the PIJ with safe haven," and in 2009 noted that Syria "provided political and material support to Hizballah in Lebanon and allowed Iran to resupply this organization with weapons, and provided safe-haven as well as political and other support to a number of designated Palestinian terror groups, including HAMAS, Palestinian Islamic Jihad (PIJ), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)."  In 2011, the State Department observed that "[t]he external

leadership of Hamas, [PIJ], [PFLP], and [PFLP-GC], among others were based in Damascus and operated within Syria's borders . . . Damascus provided exiled individuals safe haven in Syria."

470.    Over the past decade, PIJ leaders have moved between Syria and Lebanon, but Syria consistently has supported the organization.  When long-time PIJ Secretary-General Ramadan Abdullah Shallah died in 2020, he was buried in Damascus.  At his funeral his successor Ziyad al-Nakhalah asserted his "pledge to continue the route of resistance until we liberate Palestine with the allies in Syria, Iran, and Hezbollah."

471.    One year before the October 7 Attack, PIJ celebrated its 35th anniversary in Damascus, with the participation of Syrian government officials.

472.    In November 2023, the U.S. designated certain senior PIJ officials, including Deputy Secretary General Akram al-Aljouri, who the State Department noted operated out of Damascus and coordinated military training and recruitment for PIJ in Syria, among other locations.

473.    On May 4, 2023, Syria hosted Iranian President al-Raisi for a meeting with PIJ and Hamas leaders and other senior members.  During the meetings, at which Raisi and Syria entered into a series of long-term cooperation agreements, Raisi called for the "unity and cohesion of the resistance forces, the region and the Islamic world . . . to accelerate the defeat of the Zionist regime and the liberation of the holy Quds and the sovereignty of the Palestinians over their destiny."  He added (just five months before the October 7 Attack): "We consider the collapse of the Zionist regime, whose effects are visible, to be very close."

474.    Syria also provides support to other Gaza Terrorist Group Defendants.  Syria has long provided safe harbor to PFLP and its leaders, protecting them from threats to their safety in Palestinian territories, and has hosted meetings between Iranian and PFLP leaders, which led to

Iran's increasing its military and financial support to PFLP.  PFLP has publicly acknowledged Syria's support, including the training of its members.  Leadership and senior members of DFLP also are based in Syria, and the organization has maintained its headquarters there.  In 2023, the U.S. State Department observed that Syria was continuing to provide weapons and political support to Hezbollah, and to allow Iran to re-arm and finance the terrorist organization.

475.    Syria provided material support and resources to Hamas and the other Gaza Terrorist Group Defendants– both in the decades leading up to the October 7 Attack, and in the period leading up to the Attack – that enabled them to carry out the October 7 Attack.  The Gaza Terrorist Group Defendants could not have carried out the Attack without Syria's support and sponsorship, and Syria knew that they would use its support and resources to carry out attacks such as the October 7 Attack.

476.    As a direct and proximate result of the material support and resources Syria provided to the Terrorist Group Defendants, thousands of innocent people were killed or injured by the Gaza Terrorist Group Defendants in connection with the October 7 Attack, including Plaintiffs herein.

**11.    North Korea**

477.    Defendant North Korea is a totalitarian dictatorship.  For three generations, it has been ruled by the Kim family.  North Korea has long been hostile to the U.S. and Israel; the first Kim family dictator, Kim Il Sung, called Israel an "imperialist satellite" of the U.S.

478.    As one court in this District has found:

> As a matter of policy, North Korea is hostile to the United States, and North Korea has attempted to undermine the political, economic, and strategic power and influence of the United States and its democratic allies. To accomplish this objective, North Korea has previously supported numerous Communist and other anti-Western terrorist organizations. These terrorist organizations are not

only opposed to the United States, but they are also opposed to the
State of Israel, which they view as allied with the United States.

479.    As a result of North Korea's policy, "North Korea has directly supported terrorist
organizations that have carried out attacks in Israel," and courts in this District and elsewhere
have held North Korea liable for such attacks. *See, e.g., Kaplan v. Hezbollah,* 213 F. Supp. 3d 27
(D.D.C. 2016); *Calderon-Cardona v. Democratic People's Republic of Korea,* 723 F. Supp. 2d
441 (D.P.R. 2010).

480.    The U.S. first designated North Korea as a state sponsor of terrorism in 1988.
That designation was officially lifted in 2008 as part of negotiations regarding the dismantling
and oversight of North Korea's nuclear weapons program.  However, on November 20, 2017, the
U.S. re-listed North Korea as a state sponsor of terrorism after the Secretary of State determined
that North Korea "had repeatedly provided support for acts of international terrorism since its
State Sponsor of Terrorism designation was rescinded in 2008."

481.    North Korea has long been providing arms, training, technology, and other
assistance to Palestinian militants, including Iran's proxy partners—such as Hezbollah, Hamas,
and PIJ.  Indeed, North Korea has provided many of the capabilities these proxies required to
carry out their terrorist activities, including attacks in Israel such as the October 7 Attack.

482.    According to experts and public reports, in the 1970s and 1980s, there was a
steady stream of North Korean weapons and other assistance to Palestinian militants.  And into
the late 1980s, "North Korea trained Palestinian terrorists, both those belonging to the
[Palestinian Liberation Organization ("PLO")] and from Syrian and Libyan backed groups."
During the Cold War, North Korea's activities had been largely subsidized by the USSR.
However, when Soviet subsidies to North Korea waned in the early 1990s, North Korea needed a
new benefactor, and turned to Iran.  Since that time, North Korea has continued its large-scale

military support to Syria, as well as to Iran and its proxies, including Terrorist Group

Defendants.

483.    North Korea's support for aggression and attacks in Israel in particular has been

part of this effort for decades.  North Korea established a relationship with Yasser Arafat in the

1960s, and for decades thereafter supplied arms and training to multiple Palestinian militant

groups, including the PLO, PFLP, and DFLP.  North Korea supported efforts against Israel

during the Six-Day War in 1967 and in the 1973 Yom Kippur War.  North Korea also supported

the Japanese Red Army, three members of which were recruited by PFLP for the 1972 terrorist

attack on Lod Airport, in 26 people were murdered and 80 others injured.  Another court in this

District held North Korea responsible for materially supporting that attack in Israel as well.

484.    In more recent years, North Korea's support for enemies of Israel (and America)

extended to Iran and Iranian proxies.  According to experts, this support included supplying

rocket systems and launchers, specialized training for "commando" units and their commanders,

and small arms such as machine guns and rifles.  Indeed, as a key supplier of arms to Iranian

proxies, North Korea has maintained a steady, large-scale proliferation of weapons systems to

Iran – everything from conventional weapons to ballistic missiles.  This proliferation has been

ongoing since the early 1980s and continues today.  North Korea has, both directly and

indirectly, supplied Hamas and other Terrorist Group Defendants with weapons, and knew, or

was reckless in not knowing, that weapons it supplied to the Terrorist Group Defendants would

be used in terrorist attacks in Israel, such as the October 7 Attack.  North Korea also knew or was

reckless in not knowing, that weapons it sold to Iran and Syria were likely to be sent to Hamas

and other Terrorist Group Defendants, and that those weapons were also likely to be used in

terrorist attacks in Israel, such as the October 7 Attack.

485.    A court in this District also found North Korea to have provided specific assistance to Iran's proxies in connection with the design and construction of underground tunnel networks used in attacks in Israel.  In that case, the Court found that North Korea provided "professional, military, and intelligence training and assistance in building a massive network of underground military installations, bunkers, depots and storage facilities" that Hezbollah used to wage war against Israel in 2006.  Moreover, according to a research report, Hezbollah entered into a $13 million arrangement in 2013 with the Korea Mining Development Trading Corporation (a North Korean state-owned arms dealer and exporter of weapons and missile technology and equipment) to build a huge, 45-kilometer underground tunnel system, connecting key hubs in Lebanon.  As far back as 2014, the former director for Asian affairs at the White House National Security Council observed that, as with Hezbollah, "Hamas' vast tunnel network almost certainly benefited from outside assistance, whether directly from North Korea or via Iran."  At that same time, the *Telegraph* reported that Israeli military commanders supervising operations against Gaza similarly concluded that North Korean experts gave Hamas advice on building its extensive network of tunnels that enabled fighters to move weapons without detection by Israeli drones.  That belief has continued to prevail in reports ever since, and Hamas used the same tunnel network in executing the October 7 Attacks and holding hundreds of hostages captive thereafter.

486.    North Korea's most recent wave of weapons proliferation to Terrorist Group Defendants began at least as early as 2009, when North Korea was caught shipping more than 35 tons of military equipment, including small arms, rocket propelled grenades ("RPGs"), and other weapons for use by Iran's terrorist proxies.  Investigators confirmed that the shipment had been paid for by Iran, and was on its way for delivery to Hezbollah and Hamas.  According to experts,

this intercepted shipment was undoubtedly one of multiple shipments from North Korea to

Hezbollah and Hamas.

487.    North Korea's support for Terrorist Group Defendants continued.  In July 2014,

*The Telegraph* reported that North Korea entered into a deal with Hamas to sell the terrorist

organization rockets, rocket launchers, and communications gear – including guidance systems

for multiple rocket launchers.  According to experts, North Korea's support of Hamas had

become increasingly important at that time because Iran's support for Hamas had temporarily

slowed (but certainly did not stop) due to differences between them during the Syrian civil war.

Accordingly, during that period (generally from 2012-2017), North Korea's support for Hamas

increased substantially.  And when Iran renewed its typical support for Hamas after 2017, all

three state sponsors of terrorism – Iran, North Korea, and Syria – combined to strengthen

Hamas's terrorist organization with material support and resources leading up to the October 7

Attack.

488.    North Korea's support for terrorism is not limited to Hamas. North Korea has also

supported other Gaza Terrorist Group Defendants and Hezbollah.  Both PFLP and DFLP were

historically funded and trained by North Korea, and North Korean support for Gaza Terrorist

Group Defendants has continued through the present day.

489.    Unsurprisingly, the Israeli Defense Forces recovered numerous North Korean

weapons from eliminated terrorists in Gaza who participated in the October 7 Attack.  The South

Korean National Intelligence Service has also verified that Hamas has used weapons from North

Korea in its ongoing conflict with Israel.

490.    North Korea's material support for the October 7 Attack was substantial and

contributed greatly to the Attack's massively devastating impact.  In addition to its support in

helping Hamas build the tunnel network the terrorists used in carrying out the Attack and then keeping hostages captive, North Korea's weapons featured prominently in the Gaza Terrorist Group Defendants' rampage. The terrorists who committed the Attack used at least hundreds of North Korean-supplied weapons. Many were found on, or left behind by, the terrorists, and bore unique North Korean markings demonstrating their source. The terrorists did not try to conceal the source of this weaponry. Hamas propaganda videos showcase their terrorist fighters holding clearly marked and easily identifiable North Korean weapons, with their unique features, including the same types of weapons included in the 2009 interdicted shipment.

491. Public reports further confirmed North Korea's support of the October 7 Attack. South Korea's National Intelligence Service "confirmed Hamas's possession and use of North Korean-made weapons against Israel," releasing photographs of North Korean-made F-7 grenade launchers (RPGs) being used by Gaza Terrorist Group Defendants on October 7. A Hamas field manual, found on the body of one eliminated terrorist, included instructions for operating the North Korean F-7 RPGs. Other reports also provide evidence that North Korea supplied rocket shells used by Gaza Terrorist Group Defendants in the Attack. A senior official at South Korea's Joint Chiefs of Staff reported that "Hamas is believed to be directly or indirectly linked to North Korea in various areas, such as the weapons trade, tactical guidance and training," and that Hamas "employed attack methods similar to Pyongyang's modus operandi." Public news reports discuss how the IDF confirmed recovering large numbers of North Korean weapons from Hamas terrorists, and further reported that Hamas repurposed F-7 engines to create anti-tank RPGs used in the October 7 Attack.

492. North Korea provided material support and resources to Hamas and other Gaza Terrorist Group Defendants– both in the decades leading up to the October 7 Attack, and in the

period leading up to the Attack – that enabled them to carry out the October 7 Attack.  The Gaza Terrorist Group Defendants could not have carried out the Attack without North Korea's support and sponsorship, and North Korea knew that they would use its support and resources to carry out attacks such as the October 7 Attack.

493.    As a direct and proximate result of the material support and resources North Korea provided to the Terrorist Group Defendants, thousands of innocent people were killed or injured by the Gaza Terrorist Group Defendants in connection with the October 7 Attack, including Plaintiffs herein.

**B.    The October 7, 2023 Hamas-Led Terrorist Attack in Israel**

494.    At daybreak on Saturday, October 7, 2023, on the Jewish Sabbath (*Shabbat*) and during the celebration of the Jewish holiday *Simchat Torah*, approximately three thousand Hamas-led terrorists swarmed into Israeli communities near the Israel-Gaza border and waged the deadliest massacre of Jews since the Holocaust.

495.    The October 7 Attack—codenamed Operation Al-Aqsa Flood—was an unprecedented, coordinated land, sea, and air cross-border attack.  Many Israeli soldiers were on leave due to the holiday, and the terrorists capitalized on this to impose maximum casualties.

496.    The attack began around 6:30 am, when Hamas and PIJ fired thousands of rockets and mortar rounds from the Gaza Strip into Israel.  During Operation al-Aqsa Flood, Hamas and PIJ fired about 5,000 rockets into Israel.  About 4,000 of those rockets were fired in the first four hours of the attacks.  The rocket attacks largely targeted civilian population centers, including where Plaintiffs herein lived and were sheltering.  The rocket attacks also killed five people in the Bedouin village of al-Bat.

497.    As air raid sirens sounded in Israel, warning citizens of the rocket attacks in progress, terrorists piloted squadrons of armed drones to destroy guard posts and Israeli

surveillance, communication, and defensive weapons systems near the Israel-Gaza border that could protect innocent victims from the terror onslaught.

498.    Next, armed terrorists used explosive devices and bulldozers to breach the security fence separating Gaza from Israel in dozens of locations and infiltrated Israel.  This made way for thousands of armed terrorists, many riding motorcycles or racing forward in pick-up trucks and vans carrying heavy weaponry, including antitank launchers, machine guns, rifles, rounds and rounds of ammunition, and an arsenal of explosive devices. More terrorists invaded using paragliders, while others attacked Zikim Beach in southern Israel from the sea using motorboats.

499.    The terrorists who breached the security fence and stormed into Israel during the October 7 Attack included members of each of the Gaza Terrorist Group Defendants.

500.    The terrorists divided into teams with specific attack plans, and according to a document recovered from the body of a slain Hamas terrorist, their primary goal was "inflicting the maximum possible human casualties."  Another goal was to kidnap civilians and soldiers to use as human shields and bargaining chips following the Attack.  Some terrorists disguised themselves as Israeli military personnel or as Israeli police officers.  Some carried zip ties to restrain hostages. The terrorists used radios and cellular phones to communicate.  Some had cameras, such as Go-Pros, to record photos and videos of their carnage.

501.    Shortly after launching the rockets and missiles to facilitate the wider Attack, armed terrorists went on a murdering spree, killing anyone in sight.  Some terrorists set up makeshift roadblocks and then gunned down passengers in cold blood.  Hundreds of cars were lit on fire and left burning on the road.

502.    The terrorists murdered indiscriminately, killing men, women, the elderly, teenagers, toddlers, and babies.  They overran police stations and Israeli military bases.  They massacred hundreds at a music festival.  They attacked bomb shelters where terrified civilians tried to take cover.  They shot at emergency medical personnel.  They invaded Israeli kibbutzim (small, historically agricultural communities) and broke into and destroyed residents' homes, slaughtering and terrorizing entire communities.  Some victims were murdered where they were hiding; videos showed others being rounded up, bound, marched, and executed in the streets.

503.    Some individuals and entire families hid in safe rooms for hours (some more than 20 hours) until the Israeli military rescued them.  But not all families who hid in safe rooms were safe.  People were burned alive or suffocated by black smoke from the fire that terrorists had set to their homes.  Hundreds of people were burned beyond recognition.  Many who ran out of their homes trying to escape the unbearable heat and suffocating smoke were met by terrorists waiting outside of their homes who shot them dead.  Terrorists also forced their way into safe rooms and slaughtered those hiding inside.

504.    Children were forced to witness the assassinations of their parents, and then were tortured, burned alive, executed with a bullet through their heads, or butchered.  Parents were forced to witness the murder of their children.  The terrorists amputated women's breasts and shot both men and women in the genitals.

505.    The terrorists sexually abused and mutilated women.  Individuals involved in collecting and identifying bodies of those killed by the terrorists in the October 7 Attack reported multiple signs of sexual assault, including broken pelvises, bruises, cuts, and tears on victims ranging from children to the elderly.  Dead women were found stripped from the waist down.

506.    The terrorists did not hide their atrocities—to the contrary, they used body cameras to live stream and celebrate them.  Video footage released by Gaza Terrorist Group Defendants shows the sexual assaults perpetrated against women, as do numerous eyewitness accounts.

507.    The terrorists kidnapped civilians, often targeting the most vulnerable victims, including babies, children, the disabled, and the elderly.  Documents found on the bodies of terrorists revealed instructions to target schools and youth centers and take civilians hostage. Video footage of kidnapped women being paraded through the streets of Gaza and physically assaulted were uploaded onto social media sites.  Hostages were ferreted away, dispersed throughout Gaza, with many, including family members of Plaintiffs here, taken deep into Hamas's underground tunnel network.

508.    Some hostages were subsequently tortured or killed or later died of their injuries. Other hostages were kept alive to be used as human shields and leverage in political negotiations. By the end of October 7, the Gaza Terrorist Group Defendants had attacked and terrorized more than twenty different Israeli communities, and laid waste to many.  More than 1,200 Israelis, Americans, and nationals of other countries were slaughtered and thousands more injured.  The depraved terrorists massacred dozens of babies and children, and left many children orphaned. Over 250 people were abducted, including dozens of children.  Thousands who miraculously escaped physical injury or death were terrorized, suffering permanent emotional scars.

509.    Each of the Gaza Terrorist Group Defendants actively participated in, materially supported, and aided and abetted, the October 7 Attack as it raged across southern Israel, including the following:

### 1.    Attack at the Nova Music Festival

510.    One of the worst and most shockingly horrific attacks took place at a music festival in an open-air space near Kibbutz Re'im, only three miles from the Gaza border.  The Nova Music Festival—a widely popular weekend-long event which celebrates music, love, and unity—was attended by more than 3,000 Israelis and tourists from around the world.  The event was timed to the end of the Jewish holiday of *Sukkot*.  Thousands were dancing and celebrating life, unaware of the brutal attack that was about to be unleashed on them.

511.    At around 6:29 am, festival attendees saw rockets streaking through the sky. Moments later, the festival music stopped as terrorists on motorized paragliders began to land. Many more heavily armed terrorists, who had breached the border, sped toward the festival in motorcycles and pickup trucks with guns and explosives in hand, shooting indiscriminately. While rockets rained down, terrorists shot at festival attendees with live gunfire and RPGs.  The armed Gaza Terrorist Group Defendant terrorists surrounded the festival grounds and choked off almost all areas of escape, trapping their victims.  As one festival attendee described, it was a "circle of death."  The terrorists hunted, chased, dragged, shot, and murdered over 350 people – mostly young festival-goers – in cold blood.

512.    The festival-goers had only seconds to choose a survival strategy.  Some sought protection in nearby bomb shelters.  Many ran to their parked cars and tried to drive away.  Some ran across open fields to hide under nearby bushes and trees—often for many hours—as the terrorists relentlessly hunted them down.  Others played dead.

513.    Many were killed while hiding.  The terrorists targeted nearby bomb shelters, executing people at point-blank range and firing bullets and throwing hand grenades into the small concrete structures packed with people.  A few festival attendees who had taken refuge in

bomb shelters survived by hiding under other festival-goers' dead bodies and pretending to be dead.

514.    Some victims were shot in the back as they ran or executed as they hid crouched on the ground. One Plaintiff who had run into the bushes was too terrified to move or make any noise so as not to give away his position to the terrorists; he lay on the ground in his own urine for 10 hours until he was rescued.

515.    Many festival attendees who reached their cars were trapped in a traffic jam as terrorists fired at vehicles. One Plaintiff hid underneath a large tree that overlooked Route 232 – the only paved road to and from the festival – and watched in horror as fellow festival-goers trying to leave in their cars were massacred and their cars set on fire. When the terrorists began chasing after individuals who abandoned their cars, that Plaintiff made the decision to leave the tree he was hiding under and run for his life. He ran for 12 miles in open fields with no food or water until he was picked up by residents from a nearby kibbutz. The kibbutz members were driving into the fields near their homes on rescue missions, packing their cars with festival attendees who had escaped into the fields. Some festival-goers, however, were not as fortunate. Many succumbed to gunshot wounds or collapsed in the fields from dehydration.

516.    The terrorists raped and killed many women, including, according to one eyewitness account, a young woman who was gang-raped and then knifed to death by a terrorist, who then continued to rape her dead body while the terrorists around him laughed. Some victims were found with their naked bodies tied to trees, violated and mutilated.

517.    The terrorists took hostage over 40 festival-goers. Video footage showed one female at the music festival being hauled away on a motorcycle, pleading for her life and reaching for her boyfriend, who was bound and being marched by terrorists. Another woman's

lifeless and half-naked body was paraded through the streets of Gaza in the back of a truck as armed terrorists surrounding her shouted "Allahu Akbar" ("God is great").  A fragment of her skull, but not her body, was found in Gaza.  Seven months later, in May 2024, the IDF recovered her body from Gaza.

518.    The following Plaintiffs were injured or killed in the October 7 Attack at the Nova Music Festival, or are family members of those who were killed at the Nova Music Festival:

    a.    Daniel Ben Senior, murdered victim.

    b.    Shay Ben Senior, brother of murdered victim.

    c.    Aviram Abraham Bejerano, brother of murdered victim.

    d.    Perry Ben Senior, mother of murdered victim.

    e.    Jacob Ben Senior, father of murdered victim.

    f.    Nofya Levi, wife of injured victim.

    g.    Ben Odles Gewirtzman, injured victim.

    h.    Eden Odles Gewirtzman, sister of injured victim.

    i.    Sherri Gewirtzman, mother of injured victim.

    j.    Ofer Odles, father of injured victim.

    k.    Lior Yovel Bar-Or, injured victim.

    l.    Marc Leon Brawer, father of injured victim.

    m.    Zohar Tzlil Bar-Or, sister of injured victim.

    n.    Hila Malka Bar-Or, sister of injured victim.

    o.    Matan Eliyahu Boltax, injured victim.

    p.    Jonathan Marshall Boltax, father of injured victim.

    q.    Arlyn Barrie Boltax, mother of injured victim.

r.      Eliora Yerushalaim Boltax, sister of injured victim.

s.      Amichai Yisrael Boltax, brother of injured victim.

t.      N.E.B., sister of injured victim.

u.      Naor Tzion Tzedek Boltax, brother of injured victim.

v.      David Tuvial Bromberg, injured victim.

w.      Isaac Samuel Bromberg, father of injured victim.

x.      Rachel Bromberg, mother of injured victim.

y.      Elisheva Rena Bromberg, sister injured victim.

z.      Yehuda Aryeh Bromberg, brother of injured victim.

aa.     Rivka Chaya Strauss, sister of injured victim.

bb.     Gal Bukspan, injured victim.

cc.     David Englanoff, injured victim.

dd.     Samuel Englanoff, brother of injured victim.

ee.     Mordechai Nissim Englanoff, brother of injured victim.

ff.     Deborah Itzhak, sister of injured victim.

gg.     Shlomo Englanoff, brother of injured victim.

hh.     Sheerel Gabay, injured victim.

ii.     Liron Mazeh Gabay, mother of injured victim.

jj.     Gil Gabay, father of injured victim.

kk.     Orel Gabay, sister of injured victim.

ll.     Lior Gelbaum, injured victim and sister of injured victim.

mm.     Danielle Gelbaum, injured victim and sister of injured victim.

nn.     Gilad Karplus, injured victim.

oo.     Hadar Klein, injured victim.

pp.     Shay Klein, father of injured victim.

qq.     Yonat Klein, mother of injured victim.

rr.     Nitai Klein, brother of injured victim.

ss.     Eli Klein, brother of injured victim.

tt.     Ori Levy, injured victim.

uu.     Nadir Levy, brother of injured victim.

vv.     Carmel Medalia, injured victim.

ww.     Avishag Shilat Oved, injured victim.

xx.     Avivah Miriam Oved, mother of injured victim.

yy.     A.O., sister of injured victim.

zz.     Av.O. sister of injured victim.

aaa.    Aviv Oz, injured victim.

bbb.    Nava Oz, mother of injured victim.

ccc.    Hadar Oz, brother of injured victim.

ddd.    Gal Porat, injured victim.

eee.    Maya Shaham, injured victim.

fff.    Stacy Marla Shaham, mother of injured victim.

ggg.    Aviv Shaham, brother of injured victim.

hhh.    Oren Shaham, brother of injured victim.

iii.    Ofir Tal, father of injured victim.

jjj.    Shelley Sharon Weisberger, injured victim.

kkk.    Keith Stewart Weisberger, father of injured victim.

lll.     Itamar Yehuda Shapira, injured victim.

mmm.  Amy Lauren Shapira, mother of injured victim.

nnn.    Yiftach Shapira, brother of injured victim.

ooo.    N.S., sister of injured victim.

**2.     Attack at Kibbutz Kfar Aza**

519.     Kibbutz Kfar Aza is a small communal farming town only a few miles from Gaza that was home to around 750 people before the Attack.  In small towns and kibbutzim near the Gaza border, air raid sirens are fairly commonplace.  Residents know to rush to the safe room in their homes until they hear the all-clear siren.  When residents of Kfar Aza heard the air raid sirens on October 7, warning that rockets had been launched from Gaza toward Israel, they never expected an estimated 70 Gaza Terrorist Group Defendant terrorists to invade their small, close-knit community and turn it into a bloody massacre.

520.     For example, completely unaware that terrorists were lurking outside of her home, one woman left her family's safe room to grab bottles of milk for her and her husband's 10-month-old twin boys.  She was struck dead by a bullet and found in the kitchen lying next to two baby bottles.  Only moments earlier, she had sent a text to family members speaking casually about being stuck in the safe room with two dirty diapers.  Terrorists executed her husband in the family's safe room.  The couple's twin boys were found crying in their soiled diapers on the bed near their father's body. The babies had been there for at least 14 hours without food or water before being rescued by Israeli forces.  The terrorists had been seen by neighbors eating on the balcony of the home, while they intentionally left the twins thirsty, hungry, and crying as a trap to lure Israeli forces in to save them.  It took three rescue attempts by the Israeli military to get the babies out safely.

521.     After hearing gunshots and men speaking Arabic outside their houses, kibbutz members began to realize that terrorists had infiltrated their town.  Some individuals and families, including the daughter of one Plaintiff, were stuck in a small "safe room" for more than 20 hours without food, water, a bathroom, or electricity, before they were rescued by IDF soldiers.

522.     Other families were killed in their safe rooms.  The terrorists fired bullets into safe rooms, pounded houses with grenade pellets that burst through the walls, and set houses on fire.  One family that had huddled together in a safe room was found dead, their bodies burned so badly that their remains could not be separated.

523.     The terrorists went on a killing rampage, gunning down and butchering men, women, and children.  Entire families were slaughtered in their homes.

524.     At the end of the invasion, more than 100 kibbutz members had been killed in the vicious assault.  Gurneys holding bullet-riddled bodies were laid on a basketball court that had become a temporary morgue.

525.     Once a quiet, lush communal farm surrounded by sunflower fields, Kfar Aza was left in ruins, with houses reduced to rubble, and some completely burned and charred from grenades that terrorists tossed into homes knowing that families were inside.  Some of the homes were so severely burned that archeologists had to be brought in to sift through the ash.

526.     The following Plaintiffs were killed or injured at Kibbutz Kfar Aza:

      a.     Yona Betzalel Brief, murdered victim.

      b.     David Chaim Brief, father of murdered victim.

      c.     Hazel Susan Kassel Brief, mother of murdered victim.

      d.     Micha Naftalie Brief, brother of murdered victim.

e.     Libi Brief Alush, sister of murdered victim.

f.     Yasmina Tamar Brief, sister of murdered victim.

g.     Aviel Simcha Brief, brother of murdered victim.

h.     Nava Shirel Brief, sister of murdered victim.

i.     Anita Schwadron Treger, mother of injured victim.

**3.     Attack at Kibbutz Be'eri**

527.    Kibbutz Be'eri is a small collective community located approximately three miles east of the Gaza strip, and was home to about 1,200 residents prior to the Attack.

528.    Before the October 7 Attack, residents of Be'eri, including Plaintiffs in this case, were well-known for their pro-peace sentiments and altruism to Gazan families. For example, Be'eri residents volunteered to transport Gazans to and from medical care facilities in Israel, and the kibbutz had a fund that was used to give financial assistance to Gazans who came to Be'eri on work permits. One Plaintiff who the terrorists murdered worked as a midwife for Palestinian and Bedouin families. She sought peace and justice for all, and was active in many efforts to bridge gaps between Jews and Arabs. During the attack on Be'eri, another resident was heard begging for his life before being murdered: "Please, I'm not your enemy."

529.    Be'eri was one of the first communities the Gaza Terrorist Group Defendant terrorists targeted in the Attack. Scores of terrorists spent over a day pillaging and destroying the community, and slaughtering, torturing, and kidnapping its residents. Amidst their barbaric attack, the terrorists left graffiti in Arabic on their victim's homes with references to Hamas's al-Qassam Brigades and PIJ's al-Quds Brigades."

530.    Terrorists arrived at the gates of Be'eri shortly before Hamas began raining down its heavy barrage of rockets on the kibbutz and its neighboring communities. CCTV at Be'eri captured footage of heavily armed men wearing green Hamas bandanas breaking into the kibbutz

by smashing the windows of the kibbutz's guard room. The terrorists later opened fire on a sedan that pulled up to the kibbutz's gates, murdering three civilians inside the vehicle who were fleeing from the attack on the Nova festival.

531.    Be'eri's 15-person volunteer security team attempted to repel the terrorists, but was vastly outnumbered and overwhelmed by the terrorists with heavy machine guns, who killed at least five of them. The terrorists attacked army bases close to Be'eri, and lined the roads leading to Be'eri and other kibbutzim with gunmen, restricting anyone from coming to rescue the residents of Be'eri and other affected kibbutzim. As a result, the terrorists were able to gain control of Be'eri, and, according to reports, "were largely free to plunder, murder and kidnap."

532.    The terrorists systematically went house to house, and door to door, hunting, murdering, torturing, and kidnapping the residents within. The terrorists fired their weapons indiscriminately, threw grenades and Molotov cocktails, and burned down homes and community buildings.

533.    While people hid in their safe rooms, the terrorists blew up and shot through the doors, killing those inside. When they did not succeed in penetrating the safe rooms and homes, the terrorists methodically burned them down. People who tried to escape through the windows were met by terrorists waiting outside to kill them. According to one report, "[f]amilies had to choose between being burned alive or shot to death." A survivor recalled: "Some people were cooked alive inside their safe rooms because of the heat. We saw it."

534.    In some homes, the terrorists mercilessly murdered children in front of their parents and abducted the parents. In other homes, it was the reverse. Survivors recounted entire families being massacred in their homes.

535.    Nearly every home in Be'eri was experiencing similarly barbaric attacks. When it was over, more than 130 residents – more than 10% of the community – had been slaughtered by terrorists, including children, many of them in their homes with their parents.

536.    The terrorists also rounded up Be'eri residents and took them hostage for use as bargaining chips and as human shields.  More than 50 people were held hostage by terrorists for 18 hours in a kibbutz dining room.  In another part of the kibbutz, the terrorists corralled 14 hostages into a home, who they subsequently used as human shields in a standoff with the IDF. Only two of these hostages survived.  Among the dead were 12-year-old twins whose bodies were so severely burned that it took more than a month to identify them.  The terrorists abducted more than 25 Be'eri residents to Gaza.

537.    The cruelty and destruction the terrorists inflicted on Be'eri defies words. Witnesses describe the sounds of the massacre at Be'eri: "We heard them talking, shouting 'Allahu akbar,' laughing. There was the sound of endless automatic gunfire, fires burning, kibbutz residents screaming."

538.    According to one report, "[d]ays after the attack, the twisted carcasses of burned-out cars littered the community. Blood stains covered the floors and walls of some homes; others were half destroyed, gutted by fire.  Safe-room doors were pierced with bullet holes. Unexploded grenades and bullet casings lay on the ground."  The bodies of murdered residents lay strewn throughout the village.

539.    The devastation in Be'eri was so severe that residents, including some Plaintiffs, did not know for days whether their family members were murdered or taken hostage.

540.    The following Plaintiffs were injured and killed in the October 7 Attack at Kibbutz Be'eri, or are family members of those who were killed at Kibbutz Be'eri:

    a.     Adrienne Anne Neta, murdered victim.

    b.     Nahar Neta, son of murdered victim

    c.     Dror Neta, daughter of murdered victim.

    d.     Ayan Neta, daughter of murdered victim.

    e.     Carmel Neta, son of murdered victim.

    f.     Chen Zeigen, son of murdered victim.

**4.    Attack at Kibbutz Sa'ad**

541.    Kibbutz Sa'ad is a small agricultural kibbutz located about 2 miles from the Gazan border and was home to about 850 residents before the Attack.

542.    Sa'ad is one of several small, tight-knit villages in extremely close proximity to one another, including Kibbutz Kfar Aza, Kibbutz Alumim, Kibbutz Nahal Oz, Kibbutz Be'eri, and Kibbutz Kissufim, all of which were attacked by Gaza Terrorist Group Defendants as part of the October 7 Attack.  For example, the gate to Kibbutz Kfar Aza, where terrorists murdered scores of people and took 19 people hostage on October 7, is only a few hundred feet from the gate to Sa'ad.  Sa'ad is a little over a mile away from the site of the Nova festival.

543.    On October 7, residents of Sa'ad were awoken at around 6:30 am to a barrage of rocket fire that lasted for 30 to 40 minutes.  Within fifteen minutes, the kibbutz security team had assembled and grabbed weapons from the kibbutz armory to protect kibbutz residents and their neighbors.  The kibbutz declared a state of emergency and instructed residents to stay inside their homes with their doors locked and their windows closed.

544.    Hiding inside their safe rooms, Sa'ad residents huddled in terror as they anxiously sought information about what was happening outside.  They were glued to the news, which was constantly evolving as the massacre raged all around them in neighboring communities.  They frantically exchanged text messages with friends and family in neighboring communities under

attack. And they saw on social media the horrors that were unfolding just minutes away – hundreds of terrorists invading familiar places and massacring their friends and neighbors.

545.    Inside their safe rooms, the residents of Sa'ad huddled in terror and fear for their lives as they heard the machine guns and rockets just outside while Gaza Terrorist Group Defendant terrorists attempted to infiltrate their community. A rocket also hit the kibbutz, shaking the ground and causing shrapnel to fall through a home neighboring the one in which two Plaintiffs were staying. Shooting in the area around the kibbutz was described as "coming from all directions."

546.    One captured terrorist admitted during his interrogation that "[t]he plan was to go from home to home, from room to room, to throw grenades and kill everyone, including women and children […] Hamas ordered us to crush their heads and cut them off, [and] to cut their legs." Another captured terrorist disclosed that for each captured hostage, Hamas had offered the terrorists $10,000 and an apartment. By the entrance to Sa'ad, a shootout raged between the terrorists and the kibbutz's security team. Miraculously, the security team held off the terrorists from executing the full-scale carnage of the town the terrorists had planned, but could not prevent the permanent scars the terrorists caused the members of the community who they terrorized.

547.    The following Plaintiffs were injured in the October 7 Attack at Kibbutz Sa'ad:

   a.    Naomi Faye Sanders, injured victim and wife of injured victim.

   b.    David Jacob Sanders, father of injured victim.

   c.    Hila Sanders, mother of injured victim.

   d.    Rachel Esther Sanders, sister of injured victim.

5.     **Attack at Kibbutz Kissufim**

548.     Kibbutz Kissufim is a small farming collective village located in the Gaza Envelope that was home to around 300 people before the Attack.  Kissufim is roughly at the midpoint of Gaza's border with Israel, less than two miles from the Gaza Strip.

549.     At around 6:30 am, Kissufim residents were alerted to an attack by air sirens and instructed to take cover in designated safe rooms in each building.  They grabbed whatever they could in the few moments they had before sealing the doors of their safe rooms, not knowing that they would be trapped in terror until the next day.

550.     Meanwhile, at least 70 armed Gaza Terrorist Group Defendant terrorists had breached the Gaza border near the Kissufim crossing and invaded the community.  They were met by Kissufim's security team at the village entrance. Four Kissufim security members were killed trying to defend the village in that initial ambush.  Ultimately, the terrorists killed 14 people at Kissufim, including a 90-year-old woman who reportedly was shot in the head in her living room.  The terrorists abducted four kibbutz members and took them hostage.

551.     The terrorists rampaged through the village, maximizing damage by any means available to them. They shot at and lit aflame cars, homes, and even the animals at Kissufim's dairy farm.  They attacked Kissufim's infrastructure by destroying electrical lines and a water main, severing the villagers' access to the outside world and drinking water.  The terrorists lit homes on fire, attempting to lure civilians out into the open, and further the devastation.

552.     "Safe rooms" did not ensure security.  Two parents and their youngest of three children died of asphyxiation in their safe room after their home burned with them inside.

553.     The rest of the residents were trapped, terrified and terrorized in their safe rooms for the entire day as the terrorists ransacked the village.  Many hid, without proper ventilation or plumbing and meager food and water rations, while armed terrorists broke into their homes and

shot at the safe room doors.  Afraid for their lives to leave their safe room, one Plaintiff and her family of three urinated on sheets and defecated in cardboard boxes in the corner of their safe room.  With cell and internet service cut off, even those who did bring phones and computers into hiding could not contact the outside world.  During this period, their only updates came through the sounds of bullets piercing their homes and terrorists moving about, and the smells of smoke whenever they risked cracking a window for some air.

554.    An IDF battalion eventually responded to the ambush at Kissufim in the afternoon of October 7.  The battalion exchanged gunfire with the terrorists for hours before neutralizing them, with eight IDF soldiers killed as they tried to clear the kibbutz of terrorists and rescue the residents.

555.    Like many others, the village was destroyed and rendered uninhabitable.

556.    The following Plaintiffs were injured in the October 7 Attack at Kibbutz Kissufim or are family members of those who were injured at Kibbutz Kissufim:

a.    Zionah Alexandra Winitzky, injured victim, wife of injured victim, mother of injured victims.

b.    Carmi Ruth Spiwack Holtzer, mother of injured victim.

c.    David Gary Holtzer, father of injured victim.

d.    Noam Galit Edri, sister of injured victim.

e.    Ilan Yosef Holtzer, brother of injured victim.

f.    Yonatan Mordechai Holtzer, brother of injured victim.

g.    Lotan Raanan Holtzer, brother of injured victim.

**6.    Attack on Sufa Base**

557.    Sufa Base is an IDF outpost in southern Israel, next to Gaza and minutes from the Kerem Shalom crossing at the Gaza-Israel-Egypt border.  Soldiers stationed at Sufa patrol the

lower section of the border between Israel and Gaza and provide security to civilians in their region, including those at three nearby kibbutzim.

558.    Around 6:30 am, alarms and sirens rang out across the base, alerting the soldiers to missile strikes and possible attacks on civilians in their vicinity.  The patrols already on morning duty immediately left the outpost in the direction of the civilian communities.

559.    With the base mostly empty, approximately 30 armed Gaza Terrorist Group Defendant terrorists stormed the front gate of the outpost.  Some of the soldiers rushed to the entrance, where they were under constant attack, trying to hold off the terrorists with gunfire for nearly two hours without additional support.  Others barricaded themselves in the dining hall and in a bunker.

560.    The terrorist attack continued to rage on for nearly 14 hours.  Despite resisting the initial attack at the entrance, the soldiers on the base were then attacked by another group of terrorists who had snuck up on the outpost's back entrance and were firing at the bunker where many soldiers were trapped inside.  Approximately 40 terrorists attacked the Sufa Base.

561.    Between 1:30 pm and 2 pm, IDF combat units arrived via helicopters and tanks to rescue the soldiers, but could not secure the base until late in the evening.  In the meantime, soldiers stationed at the base were working to load the dead bodies of their peers onto the helicopters, to avoid them being dragged away as trophies, and evacuating the critically injured.

562.    At least two Israelis were killed in the Gaza Terrorist Group Defendants' attack at Sufa Base, and several more were severely injured.  Later in the day, Hamas released video showing the bodies of Israeli soldiers who had been killed in the Attack.

563.    The following Plaintiffs were injured in the October 7 Attack at Sufa Base, and/or are family members of those who were injured at Sufa Base:

a.    Yair Beller, injured victim.

b.    Arnona Shapiro-Beller, mother of injured victim.

c.    Noam Menachem Beller, brother of injured victim.

d.    Isaac Beller, brother of injured victim.

e.    Yehuda Shmuel Beller, brother of injured victim.

f.    Hadassa Devorah Malka Beller Cohen, sister of injured victim.

g.    Ashira Beller, sister of injured victim.

**7.    Attack at Kibbutz Erez**

564.    Kibbutz Erez is a small agricultural kibbutz located less than one mile from Gaza, that was home to around 600 people before the Attack.

565.    On October 7, Erez residents were awoken to the sound of sirens blaring, indicating incoming rocket fire from Gaza and alerting residents to go into their safe rooms.

566.    This was not an unusual occurrence.  Typically, Erez residents would remain in their safe rooms for 5 to 10 minutes while a few rockets were intercepted outside.  On October 7, however, residents quickly understood that this attack was different when the alarms continued to sound for over 20 minutes while a constant barrage of hundreds of Hamas and PIJ rockets rained down over their homes.

567.    At the same time, Erez's small security team was warned by a neighboring kibbutz that their members had seen terrorists on paragliders soaring into Israel and that a terror attack was underway.

568.    Erez's security team quickly assembled in an effort to protect the kibbutz.  The members organized themselves into defensive positions around the kibbutz, where some were able to see terrorists approaching the back gate of the kibbutz in white vans. Minutes later, Gaza Terrorist Group Defendant terrorists began their attack in an effort to overcome Erez.

569.    Erez residents received text messages from the security team ordering them to rush to bomb shelters, and to lock all doors and windows.  Terrified residents heard heavy automatic gunfire outside their homes, as "[d]ozens of terrorists stormed the Kibbutz's defensive fence," which they later shredded with explosives.

570.    Meanwhile, news and images of the brutal scenes unfolding in familiar towns and communities only minutes away from their homes began flooding in on residents' phones, social media platforms, and television news stations, filling the already overwhelmed residents with even more terror.

571.    Outside the residents' hiding places, the kibbutz security team defended the community for hours against the terrorists, who attacked with heavy gunfire and explosives, including grenades, bombs, and RPGs, which they aimed over the kibbutz fences, destroying homes.

572.    Eventually, in response to pleading by Erez security team members whose ammunition was quickly dwindling, the emergency unit of a nearby kibbutz arrived at Erez. With their help, the Erez security team fought the terrorists attacking the Kibbutz for hours until the IDF arrived later that day, but not before the terrorists murdered at least one Kibbutz member, and injured several others.

573.    In their homes, as they heard the Attack raging outside their windows, residents could do little more than pray, terrified for their lives, and not knowing whether they would survive the day.

574.    The following Plaintiffs were injured in the October 7 Attack at Kibbutz Erez, and/or are family members of those who were injured at Kibbutz Erez:

    a.    Juliana Sharoni, injured victim and mother of injured victim.

      b.      E.S., injured victim and daughter of injured victim.

      c.      Luciana Ganach, daughter of injured victim and sister of injured victim.

## 8.    Attack at Kibbutz Alumim

575.    Kibbutz Alumim is an agricultural kibbutz that was home to around 500 residents before the Attack.  Alumim is located about 2 miles away from the Gaza border, and is situated between Be'eri and Sa'ad, about 2 miles away from each.

576.    The residents of Alumim were awoken on October 7 by a deafening cascade of rocket launches from a nearby Iron Dome anti-missile battery, and the resulting booms marking the interceptions of some of the thousands of missiles launched from Gaza by Hamas and PIJ.

577.    By 6:50 am, kibbutz residents, still in their safe rooms, began hearing rounds of gunfire.  By 6:52 am, the army command instructed Alumim's security team to activate, and to close the roads and gates in the fields surrounding Alumim.

578.    Within minutes, Gaza Terrorist Group Defendant terrorists were already attempting to break through the back gate of the kibbutz near the agricultural structures – one of the two ways to enter the kibbutz.

579.    The terrorists succeeded in blowing the padlock off the back entrance, and began to infiltrate Alumim.  By 7:00 am, residents were alerted that terrorists were in the kibbutz, and that they needed to lock their doors and windows, and not to leave their bomb shelters for any reason.

580.    The terrorists entered the kibbutz on motorcycles, each carrying multiple heavily armed militants.  They immediately began unleashing carnage – murdering people, shooting indiscriminately, setting fire to haylofts and animal feed trucks, and throwing burning torches into buildings.

581.    The first people the terrorists encountered at Alumim were foreign workers, who were in the process of milking the cows.  The terrorists murdered nearly twenty of these foreign workers, and kidnapped several others to Gaza.  Many others were badly wounded, including by having their limbs blown off by terrorist grenades.  Others survived only by hiding for hours. Some hid beneath their friends' dead bodies. Others cowered in pepper fields, or beneath sinks, or in small alcoves above refrigerators. Another hid beneath cow dung for eight hours, leaving only his nostrils uncovered.

582.    At the main entrance to the kibbutz, which borders on a main road, terrorists shot at and slaughtered people who were fleeing in cars and on foot from the nearby Nova festival. Alumim's security footage shows terrorists chasing people down and captured a horrifying scene of a young woman on her knees begging for mercy, only to be shot dead, and another mercilessly cut down as she fled.

583.    Two brothers, both reservists in the IDF, rushed to protect innocents from the ongoing terror attack, and were both killed battling terrorists along the road near the entrance to Alumim.

584.    Members of the 12-person Alumim security team fought intensely for hours against the terrorists who were heavily armed with machine guns and grenades until help finally arrived in the early afternoon.

585.    The terrorists continued to attack in and around Alumim.  They hunted and terrorized victims fleeing from the Nova festival in Alumim's avocado fields.  They infiltrated the kibbutz through those fields, armed with Kalashnikovs and RPGs.  As the terrorists rampaged through the kibbutz, members of a unit of the IDF's Engineering Corps raced to the kibbutz to try to save its residents.  They arrived just as a Hamas terrorist broke into the home of an elderly

kibbutz member and shot him in the stomach. Members of the unit managed to kill the terrorist, but one member, a Plaintiff in this case, was shot and later died from his wounds.

586.    The terrorists made eight separate incursions into Alumim, intent on decimating the kibbutz. Like at other kibbutzim, documents recovered from the body of a terrorist commander killed at Alumim contained a map of Alumim with planned lines of attack.

587.    Alumim suffered a massive loss of life.  In addition to the nearly twenty foreign workers slaughtered by the terrorists, one Israeli civilian was murdered within the confines of the kibbutz along with many others who were killed on Road 232 just outside.  Among the dead were also two members of Alumim's security forces, the reservist brothers who volunteered to help, and at least two soldiers, responding to try to save lives, including a Plaintiff here.

588.    The following Plaintiffs were injured and killed in the October 7 Attack at Kibbutz Alumim, or are family members of those who were injured and killed at Kibbutz Alumim:

     a.    Etai Cohen, murdered victim.

     b.    Ortal Pnina Cohen, mother of murdered victim.

     c.    N.C., brother of murdered victim.

     d.    Ofek Hana Cohen, sister of murdered victim.

### 9.    Attack at Kibbutz Nir Oz

589.    Kibbutz Nir Oz is an agricultural and manufacturing kibbutz located less than one mile from the border with the Gaza Strip, with two paved roads leading directly to the border fence.

590.    Prior to October 7, Nir Oz was home to roughly 400 residents, and was described as a desert oasis due to its lush botanical garden.  Many of Nir Oz's residents were peace activists who volunteered to drive sick Gazans to Israeli Hospitals for medical care.

591.    At 6:30 in the morning on October 7, Nir Oz residents were awoken to a barrage of rocket fire from Gaza and alarms alerting them to rush to their safe rooms.  Residents began to hear fire from automatic weapons, grenades, and RPGs within minutes of the first alarms.

592.    Within five minutes, the residents received an alert on the kibbutz's chat application that there was heavy gunfire at neighboring communities, and that they should remain in protected spaces until further notice.   Less than fifteen minutes later, Nir Oz was fully under attack.  Security cameras captured footage of Gaza Terrorist Group Defendant terrorists arriving to the kibbutz in vehicles and on foot, one of whom fired into the kibbutz's guard post. This group represented the first of at least seven groups of Gaza Terrorist Group Defendant terrorists who arrived "nearly simultaneously from different directions, armed to the teeth."

593.    Nir Oz's security team fought to repel the terrorists, but they were outnumbered by the terrorists who ultimately killed or took hostage the majority of the team.

594.    As at the other kibbutzim, the terrorists proceeded to go door to door, ruthlessly murdering and kidnapping Nir Oz residents, and looting and setting fire to their homes.

595.    The massacre at Nir Oz, committed by hundreds of terrorists, continued relentlessly for hours before the IDF finally cleared the kibbutz 11 hours after the attack began.

596.    Much of the attack was also captured on livestream video, as instructed in terrorist handbooks found on the bodies of attackers, which included step-by-step instructions on "how to take captives."  In some of these livestream videos, terrorists are seen demanding a dying father to give information about others in the kibbutz, in front of his partner and crying children, two of whom were taken hostage, while the third was murdered after being forced at gunpoint to coax additional neighbors from their homes.  The father's partner was also murdered.  Terrorists posted another graphic video of an elderly woman's murder on her own Facebook page, for her

friends and family to see.  Further video was taken by supposed "journalists," who accompanied the terrorists during the attack and recorded and reported on the atrocities as they occurred around them.

597.    In all, the terrorists murdered 40 people at Nir Oz, abducted 79 people ranging in age from 9 months to 85 years – including family members of certain Plaintiffs – and burned to the ground more than half of the kibbutz's homes.  Over a quarter of the population of Nir Oz was either murdered or taken hostage on October 7. People from Nir Oz accounted for nearly a third of the total number of hostages abducted to Gaza on October 7, and more than half of the child hostages.

598.    The following Plaintiffs are family members of those who were killed or injured at Kibbutz Nir Oz:

      a.     Jonathan Dekel-Chen, father of injured victims.

      b.     Ray Cooper, son of murdered victim and son of injured victim.

      c.     Ora Cooper, sister of murdered victim.

**10.    Attack at Ofakim**

599.    The small desert town of Ofakim, 17 miles east from the Israel-Gaza border, was the furthest into Israel that the Gaza Terrorist Group Defendant terrorists infiltrated. To get there, the terrorists advanced from Nir Oz on Route 241, passing and commandeering for a few hours part of the IDF base at Urim, located about halfway between Nir Oz and Ofakim. Once inside Ofakim by about 6:45 am, the terrorists wreaked havoc, shooting civilians in the street, in their homes, and in public shelters, where many, including Plaintiffs in this case, gathered to take shelter from the barrage of rockets pouring down on the town since 6:30 am that morning.

600.    With machine guns, grenades and RPGs, terrorists gunned down drivers of passing cars and went door to door, breaking and entering into homes.  For those who did not

have fortified safe rooms in their homes, as was the case for many in Ofakim's older dwellings, they ran to the closest public shelters, some only to be caught in the gunfire. Those who were able – local police officers, active-duty soldiers, reservists, security guards, those with their own firearms, even a local rabbi – went out into the streets to try to stave off the inflow of terrorists. The terrorists murdered more than 50 people, mostly civilians, as they tried to defend their community and their families and friends.

601.    Although it was under direct attack, both from the missiles above and terrorists on the ground, the Ofakim's ambulance station became a triage center for victims from the Nova Festival and the attacks at nearby kibbutzim. Ofakim's ambulances were some of the first to arrive on the scenes and rescue the injured. Scores of victims, including many with gunshot wounds, were treated in Ofakim.

602.    One Plaintiff, a 75-year-old volunteer with the national ambulance service, Magen David Adom, was called out at 7:00 am to his post at Ofakim only to come under gunfire from terrorists on Route 241. The bullet pierced the driver's door of his vehicle and just missed striking him. Once at his station, he was issued body armor to protect against shrapnel from both missiles and bullets and worked a 12-hour shift, picking up and treating the wounded on the roads – including many who he knew personally from his own kibbutz and surrounding communities. It is estimated that in just one of the ambulance stations, 150 wounded people were treated that day.

603.    The following Plaintiffs were injured at the October 7, 2023 terrorist attack at Ofakim and/or are family members of those who were injured at Ofakim:

    a.    David Gary Holtzer, injured victim and father of injured victim.

    b.    Noam Galit Edri, injured victim, daughter of injured victim, and mother of injured victim.

c.    Zionah Alexandra Winitzky, daughter of injured victim and sister of injured victim.

d.    Carmi Ruth Spiwack Holtzer, wife of injured victim and mother of injured victim.

e.    Ilan Yosef Holtzer, son of injured victim and brother of injured victim.

f.    Yonatan Mordechai Holtzer, son of injured victim and brother of injured victim.

g.    Lotan Raanan Holtzer, son of injured victim and brother of injured victim.

h.    Tirtza Elmaliach Waisberg, injured victim and sister of injured victims.

i.    Lev Waisberg, husband of injured victim.

j.    L.W., son of injured victim.

k.    N.W. daughter of injured victim.

**11.    Attack at Kibbutz Nahal Oz**

604.    Nahal Oz is a small kibbutz in the northwestern part of the Negev desert about one-half mile from Israel's border with Gaza surrounded by open fields.  A tight-knit community, on the eve of the Attack, the kibbutz had a growing population of approximately 480 residents. The families of Nahal Oz run a dairy farm, a chicken breeding farm, and crop-growing fields.

605.    On October 7, around 6:30 am, Nahal Oz's residents received alerts of rocket and mortar fire from nearby Gaza and instructions to go to their safe rooms.  Bomb shelters are typical in homes in the kibbutz and residents are used to rushing into them upon rocket fire from Gaza. Sadly, this has become a regular occurrence over the past two decades.

606.    But the attack that morning was different. Residents reported hearing gunfire in the kibbutz to which they were not accustomed.  They soon learned that at least twenty (and as many as one hundred) Gaza Terrorist Group Defendant terrorists had infiltrated the kibbutz to inflict as many casualties as possible on its residents.

607.    Just as they did in other nearby Gaza envelope communities, the terrorists walked house to house in search of residents to terrorize, torture, rape, murder and/or kidnap in their bloody rampage.

608.    The kibbutz's emergency response team sprung immediately into action to confront and try to repel the terrorists upon learning of the Attack.  The terrorists murdered the team's security coordinator, and husband of one Plaintiff.  Still, the small team bravely continued to resist dozens of heavily armed terrorists for as long as they were able before reinforcements arrived preventing an even worse massacre as experienced in other nearby communities.

609.    As the terrorists continued their attack on the kibbutz, terrorized families cowered in hiding, many for over 15 hours, with no electricity or water, trying to defend themselves and their families and to simply stay alive amidst the terror.

610.    After the attack finally ended, the horrors were revealed—the terrorists had murdered or kidnapped to Gaza more than 20 victims.  They attacked and damaged or destroyed dozens of homes, cars, and kibbutz farms and buildings.

611.    The following Plaintiffs were injured in the October 7 Attack at Nahal Oz, and/or are family members of those who were killed or injured at Nahal Oz:

     a.  Sharon Shoshana Fiorentino, injured victim, wife of injured victim, mother of injured victims, and sister of injured victim.

     b.  Ora Shtrull, mother of injured victims.

     c.  Izak Shtrull, father of injured victims.

     d.  Ofir Shtrull, brother of injured victims.

     e.  Natalie Shtrull, sister of injured victims.

     f.  Eleanor Shtrull, injured victim and sister of injured victim.

     g.  Lee Dekalo, wife of injured victim and mother of injured victims.

12.    **Attack at Sderot**

612.    Sderot is the geographically closest Israeli city to Gaza, located just over a half mile from the border.

613.    As a result of its close proximity to Gaza, Sderot has become a primary target of rockets fired by Hamas and other terrorist groups from Gaza into Israel over the past twenty years. For this reason, Sderot has been commonly referred to in the media as the "Bomb Shelter Capital of the World."

614.    In the early morning of October 7, under the cover of a relentless barrage of rockets and missiles fired from Gaza, close to 200 Gaza Terrorist Group Defendant terrorists infiltrated Sderot in much the same way as the terrorists ruthlessly attacked other Israeli border communities.

615.    Upon the invasion of the terrorists, the residents of Sderot soon received alerts and instructions from municipal authorities to lock their doors and windows and not to open their doors when knocked. But it was too late for many. Once the terrorists entered the city, they murdered civilians indiscriminately on the city's streets.

616.    One resident, who survived the ordeal by barricading her home and hiding inside with her children, was terrified by live fire outside her house and came to witness and understand the extreme danger to her and her family through videos that began to circulate of elderly city residents shot at point blank range at a nearby bus shelter. It was later learned that these 13 elderly residents were on their way to the Dead Sea for vacation and had pulled over near the bus station to fix a punctured tire.

617.    Other residents of Sderot, under attack by the terrorists, similarly ran to hide in the safe rooms of their homes and apartments, sheds, and other structures to protect themselves and loved ones. One Plaintiff hid with her then-seven-month-old daughter in her apartment's safe

room. She heard repeated gunshots from outside followed by loud booms and sirens, and felt the building shake from explosions. She received text messages from neighbors with videos of terrorists roaming Sderot's streets and shooting at her building and its balconies. She experienced fear, panic, and helplessness waiting for soldiers or the police to stop the relentless terrorist attack. She had to stay with her daughter in the safe room for two days.

618.    In addition to murdering Sderot residents on the streets, the terrorists quickly overran the Sderot's police station as well.  Early in the attack they deliberately destroyed the computer systems at the police station so as to delay any response to the attacks and maximize their ability to inflict casualties.

619.    After the terrorists barricaded themselves inside the police station, the site became the focus of fierce gun battles, which continued for 24 hours, after which the assailants eventually took control of the police station.  After two days, Israeli security forces were able to destroy the station, killing the terrorists inside, but not before the terrorists had killed 35 Israeli police officers and civilians there.

620.    In all, the terrorists murdered more than 50 residents of Sderot and others visiting the city at the time of the Attack. Dozens more were injured.

621.    The following Plaintiffs were injured in the October 7 Attack at Sderot, and/or are family members of those who were injured at Sderot:

   a.   Tomer Yehuda Maoz, injured victim, son of injured victims, and brother of injured victims.

   b.    Carmi Lisa Tint, injured victim.

   c.   Ami Estelle Tint, sister of injured victim.

   d.   Arin Lee Tint, sister of injured victim.

   e.   Noa Michelle Tint, sister of injured victim.

f.   Guy Alon Paul, injured victim.

g.   Lawrence Elliot Paul, father of injured victim.

**13.      Attack at and Near Kibbutz Nirim**

622.     Kibbutz Nirim ("Nirim") is a small agricultural community of just over 400 residents, located minutes away from Nir Oz and approximately one mile from the border with Gaza.

623.     On the morning of October 7, just hours after Nirim residents had joyously celebrated the anniversary of the kibbutz's founding, the community awoke to a horrifying barrage of rockets and three relentless waves of terror by some 150 terrorists.

624.     The first wave began at 6:29 a.m., when a massive barrage of rockets from Gaza blanketed the skies over Nirim and forced its residents to seek refuge in their safe rooms.

625.     Minutes later, at 6:33 a.m., Hamas terrorists violently breached the Gaza border fence, just across from Nirim. Tearing through the border fence near the IDF "White House post," over 80 Gaza Terrorist Group Defendant terrorists moved directly toward Nirim, armed with RPGs, automatic weapons, and grenades.

626.     At the White House post, two IDF tank crews and an armored personnel carrier tried to stave off the terrorists. Despite this desperate stand, one of the tanks was disabled by Hamas fire; several of its crew members were killed, and others were violently seized and dragged into Gaza.

627.     By 6:40 a.m., terrorists on motorcycles reached Nirim's fence and began to infiltrate the kibbutz. Although IDF soldiers managed to kill three of these terrorists before also being killed, by 7:10 a.m., the first wave of terrorists began murdering and kidnapping residents, and looting, vandalizing, and setting fire to homes.

628.    At the same time, other IDF troops who had been positioned just outside Nirim were responding to reports that Gaza Terrorist Group Defendant terrorists were attacking the White House post, where the terrorists abducted two living IDF soldiers to Gaza and murdered another.

629.    Because Hamas terrorists had set up ambushes to prevent reinforcements from reaching the Gaza envelope, troops that had been stationed around Nirim were redirected to other locations, leaving Nirim exposed to a second wave of dozens of terrorists that descended upon Nirim at about 8:20 a.m.

630.    The next hour marked the most brutal phase of the attack on Nirim, during which the terrorists relentlessly opened fire on residents' homes, hurled grenades, set homes and cars ablaze, and attacked, kidnapped, and murdered Nirim residents.

631.    Terrorized community members huddled in their safe rooms listening the sounds of machine gun fire, exploding grenades and RPGs, and Arabic yelling as terrorists roamed outside their homes, while they received messages and pleas for help from friends and family that terrorists were in their homes and trying to open their safe room doors. The brutality was relentless.

632.    At around 9:30 a.m., a third wave of terrorists entered Nirim and committed acts of sexual violence, and continued to loot, ransack, and burn homes.

633.    At 10:00 a.m., Nirim's local security team and armed civilians came together to defend the community from dozens of attacking terrorists on the ground and were eventually supported at 11:20 a.m. by an Israeli Air Force helicopter that opened fire on terrorists outside the kibbutz.

634.    The last terrorist inside Nirim was not killed until 2:00 p.m., and IDF troops continued to kill terrorists in the fields outside of Nirim through the next day.

635.    In all, the terrorists murdered five Nirim residents and took five Nirim residents hostage—all of whom are now deceased. In the area in and around Nirim, including at the White House post, the terrorists killed ten IDF soldiers, six of whom they then abducted to Gaza, along with two living soldiers—including a family member of certain Plaintiffs.

636.    The damage sustained at Nirim on October 7 was devastating, and many of the homes remain heavily damaged.

637.    The following Plaintiffs are family members of those who were killed or injured at Kibbutz Nirim:

        a.    Adi Alexander, father of injured victim.

        b.    Yael Alexander, mother of injured victim.

        c.    Mika Alexander, sister of injured victim.

        d.    R.A., brother of injured victim.

**14.    Attack at Kibbutz Urim**

638.    Founded in 1946 by Holocaust survivors, Kibbutz Urim ("Urim") is a small, tranquil community in the Gaza Envelope with a population of about 500 people. Located between Ofakim and Kibbutz Re'im (the site of the Nova Music Festival), Urim is about six miles east of the Gaza Strip.

639.    On October 7, Urim residents were awoken at 6:30 a.m. to the sounds of alert sirens, incoming rocket fire, and explosions.

640.    As the relentless rocket fire rained down, Urim residents huddled in communal bomb shelters began receiving messages that terrorists had infiltrated the area, followed by harrowing updates about the horror terrorists were unleashing in surrounding communities.

641.    In addition to the rockets that were shaking their homes, the terrified Urim residents could hear the sounds of gunfire outside as they received updates about members of their community being massacred.  One Plaintiff recalls rockets landings within 100 meters of his home in Urim.

642.    Survivors recall drafting farewell messages to their family members, unsure whether they would survive the onslaught.

643.    Terrified and in fear for their lives, Urim residents remained together in the bomb shelters for more than 24 hours.

644.    Miraculously, although terrorists had reached Urim and terrorized the residents therein, multiple terrorists were killed on the road leading in, and more were captured just outside its gates, preventing what could have been catastrophic loss of life.

645.    The following Plaintiffs were killed or injured in the October 7 Attack at Kibbutz Urim, or are family members of those who were killed or injured at Kibbutz Urim:

    a.   Noah Samuel Bradshaw, injured victim and husband of injured victim.

    b.   Flor Nofar Bradshaw, wife of injured victim.

**15.    Missile Attacks**

646.    Across the area of attacks, from the communities closest to the Gaza border to Ofakim, missiles were raining down.  Though missile attacks are not unusual in Israel, the sheer volume on October 7 was. In the first hour of the Attack, Gaza Terrorist Group Defendants launched 3,000 missiles into Israel, an onslaught intended to overwhelm Israel's missile defense system.  Missiles fell throughout the region, including on communities and on the roads, where defenseless and terrified civilians were under attack, killing many.  One Plaintiff who was racing home to his family after being warned of terrorists ahead by a group of injured and terrorized Bedouins, had to drive through the missile barrage, with missiles falling not more than one

hundred feet from his car. Other Plaintiffs were huddled in their safe room, fearing for their lives and their families' lives as they felt the explosion from a rocket that completely destroyed their neighbors' home, and that shredded the exterior of their home, blew out their windows, and left shrapnel strewn across their yard.

647.　The following Plaintiffs were injured by the October 7, 2023 terrorist attack in missile attacks and/or are family members of those who were killed or injured in missile attacks:

  a.　Ron Simchi, injured victim, husband of injured victim, and father of injured victim.

  b.　Tziona Malka Simchi, injured victim, wife of injured victim, and mother of injured victim.

  c.　M.S., injured victim and daughter of injured victims.

  d.　Ilan Yosef Holtzer, injured victim.

  e.　Zionah Alexandra Winitzky, sister of injured victim.

  f.　Carmi Ruth Spiwack Holtzer, mother of injured victim.

  g.　David Gary Holtzer, father of injured victim.

  h.　Noam Galit Edri, sister of injured victim.

  i.　Yonatan Mordechai Holtzer, brother of injured victim.

  j.　Lotan Raanan Holtzer, brother of injured victim.

  k.　Y.H., son of injured victim.

  l.　L.H., daughter of injured victim.

  m.　M.H., daughter of injured victim.

  n.　David Tuvial Bromberg, brother of injured victim.

  o.　Isaac Samuel Bromberg, father of injured victim.

  p.　Rachel Bromberg, mother of injured victim.

  q.　Elisheva Rena Bromberg, sister of injured victim.

  r.　Yehuda Aryeh Bromberg, brother of injured victim.

s.    Rivka Chaya Strauss, injured victim, wife of injured victim, and mother of injured victims.

t.    Yehuda Pesach Strauss, injured victim, husband of injured victim, and father of injured victims.

u.    L.S.S., injured victim, son of injured victims, and brother of injured victim.

v.    L.Y.S., injured victim, daughter of injured victims, and sister of injured victim.

w.    Stephanie Cheryl Strauss, mother of injured victim.

x.    Shlomo Akiva Strauss, brother of injured victim.

y.    Ezra Mordechai Strauss, brother of injured victim.

z.    Meira Batya Lerner, sister of injured victim.

## COUNT I

## 28 U.S.C. § 1605A(C), PRIVATE RIGHT OF ACTION

## AGAINST THE FSIA DEFENDANTS BY ALL U.S. NATIONAL PLAINTIFFS, EXCEPT FOR THE ATA-ONLY PLAINTIFFS[2]

648.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

---

[2] The "ATA-Only Plaintiffs" are not bringing FSIA-based claims in this complaint. The ATA-Only Plaintiffs are: the Estate of Daniel Ben Senior, the Estate of Perry Ben Senior, the Estate of Jacob Ben Senior, Shay Ben Senior, Aviram Abraham Bejerano, , the Estate of Adrienne Anne Neta, Nahar Neta, Ayana Neta, Dror Neta, Carmel Neta, Chen Zeigen, the Estate of Etai Cohen, Ortal Pnina Cohen, Ofek Hana Cohen, N.C., Juliana Sharoni, Luciana Ganach, E.S., Anita Schwadron Treger, Ray Cooper, Ora Cooper, Zionah Alexandra Holtzer, Carmi Ruth Spiwack Holtzer, David Gary Holtzer, Noam Galit Edri, Ilan Yosef Holtzer, Yonatan Mordechai Holtzer, Lotan Raanan Holtzer, Y.H., L.H., M.H., Tirtza Elmaliach Waisberg, Lev Waisberg, L.W., N.W., Naomi Faye Sanders, David Jacob Sanders, Hila Sanders, Rachel Esther Sanders, Yair Beller, Arnona Shapiro-Beller, Noam Menachem Beller, Isaac Beller, Yehuda Shmuel Beller, Hadassa Devorah Malka Beller Cohen, Ashira Beller, Hila Malka Bar-Or, Lior Yovel Bar-Or, Marc Leon Brawer, Zohar Tzlil Bar-Or, Matan Eliyahu Boltax, Jonathan Marshall Boltax, Arlyn Barrie Boltax, Eliora Yerushalaim Boltax, Amichai Yisrael Boltax, N.E.B., Naor Tzion Tzedek Boltax, David Tuvial Bromberg, Isaac Samuel Bromberg, Rachel Bromberg, Elisheva Rena Bromberg, Yehuda Aryeh Bromberg, Rivka Chaya Strauss, Yehuda Pesach Strauss, L.S.S.,

156

649.    A foreign state that is or was a state sponsor of terrorism is liable to U.S. nationals for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act, committed by its officials, employees, or agents while acting within the scope of their office, employment, or agency. The term "foreign state" includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state. 28 U.S.C. § 1603(a).

650.    On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

651.    Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

652.    The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political

---

L.Y.S., Stephanie Cheryl Strauss, Shlomo Akiva Strauss, Ezra Mordechai Strauss, Meira Batya Strauss, Gal Bukspan, David Englanoff, Samuel Englanoff, Mordechai Nissim Englanoff, Deborah Itzhak, Shlomo Englanoff, Liron Mazeh Gabay, Gil Gabay, Orel Gabay, Lior Gelbaum, Danielle Gelbaum, Gilad Karplus, Hadar Klein, Shay Klein, Yonat Klein, Nitai Klein, Eli Klein, Ori Levy, Nadir Levy, Carmel Medalia, Avishag Shilat Oved, Avivah Miriam Oved, A.O., Av.O., Aviv Oz, Nava Oz, Hadar Oz, Gal Porat, Maya Shaham, Stacy Marla Shaham, Oren Shaham, Aviv Shaham, Ofir Tal, Shelley Sharon Weisberger, Keith Stewart Weisberger, Itamar Yehuda Shapira, Amy Lauren Shapira, Yiftach Shapira, N.S., Sharon Shoshana Fiorentino, Ora Shtrull, Izak Shtrull, Ofir Shtrull, Natalie Shtrull, Eleanor Shtrull, Lee Dekalo, Tomer Yehuda Maoz, Carmi Lisa Tint, Ami Estelle Tint, Arin Lee Tint, Noa Michelle Tint, Guy Alon Paul, and Lawrence Elliot Paul.

subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28

U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

653.    On October 7, 2023, Syria and/or its agents, through the provision of material

support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully

and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent

human beings, including Plaintiffs.

654.    Syria and/or its agents were acting within the scope of their office, employment or

agency in committing the acts alleged herein, including providing material support and/or

resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

655.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in

28 U.S.C. § 1605A(a)(2)(A)(i).

656.    On October 7, 2023, North Korea and/or its agents, through the provision of

material support and/or resources to the perpetrators of the October 7 Attack as described herein,

willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against

innocent human beings, including Plaintiffs.

657.    North Korea and/or its agents were acting within the scope of their office,

employment or agency in committing the acts alleged herein, including providing material

support and/or resources to the perpetrators in connection with planning and carrying out the

October 7 Attack.

658.    The Democratic People's Republic of Korea was and is a state sponsor of

terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

659.    As a direct and proximate result of the willful, wrongful, intentional, and reckless

acts of Iran, the IRGC, Syria, North Korea and/or their agents in providing material support

and/or resources to the perpetrators of the October 7 Attack in connection with planning and carrying out the October 7 Attack , Plaintiffs suffered, *inter alia*, death, torture, hostage-taking, physical pain and suffering, mental anguish, emotional pain and suffering, loss of solatium or consortium, and/or economic losses.

660.    Pursuant to 28 U.S.C. § 1605A(c), those Plaintiffs who are each a U.S. national or the estate of a deceased U.S. national may assert a cause of action against Iran, the IRGC, Syria, and North Korea for personal injury or death caused by an act of extrajudicial killing, torture, or hostage-taking, or the provision of material support or resources for such an act.

661.    Accordingly, those Plaintiffs who are each a U.S. national or the estate of a deceased U.S. national are entitled to compensatory damages from the FSIA Defendants for the death or injuries resulting from the willful, wrongful, intentional, and reckless acts of the FSIA Defendants and/or their agents.

WHEREFORE, all Plaintiffs, who are each a U.S. national or the estate of a deceased U.S. national, except for the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

## COUNT II

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## AGAINST THE FSIA DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE ATA-ONLY PLAINTIFFS

662.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

663.     A party is liable for intentional infliction of emotional distress when it acts in a manner that is outrageous and purposely or recklessly causes emotional distress so severe that it could be expected to adversely affect mental health and the party's conduct does cause such distress.

664.     On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

665.     Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

666.     The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

667.     On October 7, 2023, Syria and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

668.     Syria and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

669.     The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

670.     On October 7, 2023, North Korea and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

671.     North Korea and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

672.     The Democratic People's Republic of Korea was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

673.     The willful, wrongful, reckless, and intentional acts of Iran, the IRGC, Syria, North Korea and/or their agents in providing material support and/or resources to the perpetrators of the October 7 Attack in connection with planning and carrying out the October 7 Attack constituted extreme and outrageous conduct on the part of Defendants and/or their agents.

674.     As a direct and proximate result of the extreme and outrageous conduct on the part of the FSIA Defendants and/or their agents, Plaintiffs suffered severe emotional distress, entitling them to compensatory damages.

675.     Pursuant to 28 U.S.C. § 1605A(c) and/or applicable state law, Plaintiffs may assert a cause of action against Iran, the IRGC, Syria, and North Korea for intentional infliction of emotional distress caused by an act of extrajudicial killing, torture, or hostage-taking, or the provision of material support or resources for such an act.

676.    Accordingly, Plaintiffs are entitled to compensatory damages from the FSIA Defendants for the severe emotional distress resulting from the willful, wrongful, intentional, and reckless acts of the FSIA Defendants and/or their agents.

WHEREFORE, all Plaintiffs, except for the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

### COUNT III

### WRONGFUL DEATH AND/OR SURVIVAL DAMAGES

### AGAINST THE FSIA DEFENDANTS BY ALL PLAINTIFFS KILLED AS A RESULT OF THE OCTOBER 7 ATTACK, EXCEPT FOR THE ATA-ONLY PLAINTIFFS

677.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

678.    A party is liable for wrongful death if it knowingly or recklessly causes the death of a person.

679.    On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

680.    Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

681.    The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

682.    On October 7, 2023, Syria and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

683.    Syria and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

684.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

685.    On October 7, 2023, North Korea and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

686.    North Korea and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

687.    The Democratic People's Republic of Korea was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

688.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Iran, the IRGC, Syria, and North Korea and/or their agents in providing material support and/or resources to the perpetrators of the October 7 Attack in connection with planning and carrying out the October 7 Attack, certain individuals, who are represented herein as Plaintiffs by their personal representatives, were fatally injured.

689.    Pursuant to 28 U.S.C. § 1605A(c) and/or applicable state law, all Plaintiffs who are personal representatives of individuals who were fatally injured may assert a cause of action against Iran, the IRGC, Syria, and North Korea for wrongful death caused by an act of extrajudicial killing, torture, or hostage-taking, or the provision of material support or resources for such an act.

690.    Accordingly, all Plaintiffs who are personal representatives of individuals who were fatally injured are entitled to compensatory damages from the FSIA Defendants for wrongful death and/or survival resulting from the willful, wrongful, intentional, and reckless acts of the FSIA Defendants and/or their agents.

WHEREFORE, all Plaintiffs who are personal representatives of individuals who were fatally injured as a result of the October 7 Attack, except for the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

## COUNT IV

## SOLATIUM AND/OR LOSS OF CONSORTIUM

## AGAINST THE FSIA DEFENDANTS BY ALL FAMILY MEMBER PLAINTIFFS, EXCEPT FOR THE ATA-ONLY PLAINTIFFS

691.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

692.    A party is liable for solatium and/or loss of consortium when its wrongful acts cause emotional pain and suffering, including due to the loss of, or impairment to, the intangible benefits of a relationship with another.

693.    On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

694.    Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

695.    The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

696.    On October 7, 2023, Syria and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully

and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

697.    Syria and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

698.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

699.    On October 7, 2023, North Korea and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

700.    North Korea and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

701.    The Democratic People's Republic of Korea was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

702.    As a direct and proximate result of the willful, wrongful, intentional and reckless acts of Iran, the IRGC, Syria, North Korea and/or their agents in providing material support and/or resources to the perpetrators of the October 7 Attack in connection with planning and carrying out the October 7 Attack, the Plaintiffs who are family members of individuals who were injured or killed in the October 7 Attack suffered extreme mental anguish, emotional pain

and suffering, and the loss of the society and companionship of the victims who were injured or killed.

703.    Pursuant to 28 U.S.C. § 1605A(c) and/or applicable state law, all Plaintiffs who are family members of individuals who were injured or killed in the October 7 Attack may assert a cause of action against Iran, the IRGC, Syria, and North Korea for loss of solatium and/or loss of consortium caused by an act of extrajudicial killing, torture, or hostage-taking, or the provision of material support or resources for such an act.

704.    Accordingly, all Plaintiffs who are family members of individuals who were injured or killed in the October 7 Attack are entitled to compensatory damages from the FSIA Defendants for solatium and/or loss of consortium resulting from the willful, wrongful, intentional, and reckless acts of the FSIA Defendants and/or their agents.

WHEREFORE, all Plaintiffs who are family members of individuals who were injured or killed in the October 7 Attack, aside from the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

## COUNT V

## AIDING AND ABETTING

## AGAINST THE FSIA DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE ATA-ONLY PLAINTIFFS

705.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

706.    A party is liable in tort for aiding and abetting when it participates in, assists, advises, or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission.

707.    On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

708.    Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

709.    The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

710.    On October 7, 2023, Syria and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

711.    Syria and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

712.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

713.    On October 7, 2023, North Korea and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

714.    North Korea and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators, in connection with planning and carrying out the October 7 Attack.

715.    The Democratic People's Republic of Korea was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

716.    Iran, the IRGC, Syria, North Korea, and/or their agents provided material support and/or resources to the perpetrators of the October 7 Attack in order to aid, abet, facilitate, and cause the commission of acts of international terrorism, extrajudicial killing, torture, hostage taking, personal injury, pain and suffering, and death, including the injuries to the Plaintiffs herein.

717.    Accordingly, the FSIA Defendants are liable to Plaintiffs for damages resulting from the acts alleged herein.

WHEREFORE, all Plaintiffs, except for the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

## COUNT VI

## CIVIL CONSPIRACY

## AGAINST THE FSIA DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE ATA-ONLY PLAINTIFFS

718.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

719.    A party is liable for civil conspiracy if there is an agreement between it and one or more other parties to commit an unlawful act that harms a third party and the conspiracy is related to an underlying civil wrong, such as a tort, and the agreement is acted on and causes damage.

720.    On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

721.    Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

722.    The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

723.    On October 7, 2023, Syria and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein,

willfully, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

724.    Syria and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

725.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

726.    On October 7, 2023, North Korea and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

727.    North Korea and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

728.    The Democratic People's Republic of Korea was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

729.    Iran, the IRGC, Syria, North Korea, and/or their agents knowingly, willfully, and/or recklessly conspired, agreed, and acted in concert with one or more of the other Defendants and/or their agents in a common plan designed to cause an act of international terrorism, extrajudicial killing, hostage taking, and personal injury. The agreement was acted upon and resulted in the injuries to the Plaintiffs herein.

730.    Accordingly, the FSIA Defendants are liable to Plaintiffs for damages resulting from the acts alleged herein.

WHEREFORE, all Plaintiffs, except for the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

## COUNT VII

## ASSAULT

## AGAINST THE FSIA DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE ATA-ONLY PLAINTIFFS

731.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

732.    A party is liable for assault if it engages in the intentional use of any kind of force, directly or indirectly, against a person's body, in any manner, without that person's consent; or in an attempt or threat, by act or gesture, to use force against a person's body, when the party making the attempt or threat can be reasonably assumed to have the intent or ability to carry out the attempt or threat.

733.    On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

734.    Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material

support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

735.    The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

736.    On October 7, 2023, Syria and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

737.    Syria and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

738.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

739.    On October 7, 2023, North Korea and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

740.    North Korea and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

741.    The Democratic People's Republic of Korea was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

742.    Iran, the IRGC, Syria, North Korea, and/or their agents aided, abetted, authorized, ratified, encouraged, rewarded, and/or participated in the acts of assault committed against the Plaintiffs during the October 7 Attack in which the Gaza Terrorist Group Defendants intentionally used force and threatened to use force against Plaintiffs without consent or legal justification.

743.    Accordingly, all Plaintiffs who were injured or killed in the October 7 Attack are entitled to recovery against the FSIA Defendants resulting from the acts alleged herein.

WHEREFORE, all Plaintiffs, except for the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

## COUNT VIII

## DIRECT LIABILITY

## AGAINST THE FSIA DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE ATA-ONLY PLAINTIFFS

744.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

745.    A party is directly liable for harm suffered by another if it commits a negligent, reckless, or intentional act that a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act that a reasonable and prudent person would have committed under the same circumstances, thereby causing damages to any person

(that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, was liable to be) injured by the act or omission.

746.    On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

747.    Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

748.    The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

749.    On October 7, 2023, Syria and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

750.    Syria and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

751.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

752.     On October 7, 2023, North Korea and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

753.     North Korea and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

754.     The Democratic People's Republic of Korea was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

755.     Iran, the IRGC, Syria, North Korea, and/or their agents intentionally, recklessly, and/or negligently provided funds, weapons, ammunition, military supplies, and training, among other material support and/or resources, to the perpetrators of the October 7 Attack.  Plaintiffs were foreseeably and intentionally harmed by Defendants' conduct.

756.     Accordingly, the FSIA Defendants are liable to Plaintiffs for damages resulting from the acts alleged herein.

WHEREFORE, all Plaintiffs, except for the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

## COUNT IX

## PUNITIVE DAMAGES

## AGAINST THE FSIA DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE ATA-ONLY PLAINTIFFS

757.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

758.    On October 7, 2023, Iran, the IRGC, and/or their agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

759.    Iran, the IRGC, and/or their agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

760.    The Islamic Republic of Iran was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i). The Islamic Revolutionary Guard Corps was and is a political subdivision or agency or instrumentality of the Islamic Republic of Iran as described in 28 U.S.C. § 1605A(a)(2)(A)(i) and 28 U.S.C. §§ 1603(a), (b).

761.    On October 7, 2023, Syria and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

762.    Syria and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

763.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

764.    On October 7, 2023, North Korea and/or its agents, through the provision of material support and/or resources to the perpetrators of the October 7 Attack as described herein, willfully and/or recklessly, violently, and forcefully caused the terrorist attack in Israel against innocent human beings, including Plaintiffs.

765.    North Korea and/or its agents were acting within the scope of their office, employment or agency in committing the acts alleged herein, including providing material support and/or resources to the perpetrators in connection with planning and carrying out the October 7 Attack.

766.    The Democratic People's Republic of Korea was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

767.    Pursuant to 28 U.S.C. § 1605A(c), the FSIA Defendants are liable to Plaintiffs for punitive damages resulting from the acts alleged herein.

WHEREFORE, all Plaintiffs, except for the ATA-Only Plaintiffs, demand that judgment be entered against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps, the Syrian Arab Republic, and the Democratic People's Republic of Korea in connection with the October 7 Attack.

## COUNT X

## ANTI-TERRORISM ACT, 18 U.S.C. § 2333

## AGAINST THE GAZA TERRORIST GROUP DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE FSIA-ONLY PLAINTIFFS[3]

768.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

769.    The Anti-Terrorism Act, 18 U.S.C. § 2333, allows a United States national "injured in his or her person, property, or business by reason of an act of international terrorism," or "his or her estate, survivors, or heirs," to sue in "any appropriate district court of the United States."

770.    Plaintiffs in this action are United States nationals or the heirs, survivors, and/or representatives of the estates of United States nationals.

771.    Plaintiffs in this action suffered harms within the meaning of the Anti-Terrorism Act, including death, injuries to their person, pain and suffering, extreme mental anguish, solatium, and/or economic losses, by reason of the acts of international terrorism committed by the Gaza Terrorist Group Defendants as described herein.

772.    The terrorist acts committed by the Gaza Terrorist Group Defendants in connection with the October 7 Attack were acts of international terrorism within the meaning of the Anti-Terrorism Act, and consisted of "violent acts or acts dangerous to human life" that would violate the criminal laws of the United States or of any State, or would be crimes if committed within the jurisdiction of the United States or of any State, were carried out for the purpose of terrorism, and occurred primarily outside the territorial jurisdiction of the United

---

[3] The "FSIA-Only Plaintiffs" are not bringing ATA-based claims in this complaint.  The FSIA-Only Plaintiffs are: Flor Nofar Bradshaw and Ofer Odles.

States and transcended national boundaries in terms of the means by which they were accomplished, within the meaning of 18 U.S.C. § 2331(1).

773.    The acts of international terrorism the Gaza Terrorist Group Defendants committed in connection with the October 7 Attack as set forth herein appeared to be intended, and were intended, to intimidate or coerce one or more civilian populations (including the civilian populations of the State of Israel and the United States); to influence the policy of one or more governments (including the governments of the State of Israel and the United States) by intimidation or coercion; and to affect the conduct of one or more governments (including the governments of the State of Israel and the United States), by mass destruction, assassination, and kidnapping, within the meaning of 18 U.S.C. § 2331.

774.    In committing the acts of international terrorism that comprised the October 7 Attack as described herein, the Gaza Terrorist Group Defendants acted intentionally, and with the knowledge and intent that their actions would cause death, injury, and extreme physical and emotional harm, and did proximately cause such death, injury, and harm, to all Plaintiffs herein.

775.    Accordingly, the Gaza Terrorist Group Defendants are jointly and severally liable under 18 U.S.C. § 2333 for all damages Plaintiffs have sustained as a result of the October 7 Attack.

WHEREFORE, all Plaintiffs, except for the FSIA-Only Plaintiffs, demand that judgment be entered against Defendants Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, the Democratic Front for Liberation of Palestine, the Al-Aqsa Martyrs Brigade, the Palestinian Mujahideen Movement, and the Popular Resistance Committees in connection with the October 7 Attack.

## COUNT XI

## HOMICIDE AND OTHER CRIMES LISTED IN 18 U.S.C. § 2339A(A) UNDER THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(A)

## AGAINST THE GAZA TERRORIST GROUP DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE FSIA-ONLY PLAINTIFFS

776. The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

777. The Anti-Terrorism Act, 18 U.S.C. § 2333, allows a United States national "injured in his or her person, property, or business by reason of an act of international terrorism," or "his or her estate, survivors, or heirs," to sue in "any appropriate district court of the United States."

778. Plaintiffs in this action are United States nationals or the heirs, survivors, and/or representatives of the estates of United States nationals.

779. Plaintiffs in this action suffered harms within the meaning of the Anti-Terrorism Act, including death, injuries to their person, pain and suffering, extreme mental anguish, solatium, and/or economic losses, by reason of the acts of international terrorism committed by the Gaza Terrorist Group Defendants as described herein.

780. The terrorist acts committed by the Gaza Terrorist Group Defendants in connection with the October 7 Attack were acts of international terrorism within the meaning of the Anti-Terrorism Act, and consisted of "violent acts or acts dangerous to human life" that would violate the criminal laws of the United States or of any State, or would be crimes if committed within the jurisdiction of the United States or of any State, including the prohibition on killing, or attempting or conspiring to kill, nationals of the United States as set forth in 18 U.S.C. § 2332, and other crimes, including those set forth in 18 U.S.C. §2339A.

781.    The acts of international terrorism the Gaza Terrorist Group Defendants committed in connection with the October 7 Attack as set forth herein were carried out for the purpose of terrorism, and occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of the means by which they were accomplished, within the meaning of 18 U.S.C. § 2331(1).

782.    The acts of international terrorism the Gaza Terrorist Group Defendants committed in connection with the October 7 Attack as set forth herein appeared to be intended, and were intended, to intimidate or coerce one or more civilian populations (including the civilian populations of the State of Israel and the United States); to influence the policy of one or more governments (including the governments of the State of Israel and the United States) by intimidation or coercion; and to affect the conduct of one or more governments (including the governments of the State of Israel and the United States), by mass destruction, assassination, and kidnapping, within the meaning of 18 U.S.C. § 2331.

783.    In committing the acts of international terrorism that comprised the October 7 Attack as described herein, the Gaza Terrorist Group Defendants acted intentionally, and with the knowledge and intent that their actions would cause death, injury, and extreme physical and emotional harm, and did proximately cause such death, injury, and harm, to all Plaintiffs herein.

784.    By attempting, committing, and conspiring to commit, acts of homicide as described in 18 U.S.C. § 2332, and other crimes described in 18 U.S.C. 2339A, or other acts that would violate the criminal laws of the United States or any State, or would be crimes if committed within the jurisdiction of the United States or any State, and committing overt acts in furtherance of such conspiracy, which resulted in injury or death to Plaintiffs and Plaintiffs'

survivors and heirs, the Gaza Terrorist Group Defendants are jointly and severally liable under 18 U.S.C. § 2333 for all damages Plaintiffs have sustained as a result of the October 7 Attack.

WHEREFORE, all Plaintiffs, except for the FSIA-Only Plaintiffs, demand that judgment be entered against Defendants Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, the Democratic Front for Liberation of Palestine, the Al-Aqsa Martyrs Brigade, the Palestinian Mujahideen Movement, and the Popular Resistance Committees in connection with the October 7 Attack.

## COUNT XII

### PROVIDING MATERIAL SUPPORT FOR ACTS OF TERRORISM, ANTI-TERRORISM ACT, 18 U.S.C. §§ 2333, 2339A, AND 2339B

### AGAINST THE TERRORIST GROUP DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE FSIA-ONLY PLAINTIFFS

785.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

786.    The Anti-Terrorism Act, 18 U.S.C. § 2333, allows a United States national "injured in his or her person, property, or business by reason of an act of international terrorism," or "his or her estate, survivors, or heirs," to sue in "any appropriate district court of the United States."

787.    Plaintiffs in this action are United States nationals or the heirs, survivors, and/or representatives of the estates of United States nationals.

788.    Plaintiffs in this action suffered harms within the meaning of the Anti-Terrorism Act, including death, injuries to their person, pain and suffering, extreme mental anguish, solatium, and/or economic losses, by reason of the acts of international terrorism committed by the Gaza Terrorist Group Defendants as described herein.

789.    Each of the Terrorist Group Defendants conspired to provide, and did provide, material support and/or resources to one or more of the Gaza Terrorist Group Defendants in connection with the October 7 Attack, knowing and intending that such material support and/or resources were to be used in preparation for, and in carrying out, the October 7 Attack, which violated 18 U.S.C. § 2332 and other crimes listed in 18 U.S.C. §2339A(a), and assisted in the preparation for, carrying out, and/or committing the acts of international terrorism described herein.

790.    Each of the Terrorist Group Defendants conspired to provide, and did provide, material support and/or resources to one or more of the Gaza Terrorist Group Defendants, knowing that one or more such organizations were a designated foreign terrorist organization, had engaged or was engaging in terrorist activity, and/or had engaged or was engaging in terrorism, as those terms are defined in 18 U.S.C. §2339B.

791.    The acts of international terrorism the Gaza Terrorist Group Defendants committed and the Terrorist Group Defendants materially supported in connection with the October 7 Attack as set forth herein were carried out for the purpose of terrorism, and occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of the means by which they were accomplished, within the meaning of 18 U.S.C. § 2331(1).

792.    The acts of international terrorism the Gaza Terrorist Group Defendants committed and the Terrorist Group Defendants materially supported in connection with the October 7 Attack as set forth herein appeared to be intended, and were intended, to intimidate or coerce one or more civilian populations (including the civilian populations of the State of Israel and the United States); to influence the policy of one or more governments (including the

governments of the State of Israel and the United States) by intimidation or coercion; and to affect the conduct of one or more governments (including the governments of the State of Israel and the United States), by mass destruction, assassination, and kidnapping, within the meaning of 18 U.S.C. § 2331.

793.    The acts of international terrorism that comprised the October 7 Attack as described herein and that the Terrorist Group Defendants materially supported were a substantial and proximate cause of, and foreseeably caused, Plaintiffs' injuries, and Plaintiffs' injuries fell within the risk contemplated by the Terrorist Group Defendants' material support to one or more of the Gaza Terrorist Group Defendants.

794.    The Terrorist Group Defendants' knowing provision of material support to one or more of the Gaza Terrorist Group Defendants as set forth herein constituted and involved acts dangerous to human life, and were intended to endanger human life.

795.    By providing material support and resources to terrorists and foreign terrorist organizations as described herein, and knowingly violating 18 U.S.C. §2339A and §2339B, the Terrorist Group Defendants are jointly and severally liable under 18 U.S.C. § 2333 for all damages Plaintiffs have sustained as a result of the October 7 Attack.

WHEREFORE, all Plaintiffs, except for the FSIA-Only Plaintiffs, demand that judgment be entered against Defendants Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, the Democratic Front for Liberation of Palestine, the Al-Aqsa Martyrs Brigade, the Palestinian Mujahideen Movement, the Popular Resistance Committees, and Hezbollah in connection with the October 7 Attack.

## COUNT XIII

## AIDING AND ABETTING, ANTI-TERRORISM ACT, 18 U.S.C. § 2333

## AGAINST THE TERRORIST GROUP DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE FSIA-ONLY PLAINTIFFS

796.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

797.    The Anti-Terrorism Act, 18 U.S.C. § 2333, allows a United States national "injured in his or her person, property, or business by reason of an act of international terrorism," or "his or her estate, survivors, or heirs," to sue in "any appropriate district court of the United States."

798.    Plaintiffs in this action are United States nationals or the heirs, survivors, and/or representatives of the estates of United States nationals.

799.    Plaintiffs in this action suffered harms as a result of acts of international terrorism, as defined by 18 U.S.C. § 2331 and as described herein.

800.    Defendants Hamas, PIJ, PFLP, AAMB, and Hezbollah were each an organization designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) as of the date of the October 7 Attack, as well as during the planning and authorization of the October 7 Attack, and each remains so designated today.

801.    Each of the Terrorist Group Defendants aided and abetted Hamas and one or more of the other designated Gaza Terrorist Group Defendants that committed the October 7 Attack, within the meaning of 18 U.S.C. § 2333(d), who were each persons within the meaning of 18 U.S.C. § 2333(d)(1), by knowingly providing substantial assistance to Hamas and such other Gaza Terrorist Group Defendants, as described herein, in the commission of the acts of international terrorism that comprised the October 7 Attack.

802.    The substantial assistance the Terrorist Group Defendants provided included financial support, weapons, training, planning, coordination, and active participation in the October 7 Attack, as well as other forms of substantial assistance as described herein.

803.    Plaintiffs' injuries resulted from, and were the natural, foreseeable, and intended consequences, of the Terrorist Group Defendants' substantial assistance to Hamas and one or more of the other designated Gaza Terrorist Group Defendants in connection with the October 7 Attack, as described herein.

804.    Accordingly, the Terrorist Group Defendants are jointly and severally liable under 18 U.S.C. § 2333(d)(2) for all damages Plaintiffs have sustained as a result of the October 7 Attack.

WHEREFORE, all Plaintiffs, except for the FSIA-Only Plaintiffs, demand that judgment be entered against Defendants Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, the Democratic Front for Liberation of Palestine, the Al-Aqsa Martyrs Brigade, the Palestinian Mujahideen Movement, the Popular Resistance Committees, and Hezbollah in connection with the October 7 Attack.

## COUNT XIV

## CONSPIRACY, ANTI-TERRORISM ACT, 18 U.S.C. §§ 2332(B), 2333

## AGAINST THE TERRORIST GROUP DEFENDANTS BY ALL PLAINTIFFS, EXCEPT FOR THE FSIA-ONLY PLAINTIFFS

805.    The allegations set forth in the preceding paragraphs are incorporated herein as if fully set forth herein.

806.    The Anti-Terrorism Act, 18 U.S.C. § 2333, allows a United States national "injured in his or her person, property, or business by reason of an act of international terrorism,"

or "his or her estate, survivors, or heirs," to sue in "any appropriate district court of the United States."

807.    Plaintiffs in this action are United States nationals or the heirs, survivors, and/or representatives of the estates of United States nationals.

808.    Plaintiffs in this action suffered harms as a result of acts of international terrorism, as defined by 18 U.S.C. § 2331 and as described herein.

809.    Defendants Hamas, PIJ, PFLP, AAMB, and Hezbollah were each an organization designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) as of the date of the October 7 Attack, as well as during the planning and authorization of the October 7 Attack, and each remains so designated today.

810.    The Terrorist Group Defendants conspired with the designated Gaza Terrorist Group Defendants who committed the October 7 Attack in connection with the acts of international terrorism described herein, including with respect to the murder, and attempted murder, of Plaintiffs herein, as well as the other acts of international terrorism described herein.

811.    Each of the Terrorist Group Defendants knew the aims and objectives of the conspiracy, agreed to the essence of those objectives, and performed overt acts intended to further those objectives.

812.    Each of the Terrorist Group Defendants committed overt acts in furtherance of the conspiracy that were a substantial and proximate cause of, and foreseeably caused, Plaintiffs' injuries.

813.    Accordingly, the Terrorist Group Defendants are jointly and severally liable under 18 U.S.C. § 2333 for all damages Plaintiffs have sustained as a result of the October 7 Attack.

WHEREFORE, all Plaintiffs, except for the FSIA-Only Plaintiffs, demand that judgment be entered against Defendants, Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, the Democratic Front for Liberation of Palestine, the Al-Aqsa Martyrs Brigade, the Palestinian Mujahideen Movement, the Popular Resistance Committees, and Hezbollah in connection with the October 7 Attack.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.      Grant Plaintiffs judgment in their favor against Defendants on Counts I through XIV; and

b.      Award Plaintiffs:

1.      Compensatory damages against all Defendants in the amount of no less than one billion dollars;

2.      Punitive damages against the FSIA Defendants in the amount of no less than three billion dollars;

3.      Treble damages against the Terrorist Group Defendants in the amount of no less than three billion dollars;

4.      Pre-judgment interest;

5.      Reasonable costs and expenses:

6.      Reasonable attorneys' fees; and

7.      Such other and further relief which the Court may determine to be just and equitable under the circumstances.

Dated: September 18, 2025

Respectfully submitted,

/s/ *Aryeh S. Portnoy*
Aryeh S. Portnoy, D.C. Bar No. 464507
John L. Murino, D.C. Bar No. 484818
Emily M. Alban, D.C. Bar No. 977035

CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 624-2500


/s/ *James Pasch*
James Pasch (OH #0086809) *(pro hac vice*
*application forthcoming)*

ANTI-DEFAMATION LEAGUE
605 Third Avenue
New York, NY 10158-3650
Tel: 212-885-5806
Email: jpasch@adl.org


*Attorneys for Plaintiffs*